## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF COLORADO

IN RE:                              )
                                    )
Brent Sanders Herron               )        Case No. 25-14392-KHT
                                    )        Chapter 11
                                    )
        Debtor.                     )

---

## MOTION FOR APPOINTMENT OF TRUSTEE

---

MidCountry Bank ("**MidCountry**") by and through its undersigned counsel, hereby moves this court for the appointment of a Chapter 11 Bankruptcy Trustee pursuant to 11 U.S.C. § 1104 and Bankruptcy Rule 2007.1 and in support thereof states as follows:

### <u>INTRODUCTION</u>

This bankruptcy case involves a dishonest debtor who has committed loan fraud against MidCountry, resulting in a judgment. The Chapter 11 case of Brent Sanders Herron ("**Debtor**"), a licensed physician who currently runs his own medical practice, was filed as part of a further effort by the Debtor to defy court orders, avoid the appointment of a receiver over his limited liability companies, and avoid creditors' claims and collection efforts through dishonesty.  As set forth in more detail below, Debtor's conduct requires the appointment of a Chapter 11 trustee for cause under section 1104(a) because the Debtor has demonstrated a clear inability to act in the best interest of creditors.  Instead the Debtor seeks only to further his own personal benefit at the expense of the bankruptcy estate.  MidCountry's claim against the Debtor arises in part from a judgment in the amount of $2,931,208.94 it received against the Debtor in Minnesota state court on October 15, 2025 (the "**Judgment**").  That Judgment supports this motion because the judgment

resulted from the Debtor's fraud in inducing MidCountry to lend him $24 million dollars to finance a commercial building owned by an entity Debtor created. In order to receive this loan, Debtor falsified the purchase price of the transaction, and further falsified his own financial information which was relied upon by MidCountry to assess the viability of the loan. After MidCountry obtained the multi-million dollar judgment, the Debtor continued to disregard court orders, obfuscate, move, and hide assets to thwart MidCountry's collection efforts.

The Debtor's conduct in obtaining the loan by, but not limited to, falsifying the purchase price of a property in a purchase agreement, providing materially false financial information to MidCountry to secure the loan, and willingly participating in a "seller carry" loan without disclosing such arrangement with MidCountry, shows that cause exists to appoint a Chapter 11 trustee and that such appointment is in the best interests of creditors. This Debtor cannot be trusted to honestly and responsibly manage the bankruptcy estate for the benefit of creditors during the pendency of this bankruptcy case. Appointing a Chapter 11 trustee is also in the clear best interest of creditors to ensure a fair and accurate process to maximize value for creditors and parties in interest.

## **FACTUAL BACKGROUND**

1.      On July 15, 2025, the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code.

2.      The Debtor is an individual Chapter 11 debtor.

3.      Freeport Elk River LLC (the "**Company**") and MidCountry entered into that certain Loan Agreement dated October 21, 2021 ("**Loan Agreement**") to finance the Company's acquisition of a retail center located at 19216 Freeport Street NW in Elk River, Minnesota. (Affidavit of Steve Meads ("**Meads Aff**."), Ex. A).

2

4.      In connection with the Loan Agreement, the Company executed and delivered to MidCountry that certain Real Estate Note dated October 21, 2021 ("**Note**"), in the original principal amount of $24,240,000. (Meads Aff., Ex. B).

5.      To guaranty the payment and performance of the Company's obligations to MidCountry, including, but not limited to, those under the Loan Agreement and Note, Debtor executed and delivered to MidCountry that certain Personal Guaranty dated October 21, 2021 ("**Guaranty**"), pursuant to which Debtor absolutely, and unconditionally guaranteed to MidCountry payment of the Note and other obligations of the Company to MidCountry. (Meads Aff., Ex. C).

6.      MidCountry disbursed the principal proceeds of the Loan in accordance with the terms and conditions of the Loan Documents in exchange for, among other things, Debtors' promises (i) to make monthly payments of principal and interest as required under the Loan Documents; (ii) to abide by the financial and operating covenants set forth in the Loan Documents; and (iii) that its representations and warranties contained in the Loan Documents were, and would remain, true. (Meads Aff., ¶ 8).

7.      MidCountry relied on Debtor's promises, covenants, representations and warranties reflected in the Guarantees when MidCountry agreed to issue the Note and extend the Loan. (Meads Aff., ¶ 9).

8.      Debtor defaulted and materially breached certain terms, conditions, and covenants of the Loan Documents, including, but not limited to, falsifying the purchase price of the Real Estate in a purchase agreement and providing materially untrue information to MidCountry in order to secure the Loan, in addition to failing to timely pay amounts due and owing to MidCountry under the Loan Documents.  (Meads Aff., ¶ 10).

9.    In the Loan Documents, Debtor warranted that the information furnished to MidCountry is true and correct, but Debtor falsified the purchase price of the real property in a purchase agreement to secure the Loan. (Meads Aff., ¶ 11).

10.    Debtor provided MidCountry with materially untrue financial information to falsify his financial position. (Meads Aff., ¶ 12).

11.    Additionally, Debtor falsely inflated his cash reserves on his Personal Financial Statement to make it appear that he had materially greater cash on hand than he actually had. (Meads Aff., ¶ 13).

12.    Specifically, Debtor accepted a wire in the amount of $9,500,000.00 from his co-conspirator, Matt Onofrio ("**Mr. Onofrio**"), to inflate Debtor's cash reserves and deceive MidCountry. The next day, Debtor then wired the money back to Mr. Onofrio. (Meads Aff., ¶ 14; Ex. D).

13.    Mr. Onofrio used this deceptive transfer to mislead MidCountry as to the amount of cash in Debtor's account and fraudulently induce MidCountry to provide the $24,240,000 loan. (Meads Aff., ¶ 16).

14.    On November 17, 2022, Mr. Onofrio was indicted in Federal District Court for the District of Minnesota on three counts of bank fraud (Case No. 22-CR-00322, and he ultimately pleaded guilty to one count of bank fraud. (Meads Aff., ¶ 17, Ex. E).

15.    Debtor knew that Mr. Onofrio falsified the appraisal of the retail center and was engaging in a "seller carry" note to finance the retail center without MidCountry's approval or knowledge. (Meads Aff., ¶ 19, Ex. F).

16.     On October 11, 2024, the Sherburne County District Court in Minnesota, in case No. 71-CV-24-752 entered an order ("**Order**")against Debtor, the Company, and Debtor's wife, Michelle Herron ("**Ms. Herron**[1]"). (Meads Aff., ¶ 21).

17.     The Order made several factual findings of fraud conducted by Debtor, including falsifying the purchase price of the retail center in a purchase agreement and providing materially untrue information, including financial information, to MidCountry in order to secure the loan, specifically it found:

a.  Borrower and Guarantors defaulted and materially breached certain terms, conditions, and covenants of the Loan Documents, including, but not limited to, falsifying the purchase price of the Real Estate in a purchase agreement and providing materially untrue information to Bank in order to secure the Loan, in addition to failing to timely pay amounts due and owing to Bank under the Loan Documents.

b.  In the Loan Documents, Borrower and Guarantors warrant that the information furnished to Bank are true and correct, but Defendants falsified the purchase price of the Real Estate in a purchase agreement to secure the Loan.

c.  Guarantors provided Bank with materially untrue financial information to falsify their financial position.

(Meads Aff., ¶ 22; Ex. G at ¶¶ 22, 24).

18.     The Order also directed judgment to be entered against Debtor, the Company, and Ms. Herron, jointly and severally, in the amount of $2,931,208.94. (Meads Aff., ¶ 23).

---

[1] On August 12, 2025, Ms. Herron filed her own separate Chapter 11 petition before this Court in Case No. 25-15060-KHT.

19.     On October 15, 2025, the Sherburne County District Court entered judgment in favor of MidCountry and against the Company, Debtor, and his wife, jointly and severally, in the amount of $2,931,208.94. (See Court Index #24-25).

20.     The judgment amount is the deficiency that remained on the loan after the retail center was sold and proceeds of the sale were applied to the loan balance. (Meads Aff., ¶ 25).

21.     On November 9, 2024, MidCountry docketed the Minnesota Judgment in Adams County, Colorado, Case Number 2024-CV-31629. (Affidavit of Richard D. Beller ("Beller Aff."), ¶ 3 & Exhibit H).

22.     A true and correct copy of the Order for Confirmation of Registration of Foreign Judgment is attached to the Beller Affidavit as **Exhibit H**.

23.     On December 29, 2024, the Adams County District Court entered Charging Orders (the "**Charging Orders**") against the Debtor's businesses, including Redwood Medical, LLC ("**Redwood**"), Simply Styled USA LLC ("**Simply Styled**") and Living Well Design USA, LLC ("**Living Well Design**"). (Beller Aff., ¶ 4 & Ex. I).

24.     True and correct copies of the Charging Orders are attached to the Beller Affidavit as **Exhibit I**.

25.     The Adams County District Court's Charging Order against Debtor's 100%-owned company, Redwood, required Redwood to take the following actions, including the delivery of all financial records over the past three years, and payment of Debtor's full distributive share from Redwood:

    a.   Required to pay to Plaintiff Debtor's full distributive share, whether or not Debtor normally draws his full share due.

    b.   Prohibited from making any loans to any person until the Judgment is fully

satisfied.

 c. Prohibited from acquiring any capital assets.

 d. Prohibited from selling or encumbering any property belonging to the limited partnership or limited liability company.

 e. Required to deliver all financial records from the past three years, including balance sheets, current accounting in electronic and paper form, tax returns, operating agreements, and books of account to Plaintiff's counsel.

(Beller Aff., ¶ 6 & Ex. I p. 2 ¶ 3.)

26. Debtor holds a 100% membership interest in Redwood, but has yet to pay the Bank a single dollar from Redwood, nor has he produced the required three years of financial records from Redwood, in clear disregard of the Adams County District Court's Charging Order. Debtor instead successfully thwarted and evaded the Court's Charging Order, and frustrated Plaintiff's collection of the Judgment and the court-ordered discovery. MidCountry also filed motions to compel and for sanctions due to the Judgment Debtor's failure to provide financial documents pursuant to the Charging Orders. (Beller Aff., ¶¶ 7-9.)

27. Debtor opposed MidCountry's motions to appoint a receiver. As part of that opposition, Debtor requested that the state court schedule a hearing on MidCountry's motions to appoint a receiver, stalled that hearing for months by claiming that Debtor was not available for the state court's available hearing dates until July 17, 2025, and then filed Debtor's Chapter 11 petition in this case on July 15, 2025, only three days before the scheduled July 18, 2025 hearing date on MidCountry's motions to appoint a receiver for Redwood, Simply Styled, and Living Well Design. Thus, this entire proceeding arises in large part as an attempt to avoid the appointment of a fiduciary over significant portions of Debtor's estate. (Beller Aff., ¶¶ 9-10.)

28.     MidCountry took the Debtor's deposition on February 3, 2025..  Debtor's false testimony at that deposition again confirm that Debtor cannot be trusted.  For example, Debtor testified that he had no continuing involvement with BBSC Endurance LLC:

> **Q· · ·What is BBSC Endurance?**
> A· · ·That is a business that I owned previously.
> **Q· · ·What kind of a business was that?**
> A· · ·It was a running triathlon event production company.
> **Q· · ·Is BBSC Endurance still in business?**
> A· · ·I believe so.
> **Q· · ·Did you sell it?**
> A· · ·Yes.
> **Q· · ·How much did you sell it for?**
> A· · ·I don't recall the exact number.
> **Q· · ·When did you sell it?**
> A· · ·I would be speculating.· It was around when my kids were born, and they're three and four.
> **Q· · ·Okay.· So is it fair to say that you sold BBSC, LLC roughly three to four years ago or ·before?**
> A· · ·Yeah.
> **Q· · ·Okay.· How much did you sell it for?**
> A· · ·I said I don't recall exactly.
> **Q· · ·Do you have any current interest in BBSC Endurance?**
> A· · ·No.
> **Q· · ·How much of BBSC Endurance did you own?**
> A· · ·100 percent.
> **Q· · ·Since you sold it, have you been involved in any way with BBSC Endurance?**
> A· · ·No.

Brent Herron Deposition at p. 27, line 10- p. 28, line 14 (February 3, 2025) (Beller Aff., ¶ 11 & **Ex. J**).

29.     Despite testifying that he had "no" current interest in BBSC Endurance at his deposition, in his bankruptcy petition Debtor now discloses that he sold BBSC Endurance in 2021 for $981,789.00 through an Installment Sale, through a "15 year owner financing loan."  Debtor's Schedule A/B ¶ 30, (Debtor's Petition at p. 22 of 46).  Debtor's Petition reveals that Debtor received gross income of $63,289 from BBSC in 2025 alone, with regular monthly payments of

$10,548.17 per month.  Debtor's Statement of Income ¶ 10 (ECF 5, at p. 2); Debtor's Statement of Financial Affairs ¶ 5 (ECF 1, at p. 9). Debtor also testified at his 341 Meeting of Creditor that he is receiving the monthly payments of approximately $10,500.00 from the sale of BBSC Endurance.  Incredibly, Debtor falsified his prior testimony to avoid collection.  Debtor also failed to reveal or include in his bankruptcy schedules a whole life insurance policy, which at the 341 Meeting of Creditors the Debtor did then note has a cash surrender value of approximately $80,000.00. (Beller Aff., ¶¶ 16-19 & Ex. L ¶ 43).

30.    Debtor further refused to provide a straightforward answer to simple questions regarding the payments he has been taking from Redwood since the Judgment was entered against him, and the Charging Order was entered against his medical practice, Redwood:

**Q…Do you own Redwood?**
A     From the basis of what I know to be an employee, I'm not an employee of anybody.
**Q     Okay.  Do you own 100 percent of Redwood?**
A     Yes.
**Q     What is the full name of Redwood?**
A     Redwood Medical, LLC.
**Q     Are you paid a regular wage at Redwood?**
A     No.
**Q     Do you take distributions?**
A     No.
**Q     Does Redwood pay you anything by any means?**
A     No.
MR. LEVY:  Objection to form, vague.
**Q     (By Mr. Beller)  Do you take profits from Redwood?**
A     No.
**Q     And are you paid a salary or wage?**
A     I think you just asked that.
MR. LEVY:  Objection, asked answered.
**Q     (By Mr. Beller)  Okay.  Do you get, in addition to your salary, any other benefits  fees, commissions, stock options, profit sharing contributions or bonuses from Redwood?**
A     No.
MR. LEVY:  Objection to form.
Give me a chance to object, please.

**Q     (By Mr. Beller)  Do you take profit sharing from Redwood?**

A     I thought you just asked that.

**Q     So you're saying you get zero income from Redwood?**

A     You're saying right now?

**Q     Since -- Since October 15, 2024, have you received any income from Redwood?**

MR. LEVY:  Objection to form.

A     To be honest, I really don't think so. Yeah, I . . .

**Q     (By Mr. Beller)  When was the last time Redwood paid you money?**

A     I would have to look.

**Q     Was it before October 15, 2024?**

MR. LEVY:  If you know, you can answer.

A     Was it before --

**Q     (By Mr. Beller)  Yes.**

A     -- or have I been paid since then?

**Q     Yeah.  Have you been paid since then by Redwood?**

MR. LEVY:  Objection, asked and answered.

A     I've -- Yes, I probably have at some point.  I'm not sure the last time I've been paid.  You said am I currently getting distributions, and I am not.

**Q     (By Mr. Beller)  How much did Redwood pay you by any means in 2024?**

A     Extremely variable.

**Q     I just mean total.**

A     I believe I gave you a profit and loss.

I don't know exactly what my distribution was.

**Q     Can you approximate?**

MR. LEVY:  Objection, calls for speculation.

A     I really can't, to be honest.

**Q     (By Mr. Beller)  How often do you take distributions from Redwood?**

A     Extremely variable.

**Q     When was the last time you took a distribution from Redwood?**

A     I think you already asked that.  I said I'm not sure.  Not recently.  We haven't had any actual money.

**Q     Since October 15, 2024, list all  sources of income you've received from anybody.**

MR. LEVY:  Objection to form.

THE DEPONENT:  So that means -- So you objected.  Does that mean I don't have to answer?

MR. LEVY:  No.  You have to answer. It's an objection to form.

Can we go off the record for a second?  Can I step outside with him for a second?

MR. BELLER:  Sure.  That's fine if you want to explain the objections, that's okay with me.

(Recess from 10:24 a.m. to 10:25 a.m.)

MR. BELLER:  Can you please read back the last question?

(Last question read.)

A     I don't recall.

MR. LEVY:  I'm going to object to form anyway on the question, but --  Yeah.  If you could define "income" better by maybe asking for  some examples.

**Q     (By Mr. Beller)  So here I'm using  "income" the way the IRS would use "income."  It's a defined term.  You have to put it on your tax return. Have you received any income from anybody in 2025 for month-ending 2025?**

A     I don't recall.  No, I don't think so.

**Q     Since October 15, 2024, have you received any income?**

MR. LEVY:  Objection to form.

I really don't think so

Brent Herron Deposition at p. 10, line 1- p. 14, line 7 (February 3, 2025) (attached as Exhibit J).

(Beller Aff., ¶ 20-21 & Exhibit J).

31.     Yet, despite Debtor's claim of not receiving any income since October 15, 2024 from his medical practice or two other LLCs, Debtor somehow paid three mortgage payments on: 1) his home at 2153 S. Dayton Street, Denver, Colorado 80231, with an estimated value of $1.35 million   (https://www.zillow.com/homedetails/2153-S-Dayton-St-Denver-CO-80231/13055189 _zpid/; 2) his home which Ms. Herron occupies at 10365 N. Julian Court, Westminster, CO 80023, with  an  estimated  value  of  $765,000  (https://www.zillow.com/homedetails/10365-Julian-Ct-Westminster-CO-80031/12977037_zpid/); and 3) Debtor's cabin at 23 Grand County Road 6121, Granby Colorado, with an estimated value of $751,200 (https://www.zillow.com/homedetails/23-Gcr-6121-Granby-CO-80446/2088773733_zpid/).

32.     Debtor also paid high monthly payments on a BMW I8, a Tesla Model X, and a 2022 Ford Bronco which are registered to him.  *See* Brent Herron Deposition at p. 50, line 9 – p. 53, line 14, and p. 56, line 19 – p. 57, line 21 (February 3, 2025) (Exhibit J to Beller Aff.).

33.     In his deposition, Debtor testified that he has no role with Living Well Design, and that he has received no money from it. (Beller Aff., ¶ 21 & Exhibit J at p. 24, line 4-18).

34.     In contrast, Debtor's wife testified that Debtor has withdrawn $25,000 and $4,000 from the Living Well Design bank account in 2025 alone, after the state court's Charging Order was entered, and that he has access to the company's funds.  *See* Michelle Herron Deposition at p.

16, line 3 – p. 18, line 24, and p. 114, line 4 – p. 116, line 8 (April 23, 2025) (attached as Exhibit K to Beller Aff.).

## ARGUMENT

A motion to appoint a trustee presents a single question to the court:  will this Debtor act as a faithful fiduciary for the creditors? "[E]xcessive improper misconduct, either prepetition or postpetition, may indicate that the DIP will be an unreliable representative of the estate." *In re Microwave Products of America, Inc.*, 102 B.R. 666, 672 (Bankr. W.D. Tenn. 1989).

The Court must appoint a Chapter 11 trustee here if cause is shown, including for fraud, dishonesty, incompetence, or gross mismanagement by the debtor either before or after the filing of the case, or for similar cause or if such appointment is in the best interests of creditors. 11 U.S.C. § 1104(a)(1)-(2); *see In re Okla. Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) (Once cause is found the Court has no discretion and must appoint a trustee.); *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 640 (Bankr. D. N.M. 2009) (appointment of a Chapter 11 trustee is mandatory when cause is found). Section 1104(a) states that "the court shall order the appointment of a trustee" (1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement . . ." or (2) "if such appointment is in the interests of the creditors . . . ." 11 U.S.C. § 1104(a). Here, Debtor's fraudulent conduct, false statements/dishonesty, refusal to comply with court orders, and movement of assets away from creditors require that the Court appoint a trustee under Section 1104(a) for cause—such appointment is also in the best interests of creditors.

Moreover, the list of enumerated "causes" under Section 1104(a) is not exhaustive, and a court may consider whatever relevant factual circumstances exist.  *In re Colorado-Ute Electric Ass'n, Inc.*, 120 B.R. 164, 174 (Bankr. D. Colo. 1990).  The creditors' right to seek the appointment of a trustee is an "important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co., Inc.*,

99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  It is a misconception that the need for a trustee must

be shown by 'clear and convincing' evidence; the statute and its legislative history provide no

support for that assertion.  *In re Colby Construction Corp.*, 51 B.R. 113, 116 n.2 (Bankr. S.D.N.Y.

1985).

Bankruptcy Code section 1104(a) states:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104 (Emphasis added).

In determining whether "cause" to appoint a trustee exists, courts must consider the

debtor's pre-petition conduct.  *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988);

*In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) (even if the debtor's

"postpetition financial practices have been exemplary . . . the prepetition conduct of debtor's

management may be the sole deciding factor"). The statute is mandatory and dictates that upon a

finding of cause, the court is required to appoint a Chapter 11 trustee. *In re Sillerman*, 605 B.R.

631, 642 (Bankr. S.D.N.Y. 2019).

In determining whether appointment of a trustee would be in creditors' interests under

section 1104(a)(2), courts consider (i) the trustworthiness of the debtor; (ii) the debtor's past and

present performance and future prospects for debtor's rehabilitation; (iii) the confidence or lack

thereof of the debtor's creditors; and (iv) the potential benefits of a trustee balanced against the

cost thereof. *In re Colorado-Ute Electric Ass'n, supra*, 120 B.R. at 176; *In re Plaza de Retiro, Inc.*, 417 B.R. at 641 (same) ("Another independent ground for appointing a trustee is either a perceived dishonesty or withholding of information or a debtor's inability to provide accurate records and reports."); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). The best interests test is less stringent than the "for cause" requirement because the court has broad discretion to appoint a trustee when it is in the best interests of the parties, without any showing of fraud, mismanagement, or other finding of fault or cause. *See  In re Ionosphere Clubs, Inc.*, 113 B.R. at 168. The discretionary nature of this test "involves to some extent weighing equities." *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 475 (3d Cir. 1998).

The facts of this case dictate that a Chapter 11 trustee must be appointed because the Debtor's prepetition conduct involved fraud in obtaining a loan from MidCountry, dishonesty in disclosure of assets, and the Debtor's participation with Mr. Onofrio in what ultimately resulted in Mr. Onofrio's indictment on three counts of bank fraud, and Mr. Onofrio's subsequent guilty plea. The Debtor cannot be trusted to administer the bankruptcy estate for the benefit of creditors when he lied on his personal financial statement and blatantly defrauded MidCountry in order to secure a $24,000,000.00 loan for his entity, which quickly went under. (Meads Aff., ¶¶ 12-14; Ex. D-E). Again, Debtor was in business with an individual who has pleaded guilty to criminal bank fraud. (Meads Aff., ¶ 17).  Even after judgment was entered against the Debtor and in favor of MidCountry, Debtor continued to lie under oath, deceive MidCountry, defy court orders to produce financials of his businesses, and remitted funds from his medical practice to pay his individual expenses. *See* Beller Aff. ¶¶ 5, 7-8, 11-22 & Exhs. J & K.  Debtor's dishonesty and fraudulent conduct are cause for appointment of a trustee.

Additionally, Debtor is a high earning physician with millions in assets, numerous vehicles and parcels of real property.  It is critical that a trustee be appointed to manage these assets, particularly when the Debtor has consistently tried to deceive creditors such as MidCountry.  The appointment of a trustee ensures that Debtor's assets (and any income that those assets are producing) are protected and included in the bankruptcy estate to benefit creditors and parties in interest.  The cost of appointing a trustee pales in comparison to the risk of permitting Debtor manage his assets unchecked and misuse bankruptcy estate resources to the detriment of creditors. The Court must appoint an independent trustee to manage Debtor's bankruptcy estate where cause exists because Debtor's fraud and dishonesty and because such appointment is in the best interests of creditors.

## **CONCLUSION**

Debtor's history of fraud and dishonesty has already shown, on numerous occasions, that he cannot be trusted in any financial or fiduciary capacity.  The Debtor's creditors should not be forced to rely on a dishonest fiduciary who has consistently acted only in his self-interest to the detriment of creditors.

MidCountry urgently requests that this Court enter an order appointing a Chapter 11 trustee in this case pursuant to 11 U.S.C. § 1104, and that the Court grant such other and further relief as the Court may deem necessary or appropriate.

Respectfully submitted this 19th day of August, 2025.

RINGENBERG & BELLER, P.C.

By: */s/ Richard D. Beller*
Richard D. Beller, Atty. Reg. No. 33791
RINGENBERG & BELLER, P.C.
125 S. Howes, Third Floor
Fort Collins, CO 80521
Tel. (970) 482-1056
E-mail: rdb@rb-legal.com

WINTHROP & WEINSTINE, P.A.

*/s/ Benjamin M. Podobinski*
Andrew J. Steil (#387048 - MN)
asteil@winthrop.com
William J. Schumacher (#0397267 - MN)
wschumacher@winthrop.com
Benjamin M. Podobinski (#0401054 - MN)
bpodobinski@winthrop.com
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 604-6400
Facsimile (612) 604-6800

**Attorneys for Creditor MidCountry Bank**

40133795v7

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**
**Honorable Kimberley H. Tyson**

In re:

Brent Sanders Herron,

Debtor.

Chapter 11
Case No. 25-14392-KHT

**AFFIDAVIT OF STEVE MEADS IN SUPPORT OF**
**MIDCOUNTRY BANK'S MOTION FOR APPOINTMENT OF TRUSTEE**

I, Steve Meads, state as follows:

1.     I am the President and Chief Executive Officer of Plaintiff MidCountry Bank ("**MidCountry**"). I have personal knowledge about certain facts related to the above-captioned case and the record-keeping practices of MidCountry. I make this affidavit in support of MidCountry's Motions for Appointment of a Chapter 11 Trustee based upon my personal knowledge and/or the business records that are kept in the ordinary course of business by MidCountry.

2.     Freeport Elk River LLC (the "**Company**") and MidCountry entered into that certain Loan Agreement dated October 21, 2021 ("**Loan Agreement**") to finance the Company's acquisition of a retail center located at 19216 Freeport Street NW in Elk River, Minnesota.

3.     A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A**.

4.     In connection with the Loan Agreement, the Company executed and delivered to MidCountry that certain Real Estate Note dated October 21, 2021 ("**Note**"), in the original principal amount of $24,240,000.

5.     A true and correct copy of the Note is attached hereto as **Exhibit B**.

6.      To guaranty the payment and performance of the Company's obligations to MidCountry, including, but not limited to, those under the Loan Agreement and Note, Mr. Herron executed and delivered to MidCountry that certain Personal Guaranty dated October 21, 2021 ("**Guaranty**"), pursuant to which Debtor Brent Herron ("**Debtor**") absolutely, and unconditionally guaranteed to MidCountry payment of the Note and other obligations of the Company to MidCountry.

7.      True and correct copies of the Guaranties are attached hereto as **<u>Exhibit C</u>**.

8.      MidCountry disbursed the principal proceeds of the Loan in accordance with the terms and conditions of the Loan Documents in exchange for, among other things, the Debtors' promises (i) to make monthly payments of principal and interest as required under the Loan Documents; (ii) to abide by the financial and operating covenants set forth in the Loan Documents; and (iii) that its representations and warranties contained in the Loan Documents were, and would remain, true.

9.      MidCountry relied on Debtor's promises, covenants, representations and warranties reflected in the Guaranty when MidCountry agreed to issue the Note and extend the Loan.

10.     Debtor defaulted and materially breached certain terms, conditions, and covenants of the Loan Documents, including, but not limited to, falsifying the purchase price of the Real Estate in a purchase agreement and providing materially untrue information to MidCountry in order to secure the Loan, in addition to failing to timely pay amounts due and owing to MidCountry under the Loan Documents.

11.     In the Loan Documents, Debtor warranted that the information furnished to MidCountry was true and correct, but Debtor falsified the purchase price of the real property in a purchase agreement to secure the Loan.

12.     Debtor provided the Bank with materially untrue financial information to falsify their financial position.

13.     Additionally, Debtor falsely inflated his cash reserves on his Personal Financial Statement to make it appear as though he had much greater cash on hand than he actually had.

14.     Specifically, Debtor accepted a wire in the amount of $9,500,000.00 from his conspirator, Matt Onofrio ("**Mr. Onofrio**") in order to inflate Debtor's cash reserves and deceive MidCountry.  Debtor then wired the money back to Mr. Onofrio the next day.

15.     Attached hereto as **Exhibit D** is a true and correct copy of Debtor;s falsified Personal Financial Statement that was provided to the Bank, along with correspondence between himself and Mr. Onofrio regarding the wire transfers.

16.     Mr. Onofrio used this deceptive transfer to mislead the Bank as to the amount of cash in Debtor's account.

17.     On November 17, 2022, Mr. Onofrio was indicted in Federal District Court for the District of Minnesota on three counts of bank fraud (Case No. 22-CR-00322, and he ultimately pleaded guilty to one count of bank fraud).

18.     A true and correct copy of an email from Mr. Onofrio to MidCountry dated September 10, 2021, the day after the $9,500,000.00 transfer is attached hereto as **Exhibit E**.

19.     Debtor had knowledge that Mr. Onofrio falsified the appraisal of the retail center and was engaging in a "seller carry" note to finance the retail center without MidCountry's approval or knowledge.

20.     A true and correct copy of email correspondence from Debtor to Mr. Onofrio dated December 1, 2021 is attached hereto as **Exhibit F**.

21.     On October 11, 2024, the Sherburne County District Court in Minnesota, in case No. 71-CV-24-752 entered an Order against Debtor, the Company, and Debtor's wife, Michelle Herron ("Ms. Herron") (the "**Order**").

22.     The Order made several factual findings of fraud conducted by Debtor, including falsifying the purchase price of the retail center in a purchase agreement and providing materially untrue information, including financial information, to MidCountry in order to secure the loan, specifically it found:

a.  Borrower and Guarantors have defaulted and materially breached certain terms, conditions, and covenants of the Loan Documents, including, but not limited to, falsifying the purchase price of the Real Estate in a purchase agreement and providing materially untrue information to Bank in order to secure the Loan, in addition to failing to timely pay amounts due and owing to Bank under the Loan Documents.

b.  In the Loan Documents, Borrower and Guarantors warrant that the information furnished to Bank are true and correct, but Defendants falsified the purchase price of the Real Estate in a purchase agreement to secure the Loan.

c.  Guarantors provided Bank with materially untrue financial information to falsify their financial position.

23.     The Order also directed judgment to be entered against Debtor, the Company, and Ms. Herron, jointly and severally, in the amount of $2,931,208.94.

24.     A true and correct copy of the Order is attached hereto as **Exhibit G**.

25.     The judgment amount is the deficiency that remained on the loan after the retail center was sold and proceeds of the sale were applied to the loan balance.

I declare under penalty of perjury of the laws of the state of Colorado that the foregoing is true and correct.

Dated this *18* day of August 2025.

/s/

Steve Meads
President and Chief Executive Officer

STATE OF MINNESOTA          )
                            ) ss.
COUNTY OF HENNEPIN          )

Subscribed and sworn to before on this *18* day of August 2025, by Steve Meads.

Dan D Weninger
Notary Public
Minnesota
My Commission Expires January 31, 2029

Notary Public
My Commission Expires: *1 - 31 - 2029*

40310068v1

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page22 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page21 of 71

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement"), is made as of the 21st day of October, 2021, by and between FREEPORT ELK RIVER LLC, a Minnesota limited liability company (the "Borrower"), and MIDCOUNTRY BANK, a federal savings bank organized under the laws of the United States of America (the "Lender").

### W I T N E S S E T H :

WHEREAS, the Borrower has requested the Lender to extend a real estate loan in the original principal amount of Twenty Four Million Two Hundred Forty Thousand and 00/100 Dollars ($24,240,000.00) to finance the Borrower's acquisition of a retail center located at 19216 Freeport Street NW in Elk River, Minnesota and generally described as the Elk River Center (the "Project"); and

WHEREAS, the Lender is willing and prepared to extend such a real estate loan to the Borrower upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  REAL ESTATE LOAN.  The Lender hereby agrees to make a real estate loan to the Borrower in the original principal amount of Twenty Four Million Two Hundred Forty Thousand and 00/100 Dollars ($24,240,000.00) (the "Loan").  A portion of the Loan in the principal amount of Nine Hundred Thousand and 00/100 Dollars ($900,000.00) (the "Escrow Funds") has been funded into a blocked account the Lender (the "Escrow Account").  The Lender shall make advances of the Escrow Funds (each an "Advance") to or for the benefit of the Borrower to finance or reimburse Borrower for tenant improvements and capital improvements to the Project as well as operating expenses and debt service for the Project (each an "Approved Use").  Advances shall be made by the Lender to the Borrower no more than one (1) time per calendar month, (a) only if no Event of Default, or event which with the giving of notice or the passage of time or both would constitute an Event of Default, has occurred and is then continuing, and then (b) only upon receipt by the Lender of (a) all applicable invoices for the construction and installation of the tenant improvements or capital improvements, in the event the Borrower is seeking payment directly to the parties identified in such invoices, and, in the event the Borrower is seeking reimbursement for amounts paid with respect to such invoices, copies of duly executed lien waivers from the parties paid by the Borrower pursuant to all prior payment requests, (c) approval by the Lender of the tenant improvements, capital improvements or leasing commissions for which payment is sought, (d) receipt and approval by the Lender of each Lease related thereto, and (e) approval by the Lender of the condition of title to the Project including, without limitation, tract searches if requested by the Lender (which costs shall be paid by the Borrower).  Each request for an Advance shall be submitted by the Borrower in writing in the form attached hereto as Exhibit A at least ten (10) days prior to the date of the requested Advance.  On a monthly basis, within 3 days after the end of each calendar

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page23 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page2 of 71

month for the immediately preceding calendar month, the Borrower shall deposit into the Escrow Account an amount equal to $1/6^{th}$ of the difference between the sum of $900,000 and the balance of the Escrow Account as of the end of such preceding calendar month to replenish the Escrow Funds (*i.e.*, such that the amount in the Escrow Account is equal to $900,000). In addition, from and at all times after January 1, 2025 (until such time as the Material Conditions have been achieved), the Borrower must have a minimum balance of $900,000 in the Escrow Account. The failure of the Borrower to comply with the foregoing shall constitute an Event of Default and the Lender shall be entitled to exercise all of its rights and remedies as a result of the Event of Default. The Borrower shall be entitled to any remaining Escrow Funds upon satisfaction of all of the following conditions (the "Material Conditions"): (i) evidence acceptable to the Lender of the extension of the Anchor Lease (as defined herein) on terms and conditions acceptable to the Lender which shall include, without limitation, a minimum term of five (5) additional years (*i.e.*, until at least June 30, 3031) at a minimum annual rental rate no less than the in-place rental rate, (ii) evidence acceptable to the Lender of the commencement of the extended lease term for the Anchor Lease with the Anchor Tenant in occupancy and paying rent, (iii) evidence acceptable to the Lender of an overall occupancy level of 90% of the Project and (iv) a Debt Service Coverage Ratio (as defined herein) of greater than 1.20 to 1.00 based on in-place Leases. As used herein, "Anchor Lease" means each Shopping Center Lease Agreement dated as of October 10, 1995, by and between the Borrower, as successor-in-interest to the prior landlord thereunder, and Jerry's Enterprises, Inc. (the "Anchor Tenant"). The Borrower hereby grants to the Lender a first priority security interest in and to the Escrow Account, the Escrow Funds and all products and proceeds of the foregoing to secure repayment of the Note.

2.   <u>REAL ESTATE NOTE</u>.  The obligation of the Borrower to repay the Loan is evidenced by that certain Real Estate Note of even date herewith executed by the Borrower in the original principal amount of Twenty Four Million Two Hundred Forty Thousand and 00/100 Dollars ($24,240,000.00) and payable to the order of the Lender (the "Note").

3.   <u>MORTGAGE</u>.  As a condition precedent to the making by the Lender of the Loan, the Borrower has executed and delivered to the Lender that certain Mortgage, Security Agreement, Fixture Financing Statement and Assignment of Leases and Rents of even date herewith (the "Mortgage"), pursuant to which the Borrower has granted to the Lender a first mortgage lien and first security interest in and to, and a first assignment of leases and rents with respect to, the Project to secure repayment of the Note.

4.   <u>GUARANTIES</u>.  Also as a condition precedent to the making by the Lender of the Loan, Brent Herron and Michelle Herron (each a "Guarantor," and collectively, the "Guarantors"), have executed and delivered to the Lender those certain Personal Guaranties each of even date herewith (each a "Guaranty," and collectively, the "Guaranties"), pursuant to which the Guarantors have jointly and severally, absolutely and unconditionally guaranteed to the Lender payment of the Note and the other obligations of the Borrower to the Lender.

5.   <u>ENVIRONMENTAL INDEMNITY AGREEMENT</u>.  Also as a condition precedent to the making by the Lender of the Loan, the Borrower and each Guarantor have executed

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page24 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page3 of 71

and delivered to the Lender that certain Environmental Indemnity Agreement of even date herewith (the "Indemnity").

6.     <u>TITLE INSURANCE</u>.  Also as a condition precedent to the making by the Lender of the Loan, the Lender shall have received a title insurance policy issued by a title insurance company approved by the Lender with respect to the Project in form and content acceptable to the Lender (a proforma policy or marked-up title commitment shall satisfy this condition).

7.     <u>OTHER CONDITIONS PRECEDENT</u>.  Also as a condition precedent to the making by the Lender of the Loan, the Lender shall have received all of the following, each in form and substance satisfactory to the Lender:

A.     Current searches of appropriate filing offices showing that (i) no state or federal tax liens have been filed and remain in effect against the Borrower, (ii) no financing statements have been filed and remain in effect against the Borrower or covering the Project except those financing statements relating to liens held by persons who have agreed in writing that upon receipt of proceeds of the Note, they will deliver UCC releases and/or terminations satisfactory to the Lender, and (iii) the Lender has duly filed all financing statements necessary to perfect the security interest granted to the Lender pursuant to the Mortgage, to the extent the security interest is capable of being perfected by filing.

B.     Copies of: (i) the resolutions or written action of the Borrower's members or board of governors authorizing the execution, delivery and performance of the Borrower Documents (as defined herein), (ii) the Articles of Organization and Operating Agreement of the Borrower, and (iii) the signatures of the Borrower's managers authorized to execute and deliver the Borrower Documents and other instruments, agreements and certificates on the Borrower's behalf.

C.     A current Certificate of Good Standing or similar registration certificate issued by the Secretary of State of the State of Minnesota with respect to the Borrower.

D.     Copies of the lease agreements (each a "Lease") between the Borrower, as landlord, and each tenant of the Project (each a "Tenant"); as of the date hereof, the existing Leases and Tenants are identified on the current certified rent roll attached hereto as <u>Exhibit B</u>.

E.     A subordination, non-disturbance and attornment agreement and an estoppel certificate (collectively, an "SNDA") from each Tenant.

F.     The establishment of the operating account for the Project at the Lender.

G.     Certificates of the insurance required under the Mortgage.

H.     An ALTA survey covering the Project, properly certified to the Lender.

I.     A Phase I Environmental Site Assessment covering the Project.

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page25 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page4 of 71

J.   An appraisal for the Project showing a maximum loan-to-value percentage of eighty percent (80%).

K.   A zoning letter covering the Project and addressed to the Lender.

L.   A current certified rent roll for the Project.

M.   A copy of the property management agreement and leasing agreement for the Project (collectively, the "Management Agreement"), together with an assignment and subordination of the Management Agreement in favor of the Lender (the "Management Agreement Subordination")

N.   Payment of a fully earned, non-refundable loan origination fee in the amount of $60,600.

O.   Payment of all expenses incurred by the Lender through such date and required to be paid by the Borrower under Section 12.B. hereof, including all legal expenses incurred through the date of this Agreement.

P.   An opinion of Borrower's and Guarantors' counsel addressed to the Lender.

Q.   Such other documents as the Lender may require in connection with the Loan.

8.   <u>REPRESENTATIONS</u>.  In order to induce the Lender to make the Loan, the Borrower hereby warrants and represents to the Lender as follows:

A.   <u>Borrower Existence and Power</u>.  The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Minnesota, and has all requisite power and authority to carry on its business as now conducted and as presently proposed to be conducted.

B.   <u>Authority of Borrower</u>.  The Borrower has full power and authority to execute and deliver this Agreement, the Note, the Mortgage, the SNDAs, the Management Agreement Subordination and the Indemnity, along with all other documents and agreements to be executed in connection herewith by the Borrower (collectively, the "Borrower Documents") and to incur and perform its obligations hereunder and thereunder; the execution, delivery and performance by the Borrower of the Borrower Documents will not violate any provision of the organizational documents of the Borrower or of any law, rule, regulation or court order or result in the breach of, constitute a default under, or create or give rise to any lien under, any indenture or other agreement or instrument to which the Borrower is a party or by which the Borrower or its property may be bound or affected.

C.   <u>Enforceability Against the Borrower</u>.   Each of the Borrower Documents constitutes the legal, valid and binding obligation of the Borrower enforceable in accordance with its terms (subject, as to enforceability, to limitations resulting from bankruptcy, insolvency and other similar laws affecting creditors' rights generally).

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page26 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page5 of 71

D. <u>Financial Condition</u>.   The financial statements of the Borrower and each Guarantor heretofore furnished to the Lender are complete and correct in all material respects and fairly present the respective financial condition of the Borrower and each Guarantor at the dates of such statements.   Since the most recent set of financial statements delivered by the Borrower to the Lender, there have been no material adverse changes in the financial condition of the Borrower or either Guarantor.

E. <u>Litigation</u>.   There is no action, suit or proceeding pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower, either Guarantor, the Project or any other properties or assets of the Borrower or either Guarantor which, if adversely determined, would have a material adverse effect on the condition (financial or otherwise), of the business, properties or assets of the Borrower or either Guarantor or which would question the validity of the Borrower Documents, the Guaranties or any instrument, document or other agreement related hereto or required hereby (collectively, the "Loan Documents"), or impair the ability of the Borrower or either Guarantor to perform its, his or her obligations under the foregoing agreements.

F. <u>Licenses</u>.   The Borrower possesses adequate licenses, permits, franchises, patents, copyrights, trademarks and trade names, or rights thereto, to conduct its business substantially as now conducted and as presently proposed to be conducted.

G. <u>Default</u>.   Neither the Borrower nor either Guarantor is in default of a material provision under any agreement, instrument, decree or order to which it, he or she is a party or by which it, he or she or its, his or her property is bound or affected.

H. <u>Consents</u>.   No consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any governmental authority or any third party is required in connection with the execution and delivery of the Loan Documents or any of the agreements or instruments herein mentioned relating to the Loan to which the Borrower or either Guarantor is a party or the carrying out or performance of any of the transactions required or contemplated hereby or thereby or, if required, such consent, approval, order or authorization has been obtained or such registration, declaration or filing has been accomplished or such notice has been given prior to the date hereof.

I. <u>Taxes</u>.   The Borrower and each Guarantor have filed all tax returns required to be filed and either paid all taxes shown thereon to be due, including interest and penalties, which are not being contested in good faith and by appropriate proceedings, or provided adequate reserves for payment thereof, and the Borrower has no information or knowledge of any objections to or claims for additional taxes in respect of federal income or excess profits tax returns for prior years.

J. <u>Titles, Etc</u>.   The Borrower has good title to the Project, free and clear of all mortgages, liens and encumbrances, except the Permitted Exceptions (as defined

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT    Doc#:44    Filed:08/19/25    Entered:08/20/25 10:34:47    Page27 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT    Doc#:41-2    Filed:08/19/25    Entered:08/19/25 12:41:03    Page6 of 71

in the Mortgage).  The Mortgage constitutes a valid and perfected first mortgage lien on the Project.

K.    <u>Judgments</u>.  There are no judgments outstanding or docketed against the Borrower or either Guarantor.

L.    <u>Management Agreement</u>.  The Management Agreement is in full force and effect and neither the Borrower nor the property manager nor the leasing agent is in default thereunder.

M.    <u>Leases</u>.  Each of the existing Leases between the Borrower and each Tenant is in full force and effect and, except as otherwise disclosed to the Lender in writing, neither the Borrower nor any Tenant is in default thereunder.  <u>Exhibit B</u> shall be updated automatically upon delivery of the required rent roll under Section 9.A.(i.) hereof.

9.    <u>COVENANTS OF THE BORROWER</u>.  On and after the date hereof and until the payment in full of the Note, and the performance of all other obligations of the Borrower hereunder, the Borrower agrees that, unless the Lender shall otherwise consent in writing:

A.    <u>Financial Statements</u>.  The Borrower shall deliver or cause to be delivered to the Lender the following:

i)    as soon as available and in any event within thirty (30) days  after the end of each calendar quarter, a current operating statement and a certified rent roll for the Project;

ii)    as soon as available and in any event within thirteen (13) months after each annual personal financial statement is provided to the Lender, a current annual personal financial statement of each Guarantor, which shall include a statement of cash flow and contingent liabilities, certified as true and correct by each Guarantor and in form and detail acceptable to the Lender;

iii)    as soon as available and in any event within fifteen (15) days of the filing thereof, copies of the federal tax returns for the Borrower and each Guarantor, together with all schedules, statements and amendments thereto, for each year during the term of the Note; and

iv)    from time to time, such further information regarding the business, operations, affairs, financial and other condition of the Project, the Anchor Tenant, the property manager, the leasing agent and of the Borrower and each Guarantor and any of their respective properties as the Lender may reasonably request.

B.    <u>Taxes and Claims</u>.  The Borrower shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits,

EXHIBIT A

71-CV-24-752

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page28 of 134

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page7 of 71

or upon any of its assets or properties, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a lien or charge upon the Project or other assets of the Borrower.

C.   <u>Insurance</u>.  The Borrower shall maintain insurance coverage with respect to the Project as required by the Mortgage.

D.   <u>Maintenance of Existence; Conduct of Business</u>.  The Borrower shall preserve all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business; conduct its business in an orderly, efficient and regular manner; and shall not liquidate, merge, dissolve, suspend operations, or sell all or substantially all of its assets.  The Borrower shall maintain executive personnel and management at a level of experience and ability equivalent to present executive personnel and management (including the continuing involvement of the property manager under the Management Agreement in day to day management of the Project).

E.   <u>Maintenance of Properties</u>.  The Borrower shall keep all of its assets and properties in good working order and condition, ordinary wear and tear and casualty losses excepted.

F.   <u>Compliance with Applicable Laws</u>.  The Borrower shall comply with the requirements of all applicable state and federal laws, and of all rules, regulations and orders of any governmental or other authority or agency, a breach of which would materially and adversely affect its business or credit, except where contested in good faith and by proper proceedings.

G.   <u>Litigation</u>.  The Borrower shall promptly give to the Lender notice in writing of all litigation and of all proceedings by or before any court or governmental or regulatory agency affecting the Borrower or either Guarantor.

H.   <u>Liens</u>.  The Borrower shall not create, assume, incur or suffer to exist any assignment, mortgage, pledge, security interest, lien, charge or other encumbrance whatsoever upon its interest in the Project, securing any indebtedness or obligation.

I.   <u>Access to Books and Inspection</u>.  The Borrower shall at all times keep proper books of record and accounts for itself, and, upon request of the Lender, the Borrower shall provide any duly authorized representative of the Lender access during normal business hours to, and permit such representative to examine, copy or make extracts from, any and all books, records and documents in the Borrower's possession or control relating to its affairs, and to inspect any of its facilities and properties.

J.   <u>Access</u>.  The Borrower shall grant to the Lender's agents access to the Project at any reasonable time upon reasonable notice in order to inspect the Borrower's property and business.

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page29 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page8 of 71

K.   <u>Transfer of Collateral</u>.  The Borrower shall not sell, dispose of, lease (other than customary market-rate Leases, each a "Permitted Lease"), mortgage, assign, sublet or transfer any of its right, title or interest in or to the Project without the prior written consent of the Lender.

L.   <u>Other Defaults</u>.  The Borrower will not permit any material breach or default or event of default to occur under any note, loan agreement, indenture, lease, mortgage, contract for deed, security agreement or other contractual obligation binding upon the Borrower.

M.   <u>Debt Service Coverage Ratio</u>.  The Borrower shall cause the Project to achieve a Debt Service Coverage Ratio of at least 1.20 to 1.00 at all times.  As used herein, "Debt Service Coverage Ratio" means, for any measurement date (and the Borrower acknowledges and agrees that the Lender may measure the Debt Service Coverage Ratio at any time to determine compliance), the ratio of the Borrower's (i) the annual gross operating income of the Project (based on in-place Leases) less current annual operating expenses of the Project exclusive of non-cash and non-recurring expenses including depreciation and amortization expense, principal and interest expense and capital expense, to (ii) the annual, recurring, required installments of principal and interest payments under the Note and all other indebtedness of the Borrower to the Lender.  Notwithstanding the foregoing, the Lender shall measure the Debt Service Coverage Ratio at year end based on the actual income and expense from the immediately prior year and may also measure the Debt Service Coverage Ratio at any other time based on proforma income (from in-place Leases) and budgeted expenses.

N.   <u>SPE Covenants</u>. The sole purpose to be conducted or promoted by Borrower since its organization is to engage in the following activities:  (i) to acquire, own, hold, lease, operate, manage, maintain, develop and improve the Project; (ii) to enter into and perform its obligations under the Loan Documents; (iii) to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Project to the extent permitted under the Loan Documents; and (iv) to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of Minnesota that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.  Notwithstanding anything to the contrary in the Loan Documents or in any other document governing the formation, management or operation of Borrower, Borrower shall not (i) guarantee any obligation of any person or entity, including any affiliate, or become obligated for the debts of any other person or entity or hold out its credit as being available to pay the obligations of any other person or entity; (ii) engage, directly or indirectly, in any business other than as required or permitted to be performed under this Section; (iii) incur, create or assume any indebtedness or liabilities other than the Loan, other than loans from the members of the Borrower as permitted under the Borrower's operating agreement, and other than unsecured trade payables incurred in the ordinary course of its business

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page30 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page9 of 71

that are related to the ownership and operation of the Project, which are not evidenced by a note, and must be paid within sixty (60) days and which do not in the aggregate exceed $50,000 at any time; (iv) make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any person or entity; (v) without the prior written consent of the Lender, engage in any dissolution, liquidation, consolidation, merger, sale or other transfer of any of its assets outside the ordinary course of Borrower's business; (vi) buy or hold evidence of indebtedness issued by an other person or entity (other than cash or investment-grade securities); (vii) form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity; (vii) own any asset or property other than the Project and incidental personal propert  necessary for the ownership or operation of the Project; or (viii) take any material action without the written approval of the number of members of Borrower required to approve such actions under the Borrower's organizational documents or operating agreements.  In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any affiliate, Borrower represents and warrants that in the conduct of its operations since its organization it has and will continue to observe the following covenants:  (i) maintain books and records and bank accounts separate from those of any other person or entity; (ii) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets; (iii) comply with all organizational formalities necessary to maintain its separate existence; (iv) hold itself out to creditors and the public as a legal entity separate and distinct from any other entity; (vi) maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person and not have its assets listed on any financial statement of an  other person or entity except that Borrower's assets may be included in a consolidated financial statement of its affiliate so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of Borrower from such affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliate or any other person or entity; (vii) prepare and file its own tax returns separate from those of any person or entity to the extent required by applicable law, and pay an  taxes required to be paid b  applicable law; (viii) allocate and charge fairly and reasonably any common employee or overhead shared with affiliates; (ix) not enter into any transaction with any affiliate, except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would be available for unaffiliated third parties, and pursuant to written, enforceable agreements; (x) conduct business in its own name; (xi) not commingle its assets or funds with those of any other person or entity; (xii) not assume, guarantee or pay the debts or obligations of any other person or entity; (xiii) use commercially reasonable efforts to correct any known material misunderstanding as to its separate identity;; (xiv) not make loans or advances to any other person or entity; (xv) pay its liabilities and expenses out of and to the extent of its own funds; (xvi) maintain reasonably adequate capital in light of its contemplated business purpose, transactions and liabilities; provided, however, that the foregoing shall not require any equity

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page31 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page10 of 71

owner to make additional capital contributions to Borrower; and (xvii) cause the managers, officers, employees, agents and other representatives of Borrower to act at all times with respect to Borrower in furtherance of the foregoing and in the best interests of Borrower.

O.    <u>Sanctions</u>.  (i)  No Person within the Borrowing Group is or will be a Sanctioned Person; (ii) no Person within the Borrowing Group is or will be controlled by or is acting on behalf of a Sanctioned Person; (iii) no Person within the Borrowing Group is under investigation for an alleged breach of Sanction(s) by a governmental authority that enforces Sanctions; (iv) no Person within the Borrowing Group will use any of the Loan proceeds for the purpose of: (A) providing financing to or otherwise making funds directly or indirectly available to any Sanctioned Person; or (B) providing financing to or otherwise funding any transaction which would be prohibited by Sanctions or would otherwise cause the Lender or any other party to this Agreement, or any entity affiliated with any such party, to be in breach of any Sanction; (v) no Person within the Borrowing Group will fund any repayment of the Loan with proceeds derived from any transaction that would be prohibited by Sanctions or would otherwise cause the Lender or any other party to this Agreement, or any entity affiliated with any such party, to be in breach of any Sanction; (vi) Borrower will ensure that appropriate controls and safeguards are in place to fully comply with this Section and the Borrower will notify the Lender in writing not more than one (1) business day after becoming aware of any breach of this Section.  As used herein, "Borrowing Group" means, individually and collectively: (a) the Borrower, (b) each Guarantor, (c) any other owner of any collateral securing any part of the Loan, and (d) an officer, director or other Person acting on behalf of Borrower, either Guarantor or any such owner with respect to the credit or this Agreement.  As used herein, "Sanctions" means individually and collectively, respectively, any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by the OFAC, the U.S. State Department, the U.S. Department of Commerce, or through any existing or future Executive Order, (b) the United Nations Security Council, (c) the European Union, (d) the United Kingdom, or (e) any other governmental authorities with jurisdiction over any Person within the Borrowing Group.  As used herein, "OFAC" means the United States Treasury Department Office of Foreign Assets Control and any successor thereto.  As used herein, "Sanctioned Person" means an Person that is a target of Sanctions, including without limitation, a Person that is: (a) listed on OFAC's Specially Designated Nationals and Blocked Persons List; (b) listed on OFAC's Consolidated Non-Specially Designated Nationals List; (c) a legal entity that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Peron(s); or (d) a Person that is a Sanctions target pursuant to any territorial or country-based Sanctions program.  As used herein, "Person" means any individual, company, trust or other legal entity of any kind whatsoever, or other organization, whether or not a legal entity.  With respect to any

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page32 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page11 of 71

Sanctioned Person, "Person" shall also include any group, sector, territory or country.

P.   <u>Management Agreement</u>. The Borrower shall not enter into any Management Agreement without the prior written consent of the Lender. In addition the Borrower will comply at all times with each Management Agreement approved ˰ˑ the Lender and shall not amend, modify or terminate the same without the prior written consent of the Lender.

Q.   <u>Operating Account</u>. The Borrower shall establish and maintain at all times its operating account for the Project at the Lender.

10.   <u>EVENTS OF DEFAULT</u>. As used herein, the term "Event of Default" shall mean and include each or all of the following events:

A.   the Borrower or Guarantor shall fail to pay when due any amounts required to be paid by the Borrower under the Note or any other indebtedness of the Borrower or Guarantor to the Lender or any third party, whether an ⁊ such indebtedness is now existing or hereafter arises and whether direct or indirect, due or to becon e due, absolute or contingent, primary or secondary or joint or joint and several;

B.   the Borrower fails to comply with Sections 9.C., D., H., K., M., N., O., P. or Q. hereof;

C.   except as otherwise provided in any other subsection of this Section 10, the Borrower or either Guarantor shall fail to observe or perform any of the other covenants, conditions or agreements to be observed or performed by it, him or her under the Loan Documents or any credit or similar agreement between the Borrower or either Guarantor and the Lender for a period of ten (10) days after written notice, specifying such default and requesting that it be remedied, given to such party by the Lender;

D.   if the Borrower or either Guarantor files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, or files any petition or answer seeki⁊g any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, makes an assignment for the benefit of creditors, or seeks or consents to or acquiesces in the appointment of any trustee, receiver or liquidator of the Borrower or either Guarantor of all or any substantial part of its, his or her properties or of the Project;

E.   if within sixty (60) days after the commencement of any proceeding against the Borrower or either Guarantor seeking any reorganization, arrangement, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, such proceeding is not dismissed, or if, within sixty

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page33 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page12 of 71

(60) days after the appointment, without the consent or acquiescence of the Borrower or either Guarantor of any trustee, receiver or liquidator of the Borrower or either Guarantor of all or any substantial part of its, his or her properties or of the Project, such appointment is not vacated or stayed on appeal or otherwise, or if, within sixty (60) days after the expiration of any such stay, such appointment is not vacated;

F.   the Borrower or either Guarantor shall be or become insolvent (whether in the equity or bankruptcy sense);

G.   (i) a default occurs, beyond any applicable cure or grace period, under the Anchor Lease, (ii) the Anchor Lease is terminated for any reason, or (iii) the Anchor Tenant provides notice of non-renewal of the Anchor Lease, goes "dark" and ceases to conduct business or otherwise vacates the Project for any reason;

H.   either Guarantor shall die;

I.   either Guarantor shall revoke or attempt to revoke his or her Guaranty;

J.   the Guarantors, on a combined basis, fail to maintain at all times Liquid Assets (as defined herein) of at least (i) $500,000 through October 21, 2022, (ii) $750,000, for the period of October 21, 2022, through October 21, 2023, (iii) $1,000,000, for the period of October 21, 2023, through the Initial Maturity Date or the Extended Maturity Date (as those terms are defined in the Note), as the case may be; provided, however, that upon satisfaction of the Material Conditions as set forth in Section 1 hereof, the amount in subsection (iii) hereof shall be reduced to $500,000; as used herein, "Liquid Assets" means cash, cash equivalents and unencumbered, readily marketable securities;

K.   any representation or warranty made by the Borrower or either Guarantor in the Loan Documents shall prove to be untrue or misleading in any material respect, or any statement, certificate or report furnished hereunder or under any of the foregoing documents by or on behalf of the Borrower or either Guarantor shall prove to be untrue or misleading in any material respect on the date when the facts set forth and recited therein are stated or certified;

L.   any material adverse change shall occur in the condition (financial or otherwise) of the Borrower or either Guarantor which, in the reasonable opinion of the Lender, increases its risk with respect to the Note, or the Lender otherwise reasonably and in good faith deems itself insecure;

M.   all or any portion of the property subject to the Mortgage, or the legal, equitable or any other interest therein, shall be sold, transferred, assigned, leased (except pursuant to the Permitted Leases), or otherwise disposed of unless the prior written consent of the Lender is first obtained;

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page34 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page13 of 71

N.    failure of the Borrower to deliver signed SNDAs for each Tenant at the Project on or before November 30, 2021;

O.    final judgment(s) for the payment of money, individually or in the aggregate, shall be rendered against the Borrower or either Guarantor in excess of $10,000 individually or in the aggregate and shall remain undischarged for a period of thirty (30) days during which execution shall not be effectively stayed; or

P.    any state or federal tax lien shall be filed against or with respect to the Borrower or either Guarantor.

Upon the occurrence of an Event of Default, the Lender may, at its option, exercise any and all of the following rights and remedies (in addition to any other rights and remedies available to it):

a)    the Lender may, without notice, declare immediately due and payable all unpaid principal of and accrued interest on the Note, together with all other sums payable hereunder or under the Note, and the Note shall thereupon be immediately due and payable without presentment or other demand, protest, notice of dishonor or any other notice of any kind, all of which are hereby expressly waived;

b)    the Lender may exercise all of its rights or remedies under the Loan Documents and applicable law;

c)    the Lender may refuse to make any Advance hereunder; and/or

d)    the Lender shall have the right, in addition to any other rights provided by law, to enforce its rights and remedies under the Loan Documents.

11.    NOTICES. All notices, consents, requests, demands and other communications hereunder shall be given to or made upon the respective parties hereto at their respective addresses specified below or, as to any party, at such other address as may be designated by it in a written notice to the other party. All notices, requests, consents and demands hereunder shall be effective when personally delivered or duly deposited in the United States mails, certified or registered, postage prepaid, addressed as aforesaid.

IF TO THE LENDER:

MidCountry Bank
7825 Washington Avenue South, #120
Bloomington, MN 55436
Attention:  Keith Gordon

EXHIBIT A

MidCountry/Freeport
Loan Agreement

IF TO THE BORROWER:

Freeport Elk River LLC
15287 Huron Street
Broomfield, CO 80023
Attention: Brent Herron

12.   MISCELLANEOUS.

A.   Waivers, etc.  No failure on the part of the Lender to exercise, and no delay in exercising, any right or remedy hereunder  r under applicable law or any document or agreement related hereto shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

B.   Expenses.  The Borrower shall reimburse the Lender for any and all costs and expenses, including without limitation attorneys' fees, title fees and recording fees paid or incurred b  the Lender in connection with (i) the preparation of the Loan Documents and an  other document or agreement related hereto or there o, and the transactions contemplated hereby, which amount shall be paid prior to the making of any advance hereunder; (ii) the closing and consummation of the transactions contemplated hereby; (iii) the negotiation of any amendments, modifications or extensions to any of the foregoing documents, instruments or agreements and the preparation of any and all documents necessary or desirable to effect such amendments, modifications or extensions; (iv) the enforcement by the Lender during the term hereof or thereafter of any of the rights or remedies of the Lender under any of the foregoing documents, instruments or agreements under applicable law, whether or not suit is filed with respect thereto; and (v) costs incurred by the Lender in connection with inspections of the Project.

C.   Amendments, etc.  The Loan Documents  r ay not be amended or modifi d, nor may an  of their terms (including without limitation, terms affecting the maturity of or rate of interest on the Note) be modified or waived, except by written instruments signed by the Lender and the Borrower.

D.   Successors.  This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns; provided, however, that the Borrower may not transfer or assign its right to borrow hereunder without the prior written consen  o  he Lender.

E.   Offsets.  Nothing in this Agreement shall be deemed a waiver or prohibition of the Lender's right of banker's lien, offset, or counterclaim, which right the Borrower hereby grants to the Lender.

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page36 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page15 of 71

F.    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  The words "execution," signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.  Each party hereto hereby waives any defenses to the enforcement of the terms of this Agreement based on the form of its signature, and hereby agrees that such electronically transmitted or signed signatures shall be conclusive proof, admissible in judicial proceedings, of such party's execution of this Agreement.  Even though the parties agree that the use of electronic signatures and electronic records are legally enforceable and intended to be effective for all purposes, the signing parties agree, if requested by Lender in its sole discretion, to promptly deliver to Lender the requested original document bearing an original manual signature (i) in order to reduce the risk of fraud, comply with potentially applicable regulations, (ii) to the extent required or advisable to be delivered in connection with any program made available to the Lender or any of its affiliate by the Federal Reserve, U.S. Treasury Department or any other federal or state regulatory body, or (iii) for other operational or risk management purposes.

G.    <u>Headings</u>.  The descriptive headings for the several sections of this Agreement are inserted for convenience only and shall not define or limit any of the terms or provisions hereof.

H.    <u>Participations</u>.  The Borrower agrees that the Lender may elect, at any time, to sell, assign or grant participation in all or any portion of the Lender's rights and obligations under the Loan Documents, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities ("Participant"), at the Lender's sole discretion.  The Borrower further agrees that the Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) the Project and its operation; (b) any party connected with the Loan (including, without limitation, the Borrower, any partner, shareholder, joint venturer, manager or member of the

- 15 -

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT    Doc#:44    Filed:08/19/25    Entered:08/20/25 10:34:47    Page37 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT    Doc#:41-2    Filed:08/19/25    Entered:08/19/25 12:41:03    Page16 of 71

Borrower, any constituent partner, shareholder, joint venturer, manager or member of the Borrower, and each Guarantor); and/or (c) any lending relationship other than the Loan which the Lender may have with any party connected with the Loan. In the event of any such sale, assignment or participation, the Lender and the parties to such transaction shall share in the rights and obligations of the Lender as set forth in the Loan Documents only as and to the extent they agree among themselves. In connection with any such sale, assignment or participation, the Borrower further agrees that the Loan Documents shall be sufficient evidence of the obligations of the Borrower to each purchaser, assignee, or participant, and upon written request by the Lender, the Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation. The indemnity obligations of the Borrower under the Loan Documents shall also apply with respect to any purchaser, assignee or participant. An thing in this Loan Agreement to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Loan Agreement, including this Section, any lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents to a Federal Reserve Bank; provided that no such pledge or assignment shall release such lender from its obligations thereunder.

I.    <u>Governing Law; Jurisdiction, Venue; Waiver of Jury Trial</u>.  This Agreement and the other Loan Documents (other than as expressly stated in the Mortgage) shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of Minnesota. The parties hereto hereby (a) consent to the personal jurisdiction of the state and federal courts located in the State of Minnesota in connection with any controversy related to this Agreement and the other Loan Documents; (b) waive any argument that venue in any such forum is not convenient, (c) agree that any litigation initiated by the Lender or the Borrower in connection with this Agreement or the other Loan Documents shall be venued in either the District Court of Hennepin County, Minnesota, or the United States District Court, District of Minnesota, Fourth Division; and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. **THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.**

15357-206
22551467v4

[REMAINDER OF PAGE INTETIONALLY LEFT BLANK]

EXHIBIT A

71-CV-24-752
Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

Case:25-14392-KHT  Doc#:44  Filed:08/19/25  Entered:08/20/25 10:34:47  Page38 of 134

Case:25-14392-KHT  Doc#:41-2  Filed:08/19/25  Entered:08/19/25 12:41:03  Page17 of 71

MidCountry/Freeport
Loan Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

### BORROWER:

FREEPORT ELK RIVER LLC, a Minnesota limited liability company

By:_____

Brent Herron
Its President

STATE OF COLORADO   )
                    ) ss
COUNTY OF __Adams__ )

The foregoing instrument was acknowledged before me this **2O** day of October, 2021, by Brent Herron, the President of Freeport Elk River LLC, a Minnesota limited liability company, for and on behalf of the limited liability company.

_____
Notary Public

> HAILEY HANNER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20214034029
> MY COMMISSION EXPIRES AUGUST 26, 2025

S-1

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page39 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page18 of 71

MidCountry/Freeport
Loan Agreement

**LENDER:**

MIDCOUNTRY BANK

By: _____

Keith Gordon
Its Market President

EXHIBIT A

71-CV-24-752

Case:25-14392-KHT    Doc#:44    Filed:08/19/25    Entered:08/20/25 10:34:47    Page40 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

Case:25-14392-KHT    Doc#:41-2    Filed:08/19/25    Entered:08/19/25 12:41:03    Page19 of 71

## EXHIBIT A
### (Form of Draw Request)

RE:  Elk River Center

The undersigned, an authorized representative of Borrower, hereby requests an Advance under Section 1 of that certain Loan Agreement dated as of October __, 2021, b  and between Borrower and Lender as follows:

- Amount of Advance:        $_____

- Date of Advance:          _____

- Purpose:                  _____

In connection with such request, the undersigned hereby represents and warrants, on behalf of Borrower, to and for the benefit of Lender as follows:

(a) All of the representations and warranties of Borrower contained in the Loan Agreement or in any other Loan Document are and remain true and correct and on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they remain true and correct as of such earlier date; and

(b) As of the date hereof, no Event of Default, or event which with the giving of notice or the passage of time or both would constitute an Event of Default, has occurred or would result from and after the making of the Advance requested hereunder.

FREEPORT ELK RIVER LLC, a Minnesota
limited liability company

By:_____
        Brent Herron
        Its President

EXHIBIT A

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Loan Agreement

**EXHIBIT B**

(Current Rent Roll)


[Attached]



EXHIBIT A

Filed in District Court
State of Minnesota
Date: 6/30/2024 2:19 PM

# Rent Roll Report

**Elk Park Center**  Located at: 19112-19216 Freeport St NW, Elk River, MN 553301265   Region: Chicago Office

CAM Est: 2.41
Tax Est: 2.25

| Unit | GLA | Begin Date / End date | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | Next Rent Incr | Renewal/Notice Date PSF Amt | #Opts Years | Breakpoint % due | Year | Reported | PSF | Change | Mtls |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Furniture Liquidation** 70265 | 0 | 8/30/1994 12/31/2055 | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | | | | 19 18 17 | 0 0 0 | 0 0 0 | | |
| **Arby's #6651/Sbarro** 70500 | 0 | 12/4/1996 12/31/2055 | Mth: Ann: PSF: | 0.00 0.00 0.00 | 320.67 3,848.04 | 485.00 5,820.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 805.67 9,668.04 | | | | 19 18 17 | 0 0 0 | 0 0 0 | | |
| **Vacant** 70505 | 0 | | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | | | | 19 18 17 | 0 0 0 | 0 0 0 | | |
| **Olive to Tan** A109A | 4,894 | 3/18/2013 9/30/2023 | Mth: Ann: PSF: | 3,874.42 46,493.04 9.50 | 1,337.45 16,049.40 3.28 | 982.88 11,794.56 2.41 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 6,194.75 74,337.00 15.19 | | | | 19 18 17 | 185,976 223,561 | 38 46 0 | (16.81%) | 2.46% |
| **Carbou Coffee - 175** A109B | 1,485 | 12/12/2000 12/31/2022 | Mth: Ann: PSF: | 3,341.25 40,095.00 27.00 | 422.52 5,070.24 3.41 | 0.00 0.00 0.00 | 0.00 0.00 | 396.00 4,752.00 3.20 | 0.00 0.00 | 4,159.77 49,917.24 33.61 | | | | 19 18 17 | 529,568 516,834 512,739 | 357 348 345 | 2.46% 0.69% | (3.97%) |
| **Planet Fitness** A117 | 23,525 | 6/1/2020 5/31/2031 | Mth: Ann: PSF: | 19,604.17 235,250.04 10.00 | 2,764.19 33,170.28 1.41 | 3,489.55 41,874.60 1.78 | 0.00 0.00 | 6,534.72 78,416.64 3.33 | 0.00 0.00 | 32,392.63 388,711.56 16.52 | | | | 19 18 17 | 0 0 0 | 0 0 0 | | |
| | | **Rent Increase Schedule** | | | | | | | | | | **Option Renewal Schedule** | | | | | | | |
| | | Begin Date | End Date | Type | Amount PSF | | | | | | Notice Date | Begin Date | End Date | Type | | Opt PSF | | | |
| | | 6/1/2026 | 5/31/2031 | AMR | 10.50 | | | | | | 12/2/2030 | 6/1/2031 | 5/31/2036 | | | 11.00 | | | |
| | | 6/1/2031 | 5/31/2036 | AMR | 11.00 | | | | | | 12/2/2035 | 6/1/2036 | 5/31/2041 | | | 11.50 | | | |
| | | 6/1/2036 | 5/31/2041 | AMR | 11.50 | | | | | | | | | | | | | | |
| **Chuck & Don's Pet Food Outlet** A119 | 5,694 | 3/4/2019 1/31/2032 | Mth: Ann: PSF: | 9,015.50 108,186.00 19.00 | 1,620.05 19,440.60 3.41 | 1,119.97 13,439.64 2.36 | 0.00 0.00 | 4,667.57 56,010.84 9.84 | 0.00 0.00 | 16,423.09 197,077.08 34.61 | | | | 19 18 17 | 427,353 | 75 0 0 | | |
| | | **Rent Increase Schedule** | | | | | | | | | | | | | | | | | |
| | | Begin Date | End Date | Type | Amount PSF | | | | | | | | | | | | | | |
| | | 2/1/2022 | 1/31/2023 | AMR | 19.50 | | | | | | | | | | | | | | |
| **Vacant** A123 | 8,346 | | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 | 0.00 0.00 0.00 | | | | 19 18 17 | 0 0 0 | 0 0 0 | | |
| **CUB #5516** A125 | 60,066 | 6/5/1996 6/30/2026 | Mth: Ann: PSF: | 46,300.88 555,610.56 9.25 | 973.09 11,677.08 0.19 | 0.00 0.00 0.00 | 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 | 47,273.97 567,287.64 9.44 | | | | 19 18 17 | 22,316,670 27,538,787 27,117,746 | 455 458 451 | (0.13%) 10% | (3.92%) |
| | | **Rent Increase Schedule** | | | | | | | | | | **Option Renewal Schedule** | | | | | | | |
| | | Begin Date | End Date | Type | Amount PSF | | | | | | Notice Date | Begin Date | End Date | Type | | Opt PSF | | | |
| | | 7/1/2021 | 6/30/2026 | AMR | 9.50 | | | | | | 10/3/2025 | 7/1/2026 | 6/30/2031 | | | 10.00 | | | |
| | | 7/1/2026 | 6/30/2031 | AMR | 10.00 | | | | | | 10/3/2030 | 7/1/2031 | 6/30/2036 | | | 10.50 | | | |
| | | 7/1/2031 | 6/30/2036 | AMR | 10.50 | | | | | | | | | | | | | | |
| **CUB (Expansion)** A125A | 20,187 | 6/5/1996 6/30/2026 | Mth: Ann: PSF: | 6,365.23 76,382.76 3.78 | 6,365.23 76,382.76 3.78 | 0.00 0.00 0.00 | 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 | 6,365.23 76,382.76 3.78 | | | | 19 18 17 | 0 0 0 | 0 0 0 | | |

**EXHIBIT A**

Filed in District Court
State of Minnesota
Date: 6/30/2024 2:19 PM

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page43 of 134
Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page22 of 71

**Rent Roll Report**

**Elk Park Center**

Located at: 19112-19216 Freeport St NW
Elk River, MN 553301265

Region: Chicago Office

CAM Est: 2.41
Tax Est: 2.23

| Lease # / Tenant # | Unit | GLA | Begin Date / End date | | Rent Increase Schedule | | | | | | | | | | Next Rent Incr | Renewal/ Notice Date PSF Amt | #Opts Years | Option Renewal Schedule Begin Date | % due | Breakpoint End Date | Year | Type | Reported | Opt PSF | Sales History PSF | Change% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Begin Date | End Date | Type | Amount PSF | Tax | CAM/Ins | Util | Other | Mkt | Total | | Notice Date | | | | | | | | | |

**Christine's Hallmark** B101, GLA 7,537, Begin 9/1/1995, End 2/28/2025
- Mth: 8,340.95 / Ann: 100,091.40 / PSF: 13.28
- Rent Increase Schedule:
  - 7/1/2021 – 6/30/2022 AMR 3.90 | Tax 2,144.43 | CAM/Ins 1,482.53
  - 7/1/2022 – 6/30/2023 AMR 4.01 | Tax 25,733.16 | CAM/Ins 17,790.36
  - 7/1/2023 – 6/30/2024 AMR 4.13 | 2.36
  - 7/1/2024 – 6/30/2025 AMR 4.26
  - 7/1/2025 – 6/30/2026 AMR 4.39
  - 7/1/2026 – 6/30/2027 AMR 4.52
  - 7/1/2027 – 6/30/2028 AMR 4.65
  - 7/1/2028 – 6/30/2029 AMR 4.79
  - 7/1/2029 – 6/30/2030 AMR 4.94
  - 7/1/2030 – 6/30/2031 AMR 5.09
  - 7/1/2031 – 6/30/2032 AMR 5.24
  - 7/1/2032 – 6/30/2033 AMR 5.39
  - 7/1/2033 – 6/30/2034 AMR 5.56
  - 7/1/2034 – 6/30/2035 AMR 5.72
  - 7/1/2035 – 6/30/2036 AMR 5.89
- Total 11,967.91 / 143,614.92 / 19.05
- Next Rent Incr: 10/3/2025 | Renewal Notice Date 7/1/2026 | Begin Date 6/30/2031
- Year 19 | Reported 902,865 | Opt PSF 4.52 | PSF 120 | 1.62%
- Year 18 | Reported 888,456 | PSF 118 | 7.94%
- Year 17 | Reported 823,078 | PSF 109 | 1.61%

**Maurices** B103B, GLA 5,009, Begin 7/18/1996, End 12/31/2022
- Mth: 6,724.58 / Ann: 80,694.96 / PSF: 16.11
- Rent Increase Schedule:
  - 7/1/2020 – 6/30/2031 AMR 2.20 | Tax 918.87, 11,026.44 | CAM/Ins 905.22, 10,862.64, 2.17
- Other 2,241.53, 26,898.36, 5.37
- Total 10,790.20 / 129,482.40 / 25.85
- Next Rent Incr: 10/3/2030 | Renewal Notice Date 7/1/2031 | Begin Date 6/30/2036
- Year 19 | Reported 1,309,561 | Opt PSF 261 | (0.27%)
- Year 18 | Reported 1,313,127 | PSF 262 | (2.55%)
- Year 17 | Reported 1,347,519 | PSF 269 | (14.26%)

**Vacant** B105, GLA 2,068
- Mth: 0.00 / Ann: 0.00 / PSF: 0.00
- Tax 0.00 | CAM/Ins 0.00 | Util 0.00 | Other 0.00 | Mkt 0.00 | Total 0.00
- 0.00 / 0.00
- Year 19 | Reported 0 | 0
- Year 18 | Reported 0 | 0
- Year 17 | Reported 0 | 0
- 0 / 0

**Famous Footwear #1408** B107, GLA 5,725, Begin 7/15/1995, End 7/31/2024
- Mth: 6,798.44 / Ann: 81,581.28 / PSF: 14.25
- Rent Increase Schedule:
  - 8/1/2023 – 7/31/2024 AMR 14.25 | Tax 1,100.00, 13,200.00, 2.31 | CAM/Ins 984.52, 11,814.24, 2.06
- Other 0.00
- Total 8,882.96 / 106,595.52 / 18.62
- Year 19 | Reported 1,351,230 | Opt PSF 236 | (1.75%)
- Year 18 | Reported 1,375,236 | PSF 240 | 3.51%
- Year 17 | Reported 1,328,591 | PSF 232 | (0.00%)

**Great Clips** B111, GLA 1,406, Begin 7/19/1995, End 7/31/2025
- Mth: 3,096.33 / Ann: 36,555.96 / PSF: 26.00
- Rent Increase Schedule:
  - 8/1/2021 – 7/31/2022 AMR 26.78 | Tax 400.05, 4,800.60, 3.41 | CAM/Ins 242.01, 2,904.12, 2.07
  - 8/1/2022 – 7/31/2023 AMR 27.58
  - 8/1/2023 – 7/31/2024 AMR 28.41
  - 8/1/2024 – 7/31/2025 AMR 29.26
- Other 0.00
- Total 3,688.39 / 44,260.68 / 31.48
- Year 19 | Reported 382,352 | Opt PSF 272 | (3.49%)
- Year 18 | Reported 396,160 | PSF 282 | (6.16%)
- Year 17 | Reported 422,182 | PSF 300 | 0.07%

Filed in District Court
State of Minnesota
6/3/2024 2:19 PM

71-CV-24-752

## Rent Roll Report

**Elk Park Center**

Located at: 19112-19216 Freeport St NW
Elk River, MN 55330265

Region: Chicago Office

CAM Est: 2.41
Tax Est: 2.23

| Unit | GLA | Begin Date / End date | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | Next Rent Incr | Renewal/ Notice Date PSF Amt | #Opts Years | Breakpoint % due | Year | Reported | PSF | Change% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vacant** B113 | 1,406 | | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | | | | | 19 18 17 | 0 0 0 | 0 0 0 | 14.98% (6.87%) 7.45% |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | | |
| **Vacant** B115 | 1,406 | | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | | | | | 19 18 17 | 0 0 0 | 0 0 0 | |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | | |
| **Visionworks** B117 | 1,406 | 7/20/1995 7/31/2023 | Mth: Ann: PSF: | 3,017.04 36,204.48 25.75 | 400.05 4,800.60 3.41 | 10.00 120.00 0.09 | 0.00 0.00 0.00 | 318.63 3,823.56 2.72 | 0.00 0.00 0.00 | 3,745.72 44,948.64 31.97 | | | | | 19 18 17 | 708,168 615,891 661,329 | 504 438 470 | 14.98% (6.87%) 7.45% |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | | |
| **Sally Beauty Supply #1923** B119 | 1,406 | 6/30/1995 6/30/2023 | Mth: Ann: PSF: | 2,343.33 28,119.96 20.00 | 400.05 4,800.60 3.41 | 21.58 258.96 0.18 | 0.00 0.00 0.00 | 318.74 3,824.88 2.72 | 0.00 0.00 0.00 | 3,083.70 37,004.40 26.32 | | | | | 19 18 17 | 708,054 644,135 649,827 | 504 458 462 | 9.92% (0.88%) (4.29%) |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | | |

**Rent Increase Schedule**

| Begin Date | End Date | Type | Amount PSF |
|---|---|---|---|
| 7/1/2022 | 6/30/2023 | AMR | 20.60 |

| Unit | GLA | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | | | | | Year | Reported | PSF | Change% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vacant** B121 | 7,834 | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | | | | | 19 18 17 | 0 0 0 | 0 0 0 | |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | |
| **Vacant** C101A | 3,515 | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | | | | | 19 18 17 | 0 0 0 | 0 0 0 | |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | |
| **Farrell's eXtreme Bodyshaping** C101B | 4,800 | 10/6/2015 4/30/2026 | Mth: Ann: PSF: | 4,600.00 55,200.00 11.50 | 1,504.00 18,048.00 3.76 | 142.94 1,715.28 0.36 | 0.00 0.00 0.00 | 1,036.34 12,436.08 2.59 | 0.00 0.00 0.00 | 7,283.28 87,399.36 18.21 | | | | | 19 18 17 | 407,504 393,669 363,291 | 85 82 76 | 3.51% 8.36% 79.32% |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | |

**Rent Increase Schedule**

| Begin Date | End Date | Type | Amount PSF |
|---|---|---|---|
| 5/1/2021 | 4/30/2023 | AMR | 12.75 |
| 5/1/2023 | 4/30/2024 | AMR | 13.13 |
| 5/1/2024 | 4/30/2025 | AMR | 13.52 |
| 5/1/2025 | 4/30/2026 | AMR | 13.93 |

| Unit | GLA | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | | | | | Year | Reported | PSF | Change% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vacant** C101C | 3,600 | Mth: Ann: PSF: | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | | | | | 19 18 17 | 0 0 0 | 0 0 0 | |
| Lease # 0 / Tenant # 0 | | | | | | | | | | | | | | | | | |
| **Showcase Dance** C103 | 7,000 | 11/13/2017 11/30/2024 | Mth: Ann: PSF: | 3,791.67 45,500.04 6.50 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 3,791.67 45,500.04 6.50 | | | | | 19 18 17 | 601,556 621,139 0 | 86 89 0 | (3.15%) |
| **U.S. Postal Service** C107A | 4,020 | 6/1/2008 5/31/2023 | Mth: Ann: PSF: | 4,355.00 52,260.00 13.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 4,355.00 52,260.00 13.00 | | | | | 19 18 17 | 0 0 0 | 0 0 0 | |

**Rent Increase Schedule**

| Begin Date | End Date | Type | Amount PSF |
|---|---|---|---|
| 6/1/2023 | 5/31/2028 | AMR | 14.95 |

**Option Renewal Schedule**

| Notice Date | Begin Date | End Date | Type | Opt PSF |
|---|---|---|---|---|
| 3/2/2023 | 6/1/2023 | 5/31/2028 | | 14.95 |

EXHIBIT A

Page 3 of 5

71-CV-24-752

Filed in District Court
State of Minnesota
6/3/2024 2:19 PM

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page45 of 134
Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page24 of 71

## Rent Roll Report

**Elk Park Center**  Located at: 19112-19216 Freeport St NW  Region: Chicago Office
Elk River, MN 553301265

CAM Est: 2.41
Tax Est: 2.23

| Lease # / Tenant # | Unit | GLA | Begin Date / End date | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | Next Rent Incr | Renewal/ Notice Date PSF Amt | #Opts Years | Breakpoint % due | Year | Reported | PSF | Change/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dojo Karate C107B | C107B | 1,984 | 11/1/2000 Mth: | 2,893.33 | 564.48 | 393.30 | 0.00 | 0.00 | 0.00 | 3,851.11 | -- | -- | -- | -- | -- 19 | 279,831 | 141 | (9.23%) |
| | | | 5/31/2026 Ann: | 34,719.96 | 6,773.76 | 4,719.60 | 0.00 | 0.00 | 0.00 | 46,213.32 | | -- | -- | -- | -- 18 | 308,286 | 155 | 8.00% |
| | | | PSF: | 17.50 | 3.41 | 2.38 | 0.00 | 0.00 | 0.00 | 23.29 | | -- | | | -- 17 | 285,463 | 144 | 8.73% |

Rent Increase Schedule
| Begin Date | End Date | Type | Amount PSF |
|---|---|---|---|
| 6/1/2021 | 5/31/2024 | AMR | 17.50 |
| 6/1/2024 | 5/31/2026 | AMR | 18.00 |

| Carpet One C109 | C109 | 5,033 | 4/1/1997 Mth: | 5,284.65 | 1,431.99 | 989.90 | 0.00 | 0.00 | 0.00 | 7,706.54 | -- | -- | -- | -- | -- 19 | 972,401 | 193 | 16.81% |
| | | | 6/30/2023 Ann: | 63,415.80 | 17,183.88 | 11,878.80 | 0.00 | 0.00 | 0.00 | 92,478.48 | | -- | -- | -- | -- 18 | 832,469 | 165 | (22.20%) |
| | | | PSF: | 12.60 | 3.41 | 2.36 | 0.00 | 0.00 | 0.00 | 18.37 | | -- | | | -- 17 | 1,069,960 | 213 | 21.71% |

| Para Murphy's Take & Bake Pizz E101 | E101 | 2,008 | 12/1/2014 Mth: | 4,267.00 | 571.33 | 168.00 | 0.00 | 477.97 | 0.00 | 5,330.30 | -- | -- | -- | -- | -- 19 | 714,122 | 356 | (4.19%) |
| | | | 11/30/2024 Ann: | 51,204.00 | 6,855.96 | 168.00 | 0.00 | 5,735.64 | 0.00 | 63,963.60 | | -- | -- | -- | -- 18 | 745,228 | 371 | (3.59%) |
| | | | PSF: | 25.50 | 3.41 | 0.08 | 0.00 | 2.86 | 0.00 | 31.85 | | -- | | | -- 17 | 773,117 | 385 | 1.54% |

Rent Increase Schedule
| Begin Date | End Date | Type | Amount PSF |
|---|---|---|---|
| 12/1/2021 | 11/30/2022 | AMR | 26.00 |
| 12/1/2022 | 11/30/2023 | AMR | 26.50 |
| 12/1/2023 | 11/30/2024 | AMR | 27.00 |

| Liberty Tax E103 | E103 | 2,000 | 9/1/2016 Mth: | 1,800.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,800.00 | -- | -- | -- | -- | -- 19 | 0 | 0 | |
| | | | 4/30/2022 Ann: | 21,600.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 21,600.00 | | -- | -- | -- | -- 18 | 0 | 0 | |
| | | | PSF: | 10.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.80 | | -- | | | -- 17 | 0 | 0 | |

Rent Increase Schedule
| Begin Date | End Date | Type | Amount PSF |
|---|---|---|---|
| 5/1/2022 | 4/30/2022 | AMR | 11.40 |

| Smoke Shop E105 | E105 | 2,000 | 10/28/2013 Mth: | 4,313.33 | 568.33 | 391.48 | 0.00 | 0.00 | 0.00 | 5,273.14 | -- | -- | -- | -- | -- 19 | 301,082 | 151 | (85.01%) |
| | | | 10/31/2023 Ann: | 51,759.96 | 6,819.96 | 4,697.76 | 0.00 | 0.00 | 0.00 | 63,277.68 | | -- | -- | -- | -- 18 | 2,008,858 | 1,004 | 5.45% |
| | | | PSF: | 25.88 | 3.41 | 2.35 | 0.00 | 0.00 | 0.00 | 31.64 | | -- | | | -- 17 | 1,905,068 | 953 | 7.06% |

| Rb's Computer Service E109 | E109 | 1,691 | 7/1/2001 Mth: | 2,606.96 | 481.12 | 332.00 | 0.00 | 0.00 | 0.00 | 3,420.08 | -- | -- | -- | -- | -- 19 | 759,559 | 446 | 14.12% |
| | | | 6/30/2022 Ann: | 31,283.52 | 5,773.44 | 3,984.00 | 0.00 | 0.00 | 0.00 | 41,040.96 | | -- | -- | -- | -- 18 | 661,200 | 391 | 7.52% |
| | | | PSF: | 18.50 | 3.41 | 2.36 | 0.00 | 0.00 | 0.00 | 24.27 | | -- | | | -- 17 | 614,948 | 364 | 6.00% |

| GNC #3634 E111 | E111 | 1,500 | 11/1/2020 Mth: | 3,000.00 | 0.00 | 0.00 | 0.00 | (90.30) | 0.00 | 2,909.70 | -- | -- | -- | -- | -- 19 | 0 | 0 | |
| | | | 8/31/2021 Ann: | 36,000.00 | 0.00 | 0.00 | 0.00 | (1,083.60) | 0.00 | 34,916.40 | | -- | -- | -- | -- 18 | 0 | 0 | |
| | | | PSF: | 24.00 | 0.00 | 0.00 | 0.00 | (0.72) | 0.00 | 23.28 | | -- | | | -- 17 | 0 | 0 | |

| Vacant 0 / 0 | E113 | 1,000 | Mth: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -- | -- | -- | -- | -- 19 | 0 | 0 | |
| | | | Ann: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | -- | -- | -- | -- 18 | 0 | 0 | |
| | | | PSF: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | -- | | | -- 17 | 0 | 0 | |

| Great Nails E115 | E115 | 1,000 | 3/1/2013 Mth: | 2,300.00 | 284.17 | 220.67 | 0.00 | 0.00 | 0.00 | 2,804.84 | -- | -- | -- | -- | -- 19 | 0 | 0 | (100.00%) |
| | | | 2/28/2023 Ann: | 27,600.00 | 3,410.04 | 2,648.04 | 0.00 | 0.00 | 0.00 | 33,658.08 | | -- | -- | -- | -- 18 | 242,269 | 242 | (5.04%) |
| | | | PSF: | 27.60 | 3.41 | 2.65 | 0.00 | 0.00 | 0.00 | 33.66 | | -- | | | -- 17 | 255,114 | 255 | 10.23% |

| ChiroWay of Elk River E117 | E117 | 1,000 | 9/8/2015 Mth: | 1,695.83 | 260.83 | 0.00 | 0.00 | 252.38 | 0.00 | 2,209.04 | -- | -- | -- | -- | -- 19 | 78,233 | 78 | 26.35% |
| | | | 9/30/2025 Ann: | 20,349.96 | 3,129.96 | 0.00 | 0.00 | 3,028.56 | 0.00 | 26,508.48 | | -- | -- | -- | -- 18 | 61,919 | 62 | 39.05% |
| | | | PSF: | 20.35 | 3.13 | 0.00 | 0.00 | 3.03 | 0.00 | 26.51 | | -- | | | -- 17 | 44,529 | 45 | 76.55% |

**Sales History**

**EXHIBIT A**   Page 4 of 5

71-CV-24-752
Filed in District Court
State of Minnesota
Date:6/3/2024 2:19 PM

## Rent Roll Report

**Elk Park Center**

Located at: 19112-19216 Freeport St NW
Elk River, MN 553301265

Region: Chicago Office

CAM Est: 2.41
Tax Est: 2.23

| Lease # / Tenant # | Unit | GLA | Begin Date End date | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | Next Rent Incr | Renewal/ Notice Date PSF Amt | #Opts Years | Breakpoint % due | Year | Reported | Sales History PSF | Change% Mth |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mucho Loco | E121 | 3,458 | 9/7/2010 9/30/2023 | Mth: Ann: PSF: | 4,998.83 58,785.96 17.00 | 1,008.58 12,102.96 3.50 | 677.19 8,126.28 2.35 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 0.00 0.00 0.00 | 6,594.60 79,015.20 22.85 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 388,244 756,808 | 0 112 219 | (100.00%) (48.70%) (1.00%) |

**Rent Increase Schedule**

| Begin Date | End Date | Type | Amount | PSF |
|---|---|---|---|---|
| 10/1/2021 | 9/30/2022 | AMR | 17.51 | |
| 10/1/2022 | 9/30/2023 | AMR | 18.04 | |

| | Unit | GLA | | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | | | | | Year | Reported | PSF | Change% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacant 0 / 0 | PAD A | 0 | | Mth: Ann: PSF: | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 0 0 | 0 0 0 | |
| Vacant 0 / 0 | PKLT | 0 | | Mth: Ann: PSF: | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 0 0 | 0 0 0 | |
| Vacant 0 / 0 | PKLT03 | 0 | | Mth: Ann: PSF: | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 0 0 | 0 0 0 | |
| Vacant 0 / 0 | PKLT1 | 0 | | Mth: Ann: PSF: | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 0 0 | 0 0 0 | |
| Vacant 0 / 0 | PKLT2 | 0 | | Mth: Ann: PSF: | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 0 0 | 0 0 0 | |
| Vacant 0 / 0 | POD01 | 0 | | Mth: Ann: PSF: | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | 0.00 0.00 | -- -- -- | -- -- -- | -- -- -- | -- -- -- | 19 18 17 | 0 0 0 | 0 0 0 | |

**Totals for Elk Park Center**

| | | GLA | | | Rent | Tax | CAM/Ins | Util | Other | Mkt | Total | | | | | Year | Reported | PSF | Change% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Leased | | 175,834 | | Mth: | 164,578.72 | 18,503.16 | 13,857.83 | 0.00 | 16,153.58 | 0.00 | 213,093.29 | | | | | 19 | 37,931,085 | 192 | (4.64%) |
| Billed | | 175,834 | | Ann: | 1,974,944.64 | 222,037.92 | 166,293.96 | 0.00 | 193,842.96 | 0.00 | 2,557,119.48 | | | | | 18 | 39,775,568 | 202 | 2.17% |
| Occupied | | 175,834 85.77% | | PSF: | 9.63 | 1.08 | 0.81 | 0.00 | 0.95 | 0.00 | 12.47 | | | | | 17 | 38,931,310 | 197 | (1.79%) |
| Vacant | | 29,175 | | | | | | | | | | | | | | | | | |
| Total GLA | | 205,009 | | | | | | | | | | | | | | | | | |

MINNESOTA JUDICIAL BRANCH

Page 5 of 5

**EXHIBIT A**

MidCountry/Freeport
Real Estate Note

# REAL ESTATE NOTE

$24,240,000.00                                    Minneapolis, Minnesota
                                                  October 21, 2021

1.      FOR VALUE RECEIVED, FREEPORT ELK RIVER LLC, a Minnesota limited liability company (the "Borrower"), hereby promises to pay to the order of MIDCOUNTRY BANK, a federal savings bank organized under the laws of the United States of America, its successors and assigns (the "Lender"), at its banking house located in Minneapolis, Minnesota, the principal sum of TWENTY-FOUR MILLION TWO HUNDRED FORTY THOUSAND AND 00/100 DOLLARS ($24,240,000.00), which amount has been advanced to or for the benefit of the Borrower pursuant to that certain Loan Agreement of even date herewith by and between the Borrower and the Lender (as the same may be amended, restated, renewed or supplemented from time to time, the "Loan Agreement"), in lawful money of the United States and immediately available funds, together with interest on the unpaid balance accruing as of the date hereof at a rate initially equal to three and forty-five hundredths percent (3.45%) per annum (the "Initial Rate").

2.      Principal and accrued interest on this Note shall be initially be due and payable in equal consecutive monthly installments of $121,353.55 each on the twenty-fifth (25th) day of each calendar month, commencing on November 25, 2021, and continuing on the twenty-fifth (25th) day of each calendar month thereafter through and including October 21, 2026 (the "Reprice Date" or the "Initial Maturity  Date").  Said monthly installments are calculated based on an amount necessary to fully amortize the outstanding principal balance of this Note and accrued interest hereon at the Initial Rate in equal monthly installments by the twenty-five (25) year anniversary of the date hereof (the "Amortization Date").

3.      If this Note has not been duly extended as set forth in Paragraph 4 hereof, this Note shall mature and the full amount of principal and accrued interest on this Note shall be due and payable on the Initial Maturity Date.

4.      So long as (a) no Event of Default, or event which with the giving of notice or the passage of time or both would constitute an Event of Default, has occurred and is continuing, (b) the Borrower has paid to the Lender of a non-refundable extension fee equal to $60,600, (c) at least 90% of the net rentable square feet in the Project is leased with Tenants under arms' length, market rate Leases, with minimum Net Operating Income (as provided for in the required appraisal set forth herein) sufficient to provide for a minimum Debt Service Coverage Ratio of 1.20 to 1.00 based on the adjusted debt service payments set forth in Paragraph 6 hereof, (d) the Lender has received and approved a current appraisal of the Project which provides for a loan-to-value percentage of not greater than 75%, (e) the Anchor Lease has been extended on terms and conditions acceptable to the Lender in its discretion which must include, without limitation, a minimum term of five (5) additional years at a minimum annual rental rate no less than the in-place rental rate, and (f) there has been no material adverse change in the financial condition of the Project, the Borrower or any Guarantor, then the Borrower may extend the Initial Maturity Date to October 21, 2031 (the "Extended Maturity Date") upon providing a written extension request to Lender (the 'Extension Request') at least fifteen (15) but not more than thirty (30) days prior to the Initial Maturity Date.

EXHIBIT B

71-CV-24-752

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page48 of 134

MidCountry/Freeport
Real Estate Note

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page27 of 71

5.      If this Note has been duly extended, then effective on the Reprice Date, the rate of interest on this Note shall be adjusted to be equal to two and one half percent (2.50%) per annum in excess of the 5-year Federal Home Loan Bank Rate then in effect or such equivalent rate as is selected by the Lender (the "Adjusted Rate").

6.      If this Note has been duly extended, then the amount of each installment due hereunder shall then be adjusted on the Reprice Date to be equal to the amount necessary to fully amortize the then outstanding principal balance hereunder and accrued interest hereon at the Adjusted Rate in equal consecutive monthly installments by the Amortization Date (the "Adjusted P&I Installments").  The Adjusted P&I Installments shall be due and payable monthly, each on the twenty-fifth (25th) day of each calendar month, commencing on November 25, 2026, and shall continue on the twenty-fifth (25th) day or each calendar month thereafter, with the full amount of principal and accrued interest on this Note due and payable on the Extended Maturity Date.

7.      In all cases hereunder, interest on this Note shall be calculated on the basis of a year of three hundred sixty (360) days but charged on the basis of the actual number of days principal is unpaid.

8.      The Borrower may prepay this Note at any time, in whole or in part.  In connection with any prepayment of this Note, the Borrower shall be required to pay the Lender on the date of such prepayment a prepayment fee (the "Prepayment Fee") equal to (i) three percent (3.00%) of the principal amount repaid from the date hereof until the 2-year anniversary of the date hereof, (ii) two percent (2.00%) of the principal amount repaid from the 2-year anniversary of the date hereof until the 4-year anniversary of the date hereof, and (iii) one percent (1.00%) of the principal amount repaid from the 4-year anniversary of the date hereof until the Initial Maturity Date.  If this Note is duly extended, then in connection with any prepayment of this Note, the Borrower shall be required to pay the Lender on the date of such prepayment a Prepayment Fee equal to (i) three percent (3.00%) of the principal amount repaid from the Initial Maturity Date until the 2-year anniversary of the Initial Maturity Date, (ii) two percent (2.00%) of the principal amount repaid from the 2-year anniversary of the Initial Maturity Date until the 4-year anniversary of the Initial Maturity Date, and (iii) one percent (1.00%) of the principal amount repaid from the 4-year anniversary of the date hereof until the Extended Maturity Date.  If the Borrower fails to pay any Prepayment Fee when due, the amount of such Prepayment Fee shall thereafter bear interest until paid at the Default Rate defined herein (computed on the basis of a 360-day year, actual days elapsed). Any prepayment of principal shall be accompanied by a payment of interest accrued to date thereon; and said prepayment shall be applied to the principal installments in the inverse order of their maturities.  Notwithstanding the foregoing, no Prepayment Fee shall be payable as a result of the sale of the Project to an arms-length, non-affiliated purchaser or of the Lender refinances the Project in its sole and absolute discretion.

9.      If any installment of principal or interest on this Note, including the installment due and payable on the Initial Maturity Date or the Extended Maturity Date, as the case may be, is not paid within ten (10) days of the due date thereof, the Borrower shall pay to the Lender a late charge equal to five percent (5.00%) of the amount of such installment.

EXHIBIT B

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page49 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Real Estate Note

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page28 of 71

10.     Notwithstanding anything to the contrary contained herein, at all times after an Event of Default has occurred and is continuing, interest shall accrue on amounts outstanding hereunder at a rate equal to five percent (5.00%) per annum in excess of the rate otherwise payable hereunder.

11.     All payments and prepayments shall, at the option of the Lender, be applied first to any costs of collection, second to any late charges, third to accrued interest on this Note, fourth to any Prepayment Fee and lastly to principal.

12.     Notwithstanding anything to the contrary contained herein, if the rate of interest, late payment fee or any other charges or fees due hereunder are determined by a court of competent jurisdiction to be usurious, then said interest rate, fees and/or charges shall be reduced to the maximum amount permissible under applicable Minnesota law.

13.     This Note is issued pursuant to the terms of the Loan Agreement, is secured by the Mortgage and is guaranteed by the Guarantors pursuant to the Guaranties, and the Lender is entitled to all of the benefits provided for in said documents.

14.     Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned thereto in the Loan Agreement.

15.     Upon the occurrence of an Event of Default or at any time thereafter, the outstanding principal balance hereof and accrued interest and all other amounts due hereon shall, at the option of the Lender, become immediately due and payable, without notice or demand.

16.     Upon the occurrence of an Event of Default or any time thereafter, the Lender shall have the right to set off any and all amounts due hereunder by the Borrower to the Lender against any indebtedness or obligation of the Lender to the Borrower.

17.     Upon the occurrence of an Event of Default or at any time thereafter, the Borrower promises to pay all costs of collection of this Note, including but not limited to attorneys' fees, paid or incurred by the Lender on account of such collection, whether or not suit is filed with respect thereto and whether such cost or expense is paid or incurred, or to be paid or incurred, prior to or after the entry of judgment.

18.     Demand, presentment, protest and notice of nonpayment and dishonor of this Note are hereby waived.

19.     This Note shall be governed by and construed in accordance with the laws of the State of Minnesota without giving effect to the choice of law provisions thereof.

20.     The Borrower hereby irrevocably submits to the jurisdiction of any Minnesota o state court or federal court over any action or proceeding arising out of or relating to this Note, the Loan Agreement, the Mortgage and any instrument, agreement or document related thereto, and the Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state or federal court.  The Borrower hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  The Borrower agrees that judgment final

EXHIBIT B

MidCountry/Freeport
Real Estate Note

by appeal, or expiration of time to appeal without an appeal being taken, in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Paragraph shall affect the right of the Lender to serve legal process in any other manner permitted by law or affect the right of the Lender to bring any action or proceeding against the Borrower or its property in the courts of any other jurisdiction to the extent permitted by law.

15357-206
22548767v4

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

EXHIBIT B

MidCountry/Freeport
Real Estate Note

**BORROWER:**

FREEPORT ELK RIVER LLC, a Minnesota
limited liability company

By:_____

Brent Herron
Its President

STATE OF COLORADO          )
                           ) ss
COUNTY OF _Adams_          )

The foregoing instrument was acknowledged before me this __20th__ day of October, 2021, by Brent Herron, the President of Freeport Elk River LLC, a Minnesota limited liability company, for and on behalf of the limited liability company.

HAILEY HANNER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214034029
MY COMMISSION EXPIRES AUGUST 26, 2025

_____
Notary Public

MINNESOTA
JUDICIAL
BRANCH

S-1

**EXHIBIT B**

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page52 of 134

MidCountry/Freeport
Guaranty – Freeport

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page31 of 71



**PERSONAL GUARANTY**

BY

BRENT HERRON

TO

MIDCOUNTRY BANK

Dated:  October 21, 2021

This instrument was drafted by:

WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, MN  55402

**EXHIBIT C**

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page53 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page52 of 71

## PERSONAL GUARANTY

In consideration of and in order to induce MidCountry Bank, a federal savings bank organized under the laws of the United States of America with its banking house located in Bloomington, Minnesota (the "Lender"), to extend financial accommodations to Freeport Elk River LLC, a Minnesota limited liability company (the "Borrower"), pursuant to that certain Loan Agreement of even date herewith by and between the Lender and the Borrower (as the same may be amended, restated, renewed or supplemented, the "Loan Agreement") and as evidenced by that certain Real Estate Note of even date herewith executed by the Borrower in the original principal amount of $24,240,000 and payable to the order of the Lender ((as the same may be amended, restated, renewed or supplemented, the "Note"), the undersigned (the "Guarantor") hereby:

1.     Unconditionally and absolutely guarantees to the Lender:

   (a)     the full and prompt payment, when due, whether at the maturity dates specified therein or theretofore upon acceleration of maturity pursuant to the provisions thereof, of principal, accrued interest, prepayment premiums and late charges, if any, on the Note, and any and all renewals thereof including notes taken in substitution therefor; and

   (b)     any and all other liability or indebtedness of the Borrower to the Lender whether now existing or hereafter arising, joint or joint and several, contingent or direct; and

   (c)     the payment and performance by the Borrower of all of its obligations under and pursuant to the Note, the Loan Agreement and any and all documents related thereto;

(the Note, the Loan Agreement and such other liability, indebtedness and obligations set forth above are herein collectively referred to as the "Obligations"); together with the full and prompt payment of any and all costs and expenses of and incidental to the collection of the Obligations or the enforcement of this Guaranty, including, without limitation, attorneys' fees.

2.     Agrees that the Lender may demand payment from the Guarantor of any installment (or portion thereof) of principal or interest on the Note, when due, and the Guarantor shall immediately pay the same to the Lender, and the Lender may demand payment or performance of any or all of the other Obligations, when such payment or performance is due or required, and the Guarantor shall immediately pay or perform the same, whether or not the Lender has (i) declared an Event of Default, or (ii) accelerated payment of the Note, or (iii) commenced repossession of, or foreclosure of any security interest, mortgage or other lien in, any or all of the collateral securing the Note, or (iv) otherwise exercised its rights and remedies hereunder or under the Note, the documents related thereto or applicable law.

3.     Waives (i) presentment, demand, notice of nonpayment, protest and notice of protest and dishonor on the Obligations; (ii) notice of acceptance of this Guaranty by the Lender; and (iii) notice of the creation or incurrence of the Obligations by the Borrower.

4.     Agrees that the Lender may from time to time, without notice to the Guarantor, which notice is hereby waived by the Guarantor, extend, modify, renew or compromise the Obligations, in whole or in part, without releasing, extinguishing or affecting in any manner whatsoever the

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT    Doc#:44    Filed:08/19/25    Entered:08/20/25 10:34:47    Page54 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

Case:25-14392-KHT    Doc#:41-2    Filed:08/19/25    Entered:08/19/25 12:41:03    Page33 of 71

liability of the Guarantor hereunder, the foregoing acts being hereby consented to by the Guarantor.

5.      Agrees that the Lender shall not be required to first resort for payment to the Borrower or any other person, corporation or entity, or their properties or estates, or any other right or remedy whatsoever, prior to enforcing this Guaranty.

6.      Agrees that this Guaranty shall be construed as a continuing, absolute, and unconditional guaranty without regard to (i) the validity, regularity or enforceability of the Obligations or the disaffirmance thereof in any insolvency or bankruptcy proceeding relating to the Borrower, or (ii) any event or any conduct or action of the Borrower or the Lender or any other party which might otherwise constitute a legal or equitable discharge of a surety or guarantor but for this provision.

7.      Agrees that this Guaranty shall remain in full force and effect and be binding upon the Guarantor until the Obligations are paid in full.

8.      Agrees that the Lender is expressly authorized to forward or deliver any or all collateral and security which may at any time be placed with it by the Borrower, the Guarantor or any other person, directly to the Borrower for collection and remittance or for credit, or to collect the same in any other manner and to renew, extend, compromise, exchange, release, surrender or modify the installments of, any or all of such collateral and security with or without consideration and without notice to the Guarantor and without in any manner affecting the absolute liability of the Guarantor hereunder; and that the liability of the Guarantor hereunder shall not be affected or impaired by any failure, neglect or omission on the part of the Lender to realize upon the Obligations, or upon any collateral or security therefor, nor by the taking by the Lender of any other guaranty or guaranties to secure the Obligations or any other indebtedness of the Borrower to the Lender, nor by the taking by the Lender of collateral or security of any kind nor by any act or failure to act whatsoever which, but for this provision, might or could in law or in equity act to release or reduce the Guarantor's liability hereunder.

9.      Waives any right that the Guarantor may have to collect or seek to collect from the Borrower the claim, if any, by subrogation or otherwise, acquired by the Guarantor through payment of any part or all of the Obligations until the Obligations have been paid in full.

10.     Agrees that the liability of the Guarantor hereunder shall not be affected or impaired by the existence or creation from time to time, with or without notice to the Guarantor, which notice is hereby waived, of indebtedness from the Borrower to the Lender in addition to the indebtedness evidenced by the Note; the creation or existence of such additional indebtedness being hereby consented to by the Guarantor.

11.     Agrees that the possession of this instrument of guaranty by the Lender shall be conclusive evidence of due execution and delivery hereof by the Guarantor.

12.     Agrees that this Guaranty shall be binding upon the legal representatives, successors and assigns of the Guarantor, and shall inure to the benefit of the Lender and its successors, assigns and legal representatives; that notwithstanding the foregoing, the Guarantor shall have no right to

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page55 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport
Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page34 of 71

assign or otherwise transfer the Guarantor's rights and obligations under this Guaranty to any third party without the prior written consent of the Lender; and that any such assignment or transfer shall not release or affect the liability of the Guarantor hereunder in any manner whatsoever.

13.     Agrees that the Guarantor may be joined in any action or proceeding commenced against the Borrower in connection with or based upon the Obligations and recovery may be had against the Guarantor in any such action or proceeding or in any independent action or proceeding against him should the Borrower fail to duly and punctually pay any of the principal of or interest on the Obligations without any requirement that the Lender first assert, prosecute or exhaust any remedy or claim against the Borrower.

14.     Agrees that upon the occurrence at any time of an Event of Default, the Lender shall have the right to set off any and all amounts due hereunder by the Guarantor to the Lender against any indebtedness or obligation of the Lender to the Guarantor.

15.     Agrees that the Guarantor shall be liable to the Lender for any deficiency remaining after foreclosure of any mortgage in real estate or any security interest in personal property granted by the Borrower, the Guarantor or any third party to the Lender to secure repayment of the Obligations and the subsequent sale by the Lender of the property subject thereto to a third party (whether at a foreclosure sale or at a sale thereafter by the Lender in the event the Lender purchases said property at the foreclosure sale) notwithstanding any provision of applicable law which may prevent the Lender from obtaining a deficiency judgment against, or otherwise collecting a deficiency from, the Borrower, including, without limitation, Minnesota Statutes 582.30.

16.     Agrees that this Guaranty shall be deemed a contract made under and pursuant to the laws of the State of Minnesota and shall be governed by and construed under the laws of such state without giving effect to the choice of law provisions thereof; and that, wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of the Guaranty.

17.     Agrees that no failure on the part of the Lender to exercise, and no delay in exercising, any right or remedy hereunder shall operate as or constitute a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

18.     Waives any and all claims against the Lender and defenses to performance and payment hereunder relating in any way, directly or indirectly, to the performance of the Lender's obligations or exercise of any of its rights under the Note and the documents related thereto.

EXHIBIT C

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty - Freeport

19.    Warrants and represents to the Lender as follows:

(a)    <u>Enforceability</u>.  This Guaranty constitutes the legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms (subject, as to enforceability, to limitations resulting from bankruptcy, insolvency or other similar laws affecting creditors' rights generally).

(b)    <u>Litigation</u>.  There is no action, suit or proceeding pending or, to the knowledge of the Guarantor, threatened against or affecting the Guarantor which, if adversely determined, would have a material adverse effect on the condition (financial or otherwise), properties or assets of the Guarantor, or which would question the validity of this Guaranty or any instrument, document or other agreement related hereto or required hereby, or impair the ability of the Guarantor to perform the Guarantor's obligations hereunder or thereunder.

(c)    <u>Default</u>.  The Guarantor is not in default of a material provision under any agreement, instrument, decree or order to which the Guarantor is a party or by which the Guarantor or the Guarantor's property is bound or affected.

(d)    <u>Consents</u>.  To the Guarantor's knowledge, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any governmental authority or any third party is required in connection with the execution and delivery of this Guaranty or any of the agreements or instruments herein mentioned to which the Guarantor is a party or the carrying out or performance of any of the transactions required or contemplated hereby or thereby or, if required, such consent, approval, order or authorization has been obtained or such registration, declaration or filing has been accomplished or such notice has been given prior to the date hereof.

(e)    <u>Taxes</u>.  The Guarantor has filed all tax returns required to be filed and has paid all taxes shown thereon to be due, including interest and penalties, which are not being contested in good faith and by appropriate proceedings and has no information or knowledge of any objections to or claims for additional taxes in respect of federal income or excess profits tax returns for prior years.

(f)    <u>Financial Condition</u>. The financial statements of the Guarantor furnished to the Lender are complete and correct in all respects and fairly present the financial condition of the Guarantor at the dates of such statements, and have been prepared in accordance with generally accepted accounting principles, consistently applied. Since the most recent set of financial statements delivered by the Guarantor to the Lender, there have been no material adverse changes in the financial condition of the Guarantor.

(g)    <u>Residence, Etc.</u>.  The Guarantor is an individual person who is a citizen of the United States of America and a citizen and resident of the State of Colorado, who is under no legal disability. The obligations of the Guarantor under this Guaranty are or will be incurred in the interest of the marriage and family of the Guarantor.

EXHIBIT C

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

20.     Agrees that the liability of the Guarantor and any other guarantor of the Obligations shall be joint and several.

21.     Agrees to deliver to the Lender the financial information and documentation required under the Loan Agreement for the Guarantor.

22.     Agrees that (i) the Guarantor will indirectly benefit by and from the making of the loan by the Lender to the Borrower evidenced by the Note; (ii) the Guarantor has received legal and adequate consideration for the execution of this Guaranty and has executed and delivered this Guaranty to the Lender in good faith in exchange for reasonably equivalent value; (iii) the Guarantor is not presently insolvent and will not be rendered insolvent by virtue of the execution and delivery of this Guaranty; (iv) the Guarantor has not executed or delivered this Guaranty with actual intent to hinder, delay or defraud the Guarantor's creditors; and (v) the Lender has agreed to make such loan in reliance upon this Guaranty.

23.     Agrees that if, at any time, all or any part of any payment previously applied by the Lender to any of the Obligations must be returned by the Lender for any reason, whether by court order, administrative order or settlement, the Guarantor shall remain liable for the full amount returned as if said amount had never been received by the Lender, notwithstanding any term of this Guaranty or the cancellation or return of any note or other agreement evidencing the Obligations.

24.     Irrevocably submits to the jurisdiction of any Minnesota state court or federal court over any action or proceeding arising out of or relating to this Guaranty, the Note and any instrument, agreement or document related thereto (collectively, the "Loan Documents"); agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state or federal court; irrevocably waives, to the fullest extent he may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding; irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing by United States certified mail, return receipt requested, of copies of such process to the Guarantor's last known address; and agrees that judgment final by appeal, or expiration of time to appeal without an appeal being taken, in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by law; provided that nothing in this paragraph shall affect the right of the Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against either Guarantor or his property in the courts of any other jurisdiction to the extent permitted by law.

EXHIBIT C

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

**25.    WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED ON OR PERTAINING TO THIS GUARANTY OR THE OTHER LOAN DOCUMENTS.**

Dated as of this 21st day of October, 2021.

15357-206
22548825v1

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page59 of 134

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page38 of 71

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

_____

BRENT HERRON

STATE OF COLORADO       )
                        ) ss
COUNTY OF Adams         )

The foregoing instrument was acknowledged before me this 20 day of October, 2021, by Brent Herron, an individual.

_____
Notary Public

HAILEY HANNER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214034029
MY COMMISSION EXPIRES AUGUST 26, 2025

S-1

**EXHIBIT C**

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

**PERSONAL GUARANTY**

BY

MICHELLE HERRON

TO

MIDCOUNTRY BANK

Dated:  October 21, 2021

This instrument was drafted by:

WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, MN  55402

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page61 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty Freeport

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:42:03   Page:40 of 71

# PERSONAL GUARANTY

In consideration of and in order to induce MidCountry Bank, a federal savings bank organized under the laws of the United States of America with its banking house located in Bloomington, Minnesota (the "Lender"), to extend financial accommodations to Freeport Elk River LLC, a Minnesota limited liability company (the "Borrower"), pursuant to that certain Loan Agreement of even date herewith by and between the Lender and the Borrower (as the same may be amended, restated, renewed or supplemented, the "Loan Agreement") and as evidenced by that certain Real Estate Note of even date herewith executed by the Borrower in the original principal amount of $24,240,000 and payable to the order of the Lender ((as the same may be amended, restated, renewed or supplemented, the "Note"), the undersigned (the "Guarantor") hereby:

1.      Unconditionally and absolutely guarantees to the Lender:

    (a)      the full and prompt payment, when due, whether at the maturity dates specified therein or theretofore upon acceleration of maturity pursuant to the provisions thereof, of principal, accrued interest, prepayment premiums and late charges, if any, on the Note, and any and all renewals thereof including notes taken in substitution therefor; and

    (b)      any and all other liability or indebtedness of the Borrower to the Lender whether now existing or hereafter arising, joint or joint and several, contingent or direct; and

    (c)      the payment and performance by the Borrower of all of its obligations under and pursuant to the Note, the Loan Agreement and any and all documents related thereto;

(the Note, the Loan Agreement and such other liability, indebtedness and obligations set forth above are herein collectively referred to as the "Obligations"); together with the full and prompt payment of any and all costs and expenses of and incidental to the collection of the Obligations or the enforcement of this Guaranty, including, without limitation, attorneys' fees.

2.      Agrees that the Lender may demand payment from the Guarantor of any installment (or portion thereof) of principal or interest on the Note, when due, and the Guarantor shall immediately pay the same to the Lender, and the Lender may demand payment or performance of any or all of the other Obligations, when such payment or performance is due or required, and the Guarantor shall immediately pay or perform the same, whether or not the Lender has (i) declared an Event of Default, or (ii) accelerated payment of the Note, or (iii) commenced repossession of, or foreclosure of any security interest, mortgage or other lien in, any or all of the collateral securing the Note, or (iv) otherwise exercised its rights and remedies hereunder or under the Note, the documents related thereto or applicable law.

3.      Waives (i) presentment, demand, notice of nonpayment, protest and notice of protest and dishonor on the Obligations; (ii) notice of acceptance of this Guaranty by the Lender; and (iii) notice of the creation or incurrence of the Obligations by the Borrower.

4.      Agrees that the Lender may from time to time, without notice to the Guarantor, which notice is hereby waived by the Guarantor, extend, modify, renew or compromise the Obligations, in whole or in part, without releasing, extinguishing or affecting in any manner whatsoever the

**EXHIBIT C**

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page62 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page41 of 71

liability of the Guarantor hereunder, the foregoing acts being hereby consented to by the Guarantor.

5.      Agrees that the Lender shall not be required to first resort for payment to the Borrower or any other person, corporation or entity, or their properties or estates, or any other right or remedy whatsoever, prior to enforcing this Guaranty.

6.      Agrees that this Guaranty shall be construed as a continuing, absolute, and unconditional guaranty without regard to (i) the validity, regularity or enforceability of the Obligations or the disaffirmance thereof in any insolvency or bankruptcy proceeding relating to the Borrower, or (ii) any event or any conduct or action of the Borrower or the Lender or any other party which might otherwise constitute a legal or equitable discharge of a surety or guarantor but for this provision.

7.      Agrees that this Guaranty shall remain in full force and effect and be binding upon the Guarantor until the Obligations are paid in full.

8.      Agrees that the Lender is expressly authorized to forward or deliver any or all collateral and security which may at any time be placed with it by the Borrower, the Guarantor or any other person, directly to the Borrower for collection and remittance or for credit, or to collect the same in any other manner and to renew, extend, compromise, exchange, release, surrender or modify the installments of, any or all of such collateral and security with or without consideration and without notice to the Guarantor and without in any manner affecting the absolute liability of the Guarantor hereunder; and that the liability of the Guarantor hereunder shall not be affected or impaired by any failure, neglect or omission on the part of the Lender to realize upon the Obligations, or upon any collateral or security therefor, nor by the taking by the Lender of any other guaranty or guaranties to secure the Obligations or any other indebtedness of the Borrower to the Lender, nor by the taking by the Lender of collateral or security of any kind nor by any act or failure to act whatsoever which, but for this provision, might or could in law or in equity act to release or reduce the Guarantor's liability hereunder.

9.      Waives any right that the Guarantor may have to collect or seek to collect from the Borrower the claim, if any, by subrogation or otherwise, acquired by the Guarantor through payment of any part or all of the Obligations until the Obligations have been paid in full.

10.     Agrees that the liability of the Guarantor hereunder shall not be affected or impaired by the existence or creation from time to time, with or without notice to the Guarantor, which notice is hereby waived, of indebtedness from the Borrower to the Lender in addition to the indebtedness evidenced by the Note; the creation or existence of such additional indebtedness being hereby consented to by the Guarantor.

11.     Agrees that the possession of this instrument of guaranty by the Lender shall be conclusive evidence of due execution and delivery hereof by the Guarantor.

12.     Agrees that this Guaranty shall be binding upon the legal representatives, successors and assigns of the Guarantor, and shall inure to the benefit of the Lender and its successors, assigns and legal representatives; that notwithstanding the foregoing, the Guarantor shall have no right to

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT    Doc#:44    Filed:08/19/25    Entered:08/20/25 10:34:47    Page63 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

Case:25-14392-KHT    Doc#:41-2    Filed:08/19/25    Entered:08/19/25 12:41:03    Page42 of 71

assign or otherwise transfer the Guarantor's rights and obligations under this Guaranty to any third party without the prior written consent of the Lender; and that any such assignment or transfer shall not release or affect the liability of the Guarantor hereunder in any manner whatsoever.

13.    Agrees that the Guarantor may be joined in any action or proceeding commenced against the Borrower in connection with or based upon the Obligations and recovery may be had against the Guarantor in any such action or proceeding or in any independent action or proceeding against him should the Borrower fail to duly and punctually pay any of the principal of or interest on the Obligations without any requirement that the Lender first assert, prosecute or exhaust any remedy or claim against the Borrower.

14.    Agrees that upon the occurrence at any time of an Event of Default, the Lender shall have the right to set off any and all amounts due hereunder by the Guarantor to the Lender against any indebtedness or obligation of the Lender to the Guarantor.

15.    Agrees that the Guarantor shall be liable to the Lender for any deficiency remaining after foreclosure of any mortgage in real estate or any security interest in personal property granted by the Borrower, the Guarantor or any third party to the Lender to secure repayment of the Obligations and the subsequent sale by the Lender of the property subject thereto to a third party (whether at a foreclosure sale or at a sale thereafter by the Lender in the event the Lender purchases said property at the foreclosure sale) notwithstanding any provision of applicable law which may prevent the Lender from obtaining a deficiency judgment against, or otherwise collecting a deficiency from, the Borrower, including, without limitation, Minnesota Statutes 582.30.

16.    Agrees that this Guaranty shall be deemed a contract made under and pursuant to the laws of the State of Minnesota and shall be governed by and construed under the laws of such state without giving effect to the choice of law provisions thereof; and that, wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of the Guaranty.

17.    Agrees that no failure on the part of the Lender to exercise, and no delay in exercising, any right or remedy hereunder shall operate as or constitute a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

18.    Waives any and all claims against the Lender and defenses to performance and payment hereunder relating in any way, directly or indirectly, to the performance of the Lender's obligations or exercise of any of its rights under the Note and the documents related thereto.

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page64 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page43 of 71

19.     Warrants and represents to the Lender as follows:

(a)     <u>Enforceability</u>.  This Guaranty constitutes the legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms (subject, as to enforceability, to limitations resulting from bankruptcy, insolvency or other similar laws affecting creditors' rights generally).

(b)     <u>Litigation</u>.  There is no action, suit or proceeding pending or, to the knowledge of the Guarantor, threatened against or affecting the Guarantor which, if adversely determined, would have a material adverse effect on the condition (financial or otherwise), properties or assets of the Guarantor, or which would question the validity of this Guaranty or any instrument, document or other agreement related hereto or required hereby, or impair the ability of the Guarantor to perform the Guarantor's obligations hereunder or thereunder.

(c)     <u>Default</u>.  The Guarantor is not in default of a material provision under any agreement, instrument, decree or order to which the Guarantor is a party or by which the Guarantor or the Guarantor's property is bound or affected.

(d)     <u>Consents</u>.  To the Guarantor's knowledge, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any governmental authority or any third party is required in connection with the execution and delivery of this Guaranty or any of the agreements or instruments herein mentioned to which the Guarantor is a party or the carrying out or performance of any of the transactions required or contemplated hereby or thereby or, if required, such consent, approval, order or authorization has been obtained or such registration, declaration or filing has been accomplished or such notice has been given prior to the date hereof.

(e)     <u>Taxes</u>.  The Guarantor has filed all tax returns required to be filed and has paid all taxes shown thereon to be due, including interest and penalties, which are not being contested in good faith and by appropriate proceedings and has no information or knowledge of any objections to or claims for additional taxes in respect of federal income or excess profits tax returns for prior years.

(f)     <u>Financial Condition</u>. The financial statements of the Guarantor furnished to the Lender are complete and correct in all respects and fairly present the financial condition of the Guarantor at the dates of such statements, and have been prepared in accordance with generally accepted accounting principles, consistently applied. Since the most recent set of financial statements delivered by the Guarantor to the Lender, there have been no material adverse changes in the financial condition of the Guarantor.

(g)     <u>Residence, Etc.</u>.  The Guarantor is an individual person who is a citizen of the United States of America and a citizen and resident of the State of Colorado, who is under no legal disability. The obligations of the Guarantor under this Guaranty are or will be incurred in the interest of the marriage and family of the Guarantor.

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page65 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Guaranty – Freeport

Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page44 of 71

20.     Agrees that the liability of the Guarantor and any other guarantor of the Obligations shall be joint and several.

21.     Agrees to deliver to the Lender the financial information and documentation required under the Loan Agreement for the Guarantor.

22.     Agrees that (i) the Guarantor will indirectly benefit by and from the making of the loan by the Lender to the Borrower evidenced by the Note; (ii) the Guarantor has received legal and adequate consideration for the execution of this Guaranty and has executed and delivered this Guaranty to the Lender in good faith in exchange for reasonably equivalent value; (iii) the Guarantor is not presently insolvent and will not be rendered insolvent by virtue of the execution and delivery of this Guaranty; (iv) the Guarantor has not executed or delivered this Guaranty with actual intent to hinder, delay or defraud the Guarantor's creditors; and (v) the Lender has agreed to make such loan in reliance upon this Guaranty.

23.     Agrees that if, at any time, all or any part of any payment previously applied by the Lender to any of the Obligations must be returned by the Lender for any reason, whether by court order, administrative order or settlement, the Guarantor shall remain liable for the full amount returned as if said amount had never been received by the Lender, notwithstanding any term of this Guaranty or the cancellation or return of any note or other agreement evidencing the Obligations.

24.     Irrevocably submits to the jurisdiction of any Minnesota state court or federal court over any action or proceeding arising out of or relating to this Guaranty, the Note and any instrument, agreement or document related thereto (collectively, the "Loan Documents"); agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state or federal court; irrevocably waives, to the fullest extent he may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding; irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing by United States certified mail, return receipt requested, of copies of such process to the Guarantor's last known address; and agrees that judgment final by appeal, or expiration of time to appeal without an appeal being taken, in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by law; provided that nothing in this paragraph shall affect the right of the Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against either Guarantor or his property in the courts of any other jurisdiction to the extent permitted by law.

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page66 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Case:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:08   Guaranty - Freeport 71

**25.  WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED ON OR PERTAINING TO THIS GUARANTY OR THE OTHER LOAN DOCUMENTS.**

Dated as of this 21st day of October, 2021.

15357-206
22548828v1



[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT C

71-CV-24-752

Case:25-14392-KHT  Doc#:44  Filed:08/19/25  Entered:08/20/25 10:34:47  Page67 of 134

Filed in District Court
State of Minnesota
6/3/2024 4:19 PM

MidCountry/Freeport
Case:25-14392-KHT  Doc#:41-2  Filed:08/19/25  Entered:08/19/25 12:41:05  Guaranty – Freeport Page46 of 71

_____

MICHELLE HERRON

STATE OF COLORADO          )
                           ) ss
COUNTY OF Adams            )

The foregoing instrument was acknowledged before me this 20 day of October, 2021, by Michelle Herron, an individual.

_____
Notary Public

HAILEY HANNER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214034029
MY COMMISSION EXPIRES AUGUST 26, 2025

EXHIBIT C

**From:** "Matt Onofrio" <onofriomatt@gmail.com>

**To:** "keith.gordon@midcountrybank.com" <keith.gordon@midcountrybank.com>

**Subject:** Buyer for Elk River Cub

**Date:** Thu, 01 Jul 2021 10:17:47 -0500

**Importance:** Normal

**Attachments:** Personal_Financial_Statement-_Herron.pdf



CONFIDENTIAL

NORTHWOODS017986

**EXHIBIT D**

## American Bank

American Bank of Beaver Dam
115 Front St., 1519 N. Spring St., 120 Frances Lane
Beaver Dam, WI 53916
920-885-2705

**Personal Financial Statement**

**CHECK ONE OF THE FOLLOWING BOXES. YOU MAY APPLY FOR SEPARATE OR JOINT CREDIT.**

[X] SEPARATE CREDIT - Complete Applicant Section with information about yourself. Complete Spouse Section with information about your spouse only if you are married AND a

Wisconsin Resident. Provide the correct information to complete the remainder of the form and sign on the reverse side.

[ ] JOINT CREDIT WITH SPOUSE - Complete Applicant and Spouse Sections along with the remainder of the form.  Applicant and Spouse must both sign on the reverse side.

[ ] JOINT CREDIT WITH _____ who is not your Spouse.  Each of you must complete a separate Financial Statement as if applying for separate

credit and submit them together, including completing Spouse Section if you are married and a Wisconsin Resident.

**FOR MARRIED APPLICANTS RESIDING IN WISCONSIN.**  The credit being applied for, if granted, will be incurred in the interest of my marriage or family. (sign below)

Signature ▶ _____  Date _____

| Applicant | | | | Spouse | | | |
|---|---|---|---|---|---|---|---|
| IF YOU ARE A WISCONSIN RESIDENT INDICATE MARITAL STATUS | | | | CHECK SAME IF DUPLICATE OF APPLICANT INFORMATION | | | |
| □ Married   □ Unmarried  □ Legally Separated | | | | □ Co-Applicant   □ Non-Applicant | | | |
| Please print your full name | | | | Please print your full name | | | |
| Brent Herron | | | | | | | |
| Date of birth | Social Security Number | | | Date of birth | Social Security Number | | |
| | ____4605 | | | | | | |
| Current Address/City/State/Zip | | | | Current Address/City/State/Zip | | | |
| 15287 Huron ST Broomfield CO 80023 | | | | | | | |
| No. of years there | County you live in | Home Phone | | No. of years there | County you live in | Home Phone | |
| 1 | Adams | 303-249-0908 | | □ Same | | | |
| Previous Address/City/State/Zip | | | | Previous Address/City/State/Zip | | | |
| 10365 Julian Ct Broomfield CO 80301 | | | | | | | |
| Number of dependents and ages | | | | Number of dependents and ages | | | |
| 1 - 9 months | | | | | | | |
| Current Employer | How Long? | Business Phone | | Current Employer | How Long? | Business Phone | |
| Colorado Permenente Medical Gro | 3 years | 303-338-4545 | | | | | |
| Employer's Address/City/State/Zip | | Position | | Employer's Address/City/State/Zip | | Position | |
| 11245 Huron St Westminster CO 80301 | | Physician | | | | | |

**Statement of Financial Condition**

| ASSETS (Do not list assets of doubtful value) | | List Dollars-Omit Cents | | Liabilities | | | List Dollars-Omit Cents | |
|---|---|---|---|---|---|---|---|---|
| Schedule A | Cash Equivalent Assets (Cash in | | | Schedule H | Notes Payable to Banks -Unsecured | (17) | 15,000 | |
| | Banks, Money Markets, CDs) | (1) $ | 9,500,000.00 | Schedule H | Notes Payable to Banks-Secured | (18) | | |
| Schedule B | U.S. Gov't and Marketable Securities | (2) $ | 70,000.00 | Schedule H | Amounts Payable to others | (19) | | |
| Schedule C | Non-Marketable Securities | (3) | | | Margin Loans | (20) | | |
| Schedule C | Restricted or Control Stocks | (4) | | | Credit Cards/other Revolving Debt | (21) $ | 20,000.00 | |
| | Securities held in Margin Accounts | (5) | | | Unpaid Income Tax | (22) | | |
| Schedule D | Real Estate Owned and Interests in | | | | Other Unpaid Taxes or Interest | (23) | | |
| | Real Estate Investments | (6) $ | 3,600,000.00 | Schedule D | Real Estate Mortgages Payable | (24) $ | 2,200,000.00 | |
| Schedule E | Limited Partnership Interests | (7) $ | 1,500,000.00 | Schedule F | Life Insurance Policy Loans | (25) | | |

CONFIDENTIAL

NORTHWOODS017987

**EXHIBIT D**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Loans Receivable | (8) | | | Other Debts - Itemize Student loan | (26) | $ | 485,000.00 |
| Schedule F | Autos and Other Personal Property | (9) | $ | 100,000.00 | Other (specify) | (27) | | |
| | Life Insurance - Cash Value | (10) | $ | 35,000.00 | Other (specify) | (28) | | |
| | Retirement Assets | (11) | $ | 185,000.00 | Other (specify) | (29) | | |
| | Other Assets (Itemize) | (12) | | | Other (specify) | (30) | | |
| | Other (specify) | (13) | | | Total Liabilities ▶ | (31) | $ | 2,780,000.00 |
| | Other (specify) | (14) | | | Net Worth *(Assets minus Liabilities)* ▶ | (32) | $ | 12,210,000.00 |
| | Other (specify) | (15) | | | | | | |
| | Total Assets ▶ | (16) | $ | 14,990,000.00 | Total Liabilities and Net Worth ▶ | (33) | $ | 14,990,000.00 |

## Income and Financial Obligation Information

| | | Applicant | | Spouse | | | | |
|---|---|---|---|---|---|---|---|---|
| | Sources of Income for Year ended: | | | | Monthly Obligations | | | |
| | Salary | $ | $ 32,400.00 | $ | Mortgage or Rental Payment | | $ | 5,168.00 |
| | Commission Income | $ | | $ | (Include Tax and Insurance Accrual) | | | |
| | Bonuses | $ | | $ | | | | |
| | Dividends & Interest | $ | | $ | Notes Payable Banks | | $ | 513.00 |
| Schedule D | Net Real Estate Income | $ | $ 682.00 | $ | Amounts Payable to others | Schedule H | $ | |
| | Itemize other Income - Alimony, Child Support or Separate Maint. Pymts. | | | | Interest on Margin Loans | | $ | |
| | need not be disclosed in applicant does not wish them to be used in | | | | Credit Cards (3% of outstanding balance) | | $ | |
| | decision to extend credit. | | | | Alimony or Child Support | | $ | |
| | Other (specify)   BBSC Endurace Sports | $ | $ 12,500.00 | $ | Insurance Premiums | | $ | |
| | Other (specify) | $ | | $ | Itemize other obligations | | $ | |
| | Other (specify) | $ | | $ | Other (specify)     student loans | | $ | 1,124.00 |
| | | | | | Other (specify) | | $ | |
| | TOTAL ▶ | $ | 45,582.00 | $ - | TOTAL ▶ | | $ | 6,805.00 |

## Guarantees & Other Contingent Liabilities

Have you or your spouse guaranteed any indebtedness or have any contingent liabilities?

    X No      ☐ Yes, please describe below

| TYPE | CREDITOR | AMOUNT |
|---|---|---|
| Guarantee | | $ |
| Leases | | $ |
| Legal Claims | | $ |
| Letters of Credit | | $ |
| Other (Describe) | | $ |

Ever been a debtor in bankruptcy proceedings? If yes, please describe.

X No    ☐ Yes    ☐ Applicant    ☐ Spouse

## Personal Information

| Do you have a will? | | Will last revised? | Income Tax Settle Thru |
|---|---|---|---|
| X No  ☐ Yes | | | Date |

Do you have a trust?

☐ Revocable  ☐ Living  ☐ Marital  ☐ Family  ☐ Insurance  ☐ Charitable

Trustee:

| Attorney's Name/Firm | Accountant's Name/Firm |
|---|---|
| | |

Obligations for Alimony, Child Support or Separate Maint. Payments? If yes, describe.

☐ No    ☐ Yes    ☐ Applicant    ☐ Spouse

Ever been a defendant in any suit or legal action?  If yes, please describe.

☐ No    ☐ Yes    ☐ Applicant    ☐ Spouse

CONFIDENTIAL

NORTHWOODS017988

**EXHIBIT D**

**INSTRUCTIONS FOR INFORMATION TO BE SUPPLIED BELOW:**

If married applicants are applying for joint credit, include all assets and all liabilities of both spouses.  Both spouses must sign this statement.

If a married applicant is applying for separate credit or for joint credit with someone other than his/her spouse, include all marital property

and all individual property of the applicant spouse, but DO NOT individual property of the other spouse.

A married applicant must in every case identify the liabilities of both spouses.

For purposes of this statement:

· Marital Property means assets acquired with my or my spouse's income on or after 1-1-86; and

· Individual Property means property owned (whether in joint or sole name) by me prior to marriage, prior to establishing residence in Wisconsin

  or prior to 1-1-86, however acquired, and property acquired by me by gift or inheritance at any time.

### Schedule A · Cash Equivalent Assets

| Name of Financial Institution | Type of Accounts | In the Name of | Balance | Maturity | Are these pledged? |
|---|---|---|---|---|---|
| 1031 exchange | escrow | Brent and Michelle Herron | 1,750,000 | 8/2/21 | |
| Cryptocurrency (Blockfi, Celcius) | Savings Account | Brent Herron | 350,000 | | |
| Ally Financial | savings account | Brent Herron | 7,750,000 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

### Schedule B · US Government and Marketable Securities

| No. of Shares/face value (bonds) | Description-Name | In Name of | Restricted? | Cost | Market Value | Are these pledged? |
|---|---|---|---|---|---|---|
| Etrade | ETFs | Brent Herron | no | | 66,000 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### Schedule C · Non-Marketable Securities and Restricted or Control Stocks

| No. of Shares/face value (bonds) | Description-Name | In Name of | Book Value | Market Value | Are these pledged? |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

### Schedule D · Real Estate

| | Property Address | Homestead, Land, Investment, Commercial | Present Market Value |
|---|---|---|---|
| Property A | 15287 Huron St Broomfield CO 80023 | Primary | 1,300,000 |
| Property B | 10365 Julian Ct Westminster CO 80023 | Investment | 750,000 |
| Property C | 23 GCR 6121 Granby CO 80041 | Investment | 800,000 |
| Property D | 150 Lashley Ln Boulder CO 80303 | Investment | 750,000 |
| Property E | | | |

CONFIDENTIAL

NORTHWOODS017989

**EXHIBIT D**

## Schedule D · Continued

| | Mortgage Holder | Mortgage Maturity | Mortgage Amt. (Total Line 24) | Monthly rent income | Mortgage Pymt. | Tax & Insurance Accruals | Net Rental Income |
|---|---|---|---|---|---|---|---|
| A | Key Bank | Jun-49 | 5,168 | 0 | | | |
| B | Huntigton | Mar-48 | 2835 | 3125 | | | 290 |
| C | Key bank | Aug-47 | 2,582 | 3000 | | | 418 |
| D | Flagstar | July - | 2526 | 2500 | | | -28 |
| E | | | 7,943 | 8625 | | | |

## Schedule E · Limited Partnership Interests

| Name of Partnership | Type | Orig. Cash Outlay | Add. Required Contributions | Contingent Liability or Letter of Credit | Est. Market Value | Net Monthly Cash Flow |
|---|---|---|---|---|---|---|
| BBSC Endurance Spo | LLC | | 100% Owner | | 1,500,000 | 12,500 |
| | | | | | | |

## Schedule F · Life Insurance Carried Including Group Insurance

| Name of Insurance Company | Owner of Policy | Beneficiary | Face Amount | Cash Value of life insurance (total line 10) | Policy Loans (Total line 25) | |
|---|---|---|---|---|---|---|
| MTL Insurance Compa | Brent Herron | Michelle Lund | 4,000,000 | 35,000 | | |
| | | | | | | |

## Schedule G · Disability Insurance Carried

| Name of Insurance Company | Owner of Policy | Person Covered | Amount of Coverage · | Short/Long Term | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

## Schedule H · Credit Information (excluding Credit Cards and First Mortgage Loans)

| Creditor | Credit In name of | Original Date | High Credit | Current Balance (17-19) | Collateral | Monthly Pymt. |
|---|---|---|---|---|---|---|
| Lightstream | Brent Herron | May-16 | 26,000 | 15,000 | unsecured | 513 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

The information contained in this statement is provided for the purpose of obtaining, or maintaining credit with you on behalf of the undersigned, or persons, firms or corporations on whole behalf the undersigned may either severally or jointly with others, execute a guarantee in your favor. Each undersigned understands that you are relying on the information provided herein (including the designation made as to ownership of property) in deciding to grant or continue credit. Each undersigned represents and warrants that the information provided is true and complete and that you may consider this statement as continuing to be true and correct until a written notice of a change is given to you by the undersigned. You are authorized to make all inquiries you deem necessary to verify the accuracy of the statements made herein, and to determine my/our credit worthiness. You are authorized to answer questions about your credit experience with me/us. NOTICE TO MARRIED APPLICANTS RESIDING IN WISC No provisions of any marital property agreement, unilateral statement under sec. 766.59, Wis. Stats, or court decree under sec. 766.70 adversely affects the interest of the creditor unless the creditor, prior to the time the credit is granted is furnished a copy of the agreement, statement or decree or has actual knowledge of the adverse provision when the obligation to the creditor is incurred.

► _Brent Oro_                                              ► _____
SIGNATURE - APPLICANT                                        SIGNATURE - SPOUSE OR NON-APPLICANT

7/1/21
Date Signed

CONFIDENTIAL

NORTHWOODS017990

**EXHIBIT D**

**From:** "Matt Onofrio" <onofriomatt@gmail.com>
    **To:** "Brent Herron" <brent@yourcausesports.org>
  **Subject:** Fwd: FW: outgoing wire
    **Date:** Thu, 09 Sep 2021 10:46:13 -0500
**Importance:** Normal
**Inline-Images:** image001.jpg

---

---------- Forwarded message ---------
From: **Kristi Barnhart** <kbarnhart@premierbanks.com>
Date: Thu, Sep 9, 2021 at 10:45 AM
Subject: FW: outgoing wire
To: Matt Onofrio <onofriomatt@gmail.com>

Hi Matt,

Please see below for confirmation of the $9,500,000.00 wire that was sent this morning.

Thanks!

Kristi

**From:** Tonya Shark-Stuedemann <tshark@premierbanks.com>
**Sent:** Thursday, September 9, 2021 10:45 AM
**To:** Kristi Barnhart <kbarnhart@premierbanks.com>
**Cc:** Wire Desk <wires@premierbanks.com>
**Subject:** outgoing wire

9,500,000.00          20210909QMGFT006000532

**Tonya Shark** | Wire Desk



Bank Local. Bank Premier.



CONFIDENTIAL

NORTHWOODS019648

**EXHIBIT D**

**Office:** 651-777-7700   Ext.1188

2866 White Bear Avenue, Maplewood MN 55109

CONFIDENTIAL

NORTHWOODS019649

**EXHIBIT D**

**From:** "Matt Onofrio" <onofriomatt@gmail.com>
**To:** "Brent Herron" <brent@yourcausesports.org>, "Lisa Whelan"
     <lwhelan@premierbanks.com>, kbarnhart@premierbanks.com
**Subject:** Wire Instructions
**Date:** Thu, 09 Sep 2021 11:14:13 -0500
**Importance:** Normal
**Attachments:** 4_20_21_Northwood_Management_wire_instructions.pdf

---

Brent,
Please see attached return Wire instructions for tmrw.

Northwoods Management LLC
2602 Jeanne LN
Eau Claire, WI 54703

Call me if you need anything.
Thanks, Matt



CONFIDENTIAL

NORTHWOODS019651

**EXHIBIT D**



## Premier Banks  Wiring Instructions

**Domestic Wires:**

1. **Wire to:**    **Premier Bank**
   **Maplewood, Minnesota**
   **ABA: 096005093**

2. **Credit:**

   a. **Customer Name:** _Northwood Management LLC_

   b. **Customer Acct #:** ▮▮▮▮ _2155_

3. **Contact upon Arrival: if needed:**

   a. **Bank Employee Name:** _Lisa Whelan_

   b. **Office:** _421 Main Rochester_

Wire transfers to Premier Bank Minnesota and Premier Bank Rochester for loan payments must be received and confirmed in our account no later than 2:00 p.m. **CENTRAL TIME** in order to receive same day credit

**International Wires:**

Corresponding Bank:    US Bank
Swift Code:    USBKUS44IMT
Beneficiary:    Premier Bank
Acct #:    ▮▮686

Address: 2866 White Bear Ave, Maplewood, MN 55109

For Further Credit: Customer's name and account number

Revised June 24, 2015             Page 1

CONFIDENTIAL

NORTHWOODS019652
**EXHIBIT D**

Message

| | |
|---|---|
| **From:** | Matt Onofrio [onofriomatt@gmail.com] |
| **Sent:** | 9/10/2021 12:40:09 PM |
| **To:** | Keith Gordon [Keith.Gordon@MidCountryBank.com] |
| **Subject:** | [External Email] -- |

**WELLS FARGO**

Hurricane Branch
8 W. State St
Hurricane Utah, 84737

wellsfargo.com

September 10, 2021

Brent Herron
1528 Heron St
Broomfield Co, 80023

Dear Brent Herron:

This letter is to indicate that the Customer named above has the following deposit accounts with Wells Fargo Bank, N.A.

| Account Number (Last 4-digits) | Date Opened | Current Balance* |
|---|---|---|
| 5851 | 08/26/2008 | $9,503,867.84 |
| | | |
| | | |
| | | |

*The Current Balance provided above is the opening available balance as of the date of this letter but such balance does not include any uncollected items and/or amounts that have not yet been posted to such account as of the date hereof.

**Important Disclosures**

The recipient of this information hereby acknowledges that Wells Fargo ("we", "us") does not represent or warrant that the information provided herein is complete or accurate, and any errors or omissions in the information shall not be a basis for a claim against us. This information may not disclose the entire relationship the Customer maintains with us.

This information is subject to change at any time without notice. We are not obligated to notify the recipient of any change in this information, or if any deposit account relationship referenced herein is, or is in the process of being, modified, terminated, or cancelled, unless we are required to do so by law or under the terms of the applicable deposit account agreement.

This letter does not constitute a guaranty of future balances or credit support of any nature, nor do we accept any duty, responsibility, liability or obligation that may arise from providing this letter, including any reliance upon the information or for any loss or damage that may result.

If you have any questions, please contact me at:   **(435) 635-1700**

A representative will be happy to assist you, as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| Monday – Thursday: | Open | 9:00 AM | Close | 5:00 PM | Mountain Time |
| Friday: | Open | 9:00 AM | Close | 5:00 PM | Mountain Time |
| Saturday: | Open | 9:00 AM | Close | 5:00 PM | Mountain Time |

Thank you. We appreciate your business.

Sincerely,

Shelbie Lathim
Personal Banker (SAFE)
Wells Fargo Bank, N.A.

Shelbie Lathim   U0570   02863
435-635-1700   U1608-011
Wells Fargo Bank, N.A.   COID 119
Hurricane Branch  AU 6776

© 2020 Wells Fargo Bank, N.A. All rights reserved.
04922 (Rev 05 - 06/20)



EXHIBIT 42
WIT: Matthew Onofrio
DATE: 2/19/25
Patrick Mahon, RMR, CRR

Confidential

MCB019417

**EXHIBIT E**

From: "Brent Herron" <brent@yourcausesports.org>

To: "Matt Onofrio" <onofriomatt@gmail.com>

Subject: Deceived at elk park

Date: Wed, 01 Dec 2021 10:58:55 -0600

Importance: Normal

---

Matt,

More has came to light on this transaction and I'm realizing how much you deceived me and how much I'm under water on this mortgage already. Everyone in the community there thinks I'm an idiot. This is why Todd has taken such an interest in who I use for management. Even and article was written about me how this was the stupidest transaction in history. I trusted you and you took advantage of me.

I spoke with Jeff who is president at HJ development who was the second bid on this place at 21 million. He owns many cub foods in the area and deals with Brixmor the most. There were 10 offers total and the only condition was million hard after 1 month. Not unreasonable. Market value of this place is 21-23 million tops. End of story.

The market value of the place is 21 million with a 9% cap. I couldn't sell this for 31 million if my life depended on it right now unless you lied and deceived someone else like me.

Appraisal means nothing as no one would have bought this at 5.8% cap. Especially since you blatantly lied and committed loan fraud on the appraisal.

No one would go above 9% on this as it needs a million dollar parking lot now and new 2.8 million dollar roof in under 10 years.

You said straight up multiple times that you were doing a seller carry and what you were carrying is what you were making. You lied to me. No way around that.
You also said that closing costs might equal out and they ended up costing 300k. You kept that Omar from smoke shop was in jail.

I'm now underwater on this deal and turned 1.75 million into negative 6 million at least. Going to take 15 years and millions of dollars to make this building profitable.

I'm cash negative every month right now with mid America unable to collect rent and huge expenses for parking lot and roof that you said would be taken care of.

The original deal you presented was a 6.98% cap rate. I realize you like to buy 9% places and then sell for 7% so that is what I want. That is what you gave Pete and originally presented to me.

That is a purchase price of 26 million. Which would have made you almost 5 million. A huge profit and the profit you lead me to believe you were making. Instead you sold to me for 30.25 million and deceived and lied to me that I was getting 7% cap rate. Then putting my family and I millions underwater on this. I really don't know how sleep at night knowing this. Once I realized this I certainly can't.

Once again I don't care if it appraised as they received false information and that is not the market value so it means nothing.

I'm sure you value your reputation and I'm really trying to not get extremely angry here and do something rash but I'm about to do everything in my power right now to make sure others don't get screwed like this.

You could have made an easy 4.7 million and not screwed me over. Is that not a healthly profit!!!? You said this was a partnership not you robbing me.

I'm not going to threaten anything at this point but I hope you really use your heart to do some thinking here. I need the seller carry taken off so I can at least make this cash neutral with the massive amount of expenses that need to come out, lawyer fees, etc. And if not going to use your heart to do the right thing I hope you can use your brain to know that this situation can hurt your reputation and put you in jeopardy from a legal perspective if you want to battle this out and be greedy.

CONFIDENTIAL

EXHIBIT 198
WIT: Onofrio
DATE: 3/24/25
Amanda Doherty

NORTHWOODS015408

EXHIBIT F

I want to salvage our relationship and do additional deals with you instead of battling you so I really hope you don't let greed get the best of you and be happy with 4.7 million. Any reasonable person would love that. If you get to greedy doing what you do then eventually everyone is going to figure this out and it is going to come crashing down. Please don't force me to shed light on this.

I'm free to discuss on the phone after 5pm your time.

Brent

Sent from my iPhone

CONFIDENTIAL

NORTHWOODS015409

**EXHIBIT F**

71-CV-24-752

Electronically Served
10/15/2024 8:35 AM
Sherburne County, MN

Case 25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page80 of 134

Filed in District Court
State of Minnesota
10/11/2024

:25-14392-KHT   Doc#:41-2   Filed:08/19/25   Entered:08/19/25 12:41:03   Page59 of 71

STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF SHERBURNE             TENTH JUDICIAL DISTRICT
                                           CASE TYPE: CONTRACT

---

MidCountry Bank,                            Court File No.  71-CV-24-752
                   Plaintiff,                   Judge Brianne J. Buccicone

      v.

                                              **ORDER**

Freeport Elk River LLC; Brent Herron; and
Michelle Herron,

                   Defendants.

---

The above-entitled matter came before the Honorable Brianne J. Buccicone on October 11,
2024 on Plaintiff MidCountry Bank's ("Plaintiff" or the "Bank") motion for default judgment in
the above-captioned matter against Defendants Freeport Elk River LLC ("Borrower"), Brent
Herron ("Mr. Herron"), and Michelle Herron ("Mrs. Herron") (Mr. Herron and Mrs. Herron,
collectively, "Guarantors") (Borrower and Guarantors, collectively, "Defendants").   Plaintiff
appeared by Michael E. Obermueller of Winthrop & Weinstine PA.  Other appearances, if any,
were noted on the record.  The Court, having considered the same, and being duly advised of the
issues in dispute, hereby makes the following findings:

## PARTIES

1.      Plaintiff is a federally chartered savings bank with a main office address of 7825
Washington Avenue South, Suite #120, Bloomington, Minnesota 55439.

2.      Borrower is a Minnesota limited liability company with a registered address of
1809 Northwestern Avenue, Stillwater, MN 55082.

3.      Mr. Herron is a Colorado resident with a residential address of 2153 South Dayton
Street, Denver, CO 80231.

**EXHIBIT G**

4.      Mrs. Herron is a Colorado resident with a residential address of 10365 N. Jullian Court, Westminster, CO 80023.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this lawsuit.

6.      This Court has personal jurisdiction over Defendants pursuant to Minnesota law.

7.      Venue is proper in this Court by consent of the parties under their subject loan documents and pursuant to Minn. Stat. §§ 542.02 and 542.09 because the subject real and personal property of this action are located in Sherburne County.

## FACTUAL BACKGROUND

**A.      The Agreement**

8.      Borrower and the Bank entered into that certain Loan Agreement dated October 21, 2021 ("Loan Agreement") to finance Borrower's acquisition of a retail center located at 19216 Freeport Street NW in Elk River, MN.   Compl. at ¶ 8. A true and correct copy of the Loan Agreement is attached to the Complaint as <u>Exhibit A</u>. *Id.*

9.      In connection with the Loan Agreement, Borrower executed and delivered to Bank that certain Real Estate Note dated October 21, 2021 ("Note"), in the original principal amount of <u>$24,240,000</u> ("Loan"). *Id.* at ¶ 9. A true and correct copy of the Note is attached to the Complaint as <u>Exhibit B</u>. *Id.*

10.     To secure the obligations of Borrower to Bank, including, but not limited to, the obligations under the Loan Agreement and the Note, Borrower executed and delivered to Bank that certain Mortgage, Security Agreement, Fixture Financing Statement and Assignment of Leases and Rents ("Mortgage") in favor of Bank, dated October 22, 2021, recorded with the Sherburne County Office of the Registrar of Titles on October 29, 2021 as Document No. 59905. *Id.* at ¶ 9. A true and correct copy of the Mortgage is attached to the Complaint as <u>Exhibit C</u>. *Id.*

**EXHIBIT G**

11.     The Mortgage encumbered all of the property described therein, which property includes, among other things, all personal property, rents, profits, accounts, and general intangibles of the Borrower within the subject real property ("Collateral") and the real estate, generally described as the Elk River Center, with a common address of 19216 Freeport Street NW, Elk River, MN ("Real Estate," together will Collateral, "Property"). *Id.* at ¶ 11.

12.     To further guarantee the payment and performance of Borrower's obligations to the Bank, including, but not limited to, those under the Loan Agreement, Note, and Mortgage, Mr. Herron and Mrs. Herron each executed and delivered to Bank those certain Personal Guaranties dated October 21, 2021 ("Guaranties"), pursuant to which the Guarantors have jointly and severally, absolutely, and unconditionally guaranteed to the Bank payment of the Note and other obligations of the Borrower to the Bank. *Id.* at ¶ 12. True and correct copies of Mr. Herron's Guaranty and Mrs. Herron's Guaranty are attached to the Complaint as Exhibit D and Exhibit E, respectively. *Id.*

13.     The Loan Agreement, the Note, the Mortgage, the Guaranties, and all documents related thereto, are collectively referred to herein as the "Loan Documents."

14.     The Bank disbursed the principal proceeds of the Loan in accordance with the terms and conditions of the Loan Documents in exchange for, among other things, Borrower's and Guarantors' promises (i) to make monthly payments of principal and interest as required under the Loan Documents; (ii) to abide by the financial and operating covenants set forth in the Loan Documents; and (iii) that its representations and warranties contained in the Loan Documents were, and would remain, true. *Id.* at ¶ 14.

**EXHIBIT G**

15.     The Bank reasonably relied on Borrower's and Guarantors' promises, covenants, representations and warranties reflected in the Loan Documents when the Bank agreed to issue the Note and extend the Loan. *Id.* at ¶ 15.

**B.     Events of Default Under the Loan Documents**

16.     The Loan Documents define the events of default, which include, among other things, failure to provide Bank with truthful representation and failure to make payment of any portion of the Loan when due and owing as required under the Loan Documents, such as the real estate taxes and the monthly principal and interest payments (each defined event of default shall be "Event of Default" herein). *Id.* at ¶ 16.

17.     Section 3.6 of the Loan Agreement states that "representations and warranties contained in Section 4 hereof are true and correct on and as of the date hereof." *Id.* at ¶ 8, Ex. A.

18.     Section 4.5 of the Loan Agreement expressly provides that "[no] Event of Default has occurred and is continuing as of the date hereof and no event has occurred and is continuing which would constitute an Event of Default with notice, lapse of time or both." *Id.*

19.     Section 7.1(b) of the Loan Agreement provides that "Borrower or Guarantor shall default in the due performance or observance of any term, covenant, or agreement contained in this Loan Agreement . . . the Loan Documents or in any other documents or agreements delivered pursuant hereto or in connection herewith." *Id.*

20.     Section 7.1(d) of the Loan Agreement provides an Event of Default occurs under the Loan Agreement "[i]f any representation or warranty contained in this Loan Agreement, any of the Loan Documents, or any letter or certificate furnished or to be furnished to [Bank] proves to be false as of the date of the Loan Agreement, or the date such Loan Documents are executed or at the time such letter or certificate is delivered to [Bank]." *Id.*

4

**EXHIBIT G**

21.     Section 7.01 of the Mortgage provides that it is it is an event of default under the Mortgage if an "Event of Default occurs under the Loan Agreement."  Compl. at ¶ 9, Ex. C.

**C.**     **Borrower and Guarantors Default Under the Loan Documents**

22.     Borrower and Guarantors have defaulted and materially breached certain terms, conditions, and covenants of the Loan Documents, including, but not limited to, falsifying the purchase price of the Real Estate in a purchase agreement and providing materially untrue information to Bank in order to secure the Loan, in addition to failing to timely pay amounts due and owing to Bank  under the Loan Documents.  Compl. at ¶ 22.

23.     In the Loan Documents, Borrower and Guarantors warrant that the information furnished to Bank are true and correct, but Defendants falsified the purchase price of the Real Estate in a purchase agreement to secure the Loan. *Id.* at ¶ 23.

24.     Guarantors provided Bank with materially untrue financial information to falsify their financial position. *Id.* at ¶ 24.

25.     In addition, Borrower and Guarantors have failed to timely pay, among other things, the taxes against the Real Estate and the monthly principal and interest payments due and owing to Bank. *Id.* at ¶ 25.

26.     As a result of Borrower's and Guarantors' defaults and material breaches of the Loan Documents, on January 4, 2023, Bank sent Borrower and Guarantor a written notice of default ("Notice of Default"). *Id.* at ¶ 26. A true and correct copy of the Notice of Default is attached to the Complaint as Exhibit F. *Id.*

**D.**     **The Bank's Remedies for Borrower and Guarantors' Defaults**

27.     The Loan Documents enable the Bank to exercise its rights and remedies by, among other things, accelerating the Loan and implementing default interest at a rate equal to five percent (5.00%) per annum in excess of the then-current interest rate. *Id.* at ¶ 27.

5

**EXHIBIT G**

**E.**     **The Forbearance Agreement and First Amendment**

28.     On or around February 7, 2023, the Bank, Borrower, and Guarantors entered into a Forbearance Agreement dated and effective February 1, 2023 ("Forbearance Agreement") as a result of Borrower's and Guarantors' request that the Bank forbear from exercising its rights and remedies under the Loan Documents and applicable laws. *Id.* at ¶ 28. A true and correct copy of the Forbearance Agreement is attached to the Complaint as Exhibit G. *Id.*

29.     Under the Forbearance Agreement, the Bank agreed to forbear from exercising some of its rights and remedies under the Loan Documents in exchange for Borrower committing to: (a) cause tenant payments in connection with the Real Estate to be deposited in the operating account established for the same at the Bank pursuant to Section 7(F) of the Loan Agreement; (b) pay a forbearance fee to Bank in the amount of $30,000.00; (c) provide status reports to Bank of leasing activity in connection with the Real Estate; (d) provide Bank with updated financial statements and tax returns; and (e) pay the Bank the entire amount due and owing under the Loan on or before September 30, 2023 ("Maturity Date"). *Id.* at ¶ 29.

30.     The Forbearance Agreement obligates Guarantors to provide updated financial statements and their most recent tax returns within seven days of the effective date of the Forbearance Agreement. *Id.* at ¶ 30.

31.     Under Section 4 of the Forbearance Agreement, Borrower and Guarantors "acknowledge[d] that an event of default has occurred and is continuing under the Loan Documents." *Id.* at ¶ 31, Ex. G.

32.     Section 6 of the Forbearance Agreement provides that Borrower and Guarantors' failure to perform each and every obligation under the Forbearance Agreement, and the following events, in relevant part, constitute an event of default: (a) breach or violation of any covenant or agreement of Borrower and Guarantors as set forth in the Forbearance Agreement; (b) false

**EXHIBIT G**

warranties, representations, or statements made by Borrower or Guarantors to Bank; and (c) failure of Borrower or Guarantors to perform obligations under any other agreement with Bank. *Id.* at ¶ 32, Ex. G.

33.     Section 7 of the Forbearance Agreement entitles Bank to "exercise all of its legal and equitable rights and rights under the Forbearance Agreement, the Loan Documents, and the right to recover reasonable attorneys' fees and legal expenses incurred by the Bank in the enforcement of such rights and remedies." *Id.* at ¶ 33, Ex. G.

34.     Under Section 7 of the Forbearance Agreement, Bank is entitled to pursue any and all collection efforts available to it against (a) Borrower pursuant to the Loan Documents and the Forbearance Agreement; and (b) Guarantors pursuant to their respective Guaranties and the Forbearance Agreement. *Id.* at ¶ 34, Ex. G.

35.     Section 9 of the Forbearance Agreement provides, "[u]nless otherwise expressly provided herein, nothing in this Agreement shall modify, release, or discharge the obligations of Borrower and Guarantors under the Loan Documents; and [] Bank expressly reserves all such rights. Any forbearance by [] Bank to Borrower and Guarantors shall not modify Borrower and Guarantors' obligations to [] Bank under this Agreement or the Loan Documents." *Id.* ¶ 35, Ex. G.

36.     On May 22, 2023, the Bank, Borrower, and Guarantors entered into a First Amendment to Forbearance Agreement dated and effective April 28, 2023 ("First Forbearance Amendment") to amend certain terms of the Forbearance Agreement. A true and correct copy of the First Forbearance Amendment is attached to the Complaint as Exhibit H.  Compl. at ¶ 36, Ex. H.

**EXHIBIT G**

37.     Under Section 2 of the First Forbearance Amendment, "Borrower and Guarantors acknowledge, represent, and warrant that the Indebtedness due and owing to the Bank is correct and is absolutely and unconditionally due and payable by Borrower to the Bank . . . As of [April 28, 2023] of this [First Forbearance] Amendment, the current balance of the Indebtedness is a principal balance of $23,499,629.28, plus accrued and unpaid interest in the amount of $203,038.58, plus the Bank's attorney's fees and costs incurred in connection with the [First Forbearance] Amendment." *Id.* at ¶ 37, Ex. H.

38.     Under the First Forbearance Amendment, the Bank further agreed to forbear from exercising some of its rights and remedies under the Loan Documents, by requiring Borrower and Guarantors, among other things, to: (a) authorize Bank to withdraw sums due and owing to it from certain accounts held at Bank; (b) lose access to direct, online banking for any and all of their accounts held at Bank; (c) pay default interest in the manner set forth in the First Forbearance Amendment; and (d) list the Real Estate for sale within 120 days of the effective date of the First Forbearance Amendment with the closing being 90 days after execution of the purchase agreement. *Id.* at ¶ 38, Ex. H.

39.     The First Forbearance Amendment provides, "[i]f one or more purchase agreements for the entire [Real Estate] are entered into within the timeframes above, and all other conditions of this [First Forbearance] Amendment are met, the Maturity Date shall be amended to 90 days after the execution of the purchase agreement." *Id.* at ¶ 39, Ex. H.

40.     Under Section 4 of the First Forbearance Amendment, Borrower and Guarantors "acknowledge[d] that an event of default has occurred and is continuing under the Loan Documents." *Id.* at ¶ 50, Ex. H.

**EXHIBIT G**

41.     Section 7 of the First Forbearance Amendment provides, "[u]nless otherwise expressly provided herein, nothing in this Amendment shall modify, release, or discharge the obligations of Borrower and Guarantors under the Loan Documents or the [Forbearance] Agreement and the Bank expressly reserves all such rights." (emphasis added). *Id.* at ¶ 41, Ex. H.

42.     Section 8 of the First Forbearance Amendment provides, "Borrower and Guarantors, on behalf of themselves, their agents, insurers, heirs, successors and assigns, releases, acquits and forever discharges the Bank, together with all of its claims, demands, or causes of action of any kind, nature or description whether arising in law or equity or upon contract or tort under any state or federal law or otherwise, which Borrower has, had or may claim to have against Bank for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this [First Forbearance] Amendment, whether such claims, demand and cause of action are matured or unmatured or known or unknown." *Id.* at ¶ 42, Ex. H.

## F.     The Sale of the Real Estate

43.     On December 22, 2023, Borrower, as seller, and EGPSYC Elk River II, LLC ("Purchaser"), as purchaser, closed on the Real Estate ("Sale").  Compl. at ¶ 43.

44.     On December 22, 2023, Bank received a wire in the amount of $20,176,968.18 in immediately available funds from the Sale to be applied as a principal reduction on the Note ("Sale Proceeds"). Bank further set off an amount of $195,775.00 from the operating account of Borrower ("Setoff"). *Id.* at ¶ 44.

45.     Despite the Sale Proceeds and Setoff, as of the date of the Complaint, Borrower and Guarantors still owe ***at least*** $2,600,000.00 to Bank under the Loan Documents, plus continuing interest, costs, taxes, attorneys' fees, late and other charges, which costs, fees, and expenses accrue daily under the Loan Documents. *Id.* at ¶ 45.

9

**EXHIBIT G**

**G.**     **Defendants' Default in the Present Action**

46.     On April 29, 2024, Bank, by process server, completed personal service upon Mr. Herron at 2153 South Dayton Street, Denver, CO 80231 as evidenced by the Affidavit of Service filed with the Court on June 3, 2024.

47.     Mr. Herron's deadline to answer or otherwise respond to the Complaint was 21 days from April 29, 2024, on May 20, 2024. Bank granted Mr. Herron an answer extension deadline to May 31, 2024, pursuant to counsel for Bank's phone conversation with Mr. Herron's counsel at the time.

48.     On April 30, 2024, Bank, by process server, completed personal service upon Mrs. Herron at 10365 North Jullian Court, Westminster, CO 80023 as evidenced by the Affidavit of Service filed with the Court on June 3, 2024.

49.     Mrs. Herron's deadline to answer or otherwise respond to the Complaint was 21 days from April 30, 2024, on May 21, 2024.

50.     On May 10, 2024, Bank, by process server, completed personal service upon the Minnesota Secretary of State, authorized agent of Borrower, at 332 Minnesota Street, Suite N201, Saint Paul, MN 55101, as evidenced by the Affidavit of Service filed with the Court on June 3, 2024, because no agent, officer, manager, or general partner could be found at the registered address filed with the Minnesota Secretary of State.  Shortly thereafter, on May 13, 2024, the Minnesota Secretary of State completed service upon Freeport by certified mail as evidenced by the Certificate of Service filed with the Court on July 30, 2024.

51.     Borrower's deadline to answer or otherwise respond to the Complaint was 30 days from May 13, 2024, on June 12, 2024. Minn. Stat. § 5.25, subd. 7.

52.     On June 3, 2024, after completing service upon Defendants, Bank filed this action with the Court.

**EXHIBIT G**

53.     Defendants have failed to answer or otherwise respond to Bank's Complaint or serve a copy of any answer or other defense upon Bank.

54.     Defendants have not validly disputed their defaults under the terms and conditions of their respective agreements executed by and between Bank and each of the Defendants. *Id.* at ¶ 10.

55.     The Complaint alleges causes of action against Defendants for Breach of Loan Documents (against Borrower) (Count I) and Breach of Guaranties (against Guarantors) (Count II).

56.     The Complaint seeks a judgment against Defendants for the amounts due under applicable Minnesota law and the Loan Documents, Forbearance Agreement, and First Forbearance Amendment, including Bank's reasonable attorneys' fees and costs.

57.     Defendants are in default by failing to file an answer or by otherwise responding to the Complaint within the answer deadline. As set forth above, Mrs. Herron's answer was due on May 21, 2024, Mr. Herron's answer was due on May 31, 2024, and Borrower's answer was due on June 12, 2024.

58.     Based upon the foregoing facts, Defendants now are in default, and Bank is entitled to the entry of a default judgment against Defendants.  Accordingly, under Minn. R. Civ. P. 55.01, Bank is entitled to the entry of judgment against Defendants, jointly and severally, for the relief sought in the Complaint. The judgment amount as of September 24, 2024, based on the terms of the Loan Documents, Forbearance Agreement, and First Forbearance Amendment, is as follows:

| | |
|---|---|
| Principal: | $2,185,386.19 |
| Interest to Sep 24, 2024: | $270,290.49 |
| Commercial PPP 3-2-2-2-1: | $43,707.72 |
| Default Interest 2.5% from 4/28/23-12/13/23: | $368,580.92 |
| Unreimbursed Attorney Fees as of 8/31/2024: | $55,454.47 |
| Net Amount Due: | $2,923,419.79 |

**EXHIBIT G**

71-CV-24-752

| | |
|---|---|
| Interest @ 361.20 per day (Sept. 24 to Oct. 11): | $6,140.40 |
| Litigation costs and disbursements: | $1,648.75 |
| Total Judgment: | **$2,931,208.94** plus post-judgment interest. |

(Obermueller Declaration of Amounts Due, ¶¶1-10, Exs. A-C)

Based on the foregoing findings, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. Plaintiff MidCountry Bank's Motion for Default Judgment is **GRANTED IN ITS ENTIRETY**;

2. Pursuant to Minn. R. Civ. P. 55.01, a judgment is hereby entered on Plaintiff MidCountry Bank's breach of loan documents claim against Defendant Freeport Elk River LLC (Count I of the Complaint) and breach of guaranties claim against Defendants Brent Herron and Michelle Herron (Count II of the Complaint).

3. Plaintiff MidCountry Bank is awarded monetary judgment against Defendants Freeport Elk River LLC, Brent Herron, and Michelle Herron, jointly and severally, in the following manner:

   (a) Defendants Freeport Elk River LLC, Brent Herron, and Michelle Herron are jointly and severally liable in the amount of **$2,931,208.94** in monetary damages, inclusive of attorneys' fees, costs, disbursements, and expenses through August 31, 2024 and interest through October 11, 2024, which is hereby awarded to Plaintiff MidCountry Bank.

   (b) Based upon review of the Declaration Michael E. Obermueller concerning expenses and attorneys' fees incurred by Plaintiff MidCountry Bank in connection with this action, this Court concludes that they are reasonable and necessary under the

**EXHIBIT G**

circumstances, and Defendants Freeport Elk River LLC, Brent Herron, and Michelle Herron are jointly and severally liable for such attorneys' fees and expenses.

(c)     Defendants Freeport Elk River LLC, Brent Herron, and Michelle Herron are jointly and severally liable for any additional costs and any attorneys' fees incurred by MidCountry Bank on or after September 1, 2024, which are recoverable under the subject Loan Documents, Forbearance Agreement, and First Forbearance Amendment at issue in this action. Such amounts are hereby awarded to Plaintiff MidCountry Bank in addition to the monetary damages awarded above.

(d)     Plaintiff MidCountry Bank shall be entitled to applicable post-judgment interest at the maximum rate allowed by law.

4.     The Court Administrator is directed to enter final judgment in favor of Plaintiff and against Defendant in the total amount of **$2,931,208.94** plus costs, fees and post-judgment interest in accord with this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this __11__ day of __October__, 2024.

BY THE COURT:

Buccicone, Brianne (Judge)
2024.10.11 10:10:19 -05'00'

The Honorable Brianne J. Buccicone
Judge of District Court

29778831v1

13

**EXHIBIT G**

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF COLORADO

IN RE: )
)
Brent Sanders Herron )     Case No. 25-14392-KHT
)     Chapter 11
)
Debtor. )

---

## AFFIDAVIT OF RICHARD D. BELLER IN SUPPORT OF MIDCOUNTRY BANK'S MOTION FOR APPOINTMENT OF A TRUSTEE

---

I, Richard D. Beller, state as follows:

1.     I am an attorney licensed to practice in the State of Colorado, and am counsel of record to MidCountry Bank ("MidCountry" or the "Bank"), both in the above-captioned bankruptcy, and in Adams County District Court Case No. 2024CV031629 (the "Adams County Litigation"), which MidCountry filed against Brent Sanders Herron ("Debtor"), Michelle Herron ("Ms. Herron"), and Freeport Elk River, LLC ("Freeport" or the "Company").  Debtor, the Company, and Ms. Herron are collectively referred to as the "Judgment Debtors".

2.     MidCountry hired me to domesticate and collect upon a judgment that the Minnesota District Court of Sherburne County had entered in favor of the Bank and Judgment Debtors, jointly and severally, in the amount of $2,931,208.94 (the "Minnesota Judgment").

3.     On or about November 9, 2024, the Bank docketed the judgment in the District Court for Adams County, Colorado, Case Number 2024CV31629 (the "Colorado Judgment").  A true and correct copy of the Adams County District Court's Order for Confirmation of Registration of Foreign Judgment is attached hereto as **Exhibit H**.

1

4.      On or about December 29, 2024, the Adams County District Court entered Charging Orders (the "**Charging Orders**") against businesses the Judgment Debtors own and control, Redwood Medical, LLC ("**Redwood**"), Living Well Design USA LLC ("**Living Well Design**"), and Simply Styled USA LLC ("**Simply Styled**"), collectively, the "**Judgment Debtor Companies**").  True and correct copies of the Charging Orders are attached hereto as **Exhibit I**.

5.      The Judgment Debtors have failed to remit to the Bank any payments received from the Judgment Debtor Companies based upon the Judgment Debtors' full distributive share, in violation of the Charging Orders.  The Judgment Debtors have also failed to provide the Bank with the full financial records of the Judgment Debtor Companies as required by the Charging Orders.

6.      For example, the Adams County District Court's Charging Order against Debtor's 100%-owned company, Redwood, required Redwood to take the following actions, including the delivery of all financial records over the past three years, and payment of Debtor's full distributive share from Redwood:

a. Required to pay to Plaintiff Mr. Herron's full distributive share, whether or not Mr. Herron normally draws his full share due.

b. Prohibited from making any loans to any person until the Judgment is fully satisfied.

c. Prohibited from acquiring any capital assets.

d. Prohibited from selling or encumbering any property belonging to the limited partnership or limited liability company.

e. Required to deliver all financial records from the past three years, including balance sheets, current accounting in electronic and paper form, tax returns, operating agreements, and books of account to Plaintiff's counsel.

*See* **Exhibit I,** p. 2 ¶ 3.

2

7.     Debtor has testified that he owns a 100% membership interest in Redwood, but has yet to pay the Bank a single dollar from Redwood, nor has he produced the required three years of financial records from Redwood, in clear disregard of the Adams County District Court's Charging Order. Debtor instead successfully thwarted and evaded the Court's Charging Order, and frustrated Plaintiff's collection of the Judgment and the court-ordered discovery.

8.     Similarly, Simply Styled and Living Well Design did not comply with the Charging Orders, and their requirements that Debtor and Ms. Herron pay their distributive shares to MidCountry, and produce documents.

9.     On April 14, 2025 and April 21, 2025, as a result of Debtor and Ms. Herron's failures to comply with the Charging Orders, MidCountry moved for the appointment of a receiver over Redwood, Simply Styled, and Living Well Design, pursuant to C.R.S. § 7-80-703. MidCountry also filed motions to compel and for sanctions due to the Judgment Debtor's failure to provide financial documents pursuant to the Charging Orders.

10.    Debtor opposed MidCountry's motion to appoint a receiver. As part of that opposition, Debtor requested that the state court schedule a hearing. Debtor then stalled that hearing by claiming that Debtor was not available for the state court's available hearing dates until July 17, 2025. Debtor then filed Debtor's Chapter 11 petition in this case on July 15, 2025, only three days before the scheduled July 18, 2025 hearing date on MidCountry's motions to appoint a receiver. Thus, Debtor's Chapter 11 bankruptcy filing arises in large part as Debtor's attempt to avoid the appointment of a fiduciary over significant portions of Debtor's estate.

11.    On behalf of MidCountry, I took the Debtor's deposition on February 3, 2025. Debtor's evasive and false testimony under oath at his deposition repeatedly confirm that Debtor

3

cannot be trusted. For example, Debtor testified that he had no continuing involvement with BBSC

Endurance LLC ("BBSC"):

> Q· · ·What is BBSC Endurance?
> A· · ·That is a business that I owned previously.
> Q· · ·What kind of a business was that?
> A· · ·It was a running triathlon event production company.
> Q· · ·Is BBSC Endurance still in business?
> A· · ·I believe so.
> Q· · ·Did you sell it?
> A· · ·Yes.
> Q· · ·How much did you sell it for?
> A· · ·I don't recall the exact number.
> Q· · ·When did you sell it?
> A· · ·I would be speculating.· It was around when my kids were born, and they're three and four.
> Q· · ·Okay.· So is it fair to say that you sold BBSC, LLC roughly three to four years ago or ·before?
> A· · ·Yeah.
> Q· · ·Okay.· How much did you sell it for?
> A· · ·I said I don't recall exactly.
> Q· · ·Do you have any current interest in BBSC Endurance?
> A· · ·No.
> Q· · ·How much of BBSC Endurance did you own?
> A· · ·100 percent.
> Q· · ·Since you sold it, have you been involved in any way with BBSC Endurance?
> A· · ·No.

Brent Herron Deposition at p. 27, line 10- p. 28, line 14 (February 3, 2025) (attached as **Exhibit J**).

12.     Despite testifying that he had no current interest in BBSC Endurance at his deposition, Debtor has now disclosed in his bankruptcy petition that he sold BBSC Endurance in 2021 for $981,789.00 through an Installment Sale, through a "15 year owner financing loan." Debtor's Schedule A/B ¶ 30, (Debtor's Petition at p. 22 of 46). Debtor's Petition reveals that Debtor received gross income of $63,289 from BBSC in 2025 alone, with regular monthly payments of $10,548.17 per month. Debtor's Statement of Income ¶ 10 (ECF 5, at p. 2); Debtor's

Statement of Financial Affairs ¶ 5 (ECF 1, at p. 9).  Debtor did not disclose these payments from BBSC at his deposition.

13.     Debtor also failed to disclose the $10,548.17 monthly payments from BBSC as income in his responses to MidCountry's Judgment Debor interrogatories, a true and correct copy of which are attached as **Exhibit L.**

14.     Interrogatory 15 of MidCountry's Judgment Debor interrogatories asked:

> 15. What other sources of income do you presently have? For each income source, please answer the following:
>     a. The amount of income on a monthly basis;
>     b. The name, address, and phone number of the person paying to you the income;
>     c. The reason you receive this income; and
>     d. The dates you were paid by this person in the past three months.

15.     In response, Debtor responded only "Self employed". **Exhibit L**, p. 3 ¶ 15.

16.     I am informed and believe that at his 341 Meeting of Creditors in this case, Debtor testified that he failed to include in his bankruptcy schedules a whole life insurance policy, which I understand that Debtor testified at the Meeting of Creditors has a cash surrender value of approximately $80,000.00.

17.     Yet, in his deposition in state court, Debtor denied having any life insurance with a cash surrender value, testifying as follows under oath:

> Q· · ·Do you have any accident, health or life insurance?
> A· · ·I have health insurance.
> Q· · ·Let's talk about -- Do you have any life insurance?
> A· · ·The loans that we got made us get life insurance, so, yeah.
> Q· · ·What kind of life insurance is that?
> A· · ·I believe it's called a term life insurance.
> Q· · ·How much is the amount?
> A· · ·I don't know.
> Q· · ·Do you know if it was a million?
> A· · ·I think it was around the amount to cover --· I don't know.
> Q· · ·Do you know if this life insurance is still active?
> A· · ·I think so.
> Q· · ·Do you know if it has a cash surrender value?

A· · ·I don't think so.

Brent Herron Deposition at p. 49, line 7- p. 50, line 2 (February 3, 2025) (attached as **Exhibit J**).

18.     Interrogatory No. 43 of MidCountry's Judgment Debtor Interrogatories also asked

Debtor about his life insurance policies, and Debtor did not disclose any:

> "43. Do you have any accident, health or life insurance? If so:
>> a. Name of each company;
>> b. Each policy number;
>> c. Amount, type and date of issuance of each life insurance policy;
>> d. Name and address of all beneficiaries;
>> e. Any changes in beneficiaries? If so, details;
>> f. Any assignments of life insurance policies? If so, details; and
>> g. The dates and amounts of any loans against such policies."

19.     Debtor's response to Interrogatory 43 stated only: "N/A".  Exhibit L, p. 6, ¶ 43.

20.     Debtor also refused to provide straightforward answers to simple questions

regarding his income, and the payments he has been taking from his medical practice, Redwood,

since the Judgment was entered against him, and the Charging Order was entered against

Redwood:

> Q...Do you own Redwood?
> A     From the basis of what I know to be an employee, I'm not an employee of anybody.
> Q     Okay.  Do you own 100 percent of Redwood?
> A     Yes.
> Q     What is the full name of Redwood?
> A     Redwood Medical, LLC.
> Q     Are you paid a regular wage at Redwood?
> A     No.
> Q     Do you take distributions?
> A     No.
> Q     Does Redwood pay you anything by any means?
> A     No.
> MR. LEVY:  Objection to form, vague.
> Q     (By Mr. Beller)  Do you take profits from Redwood?
> A     No.
> Q     And are you paid a salary or wage?

A    I think you just asked that.

MR. LEVY:  Objection, asked answered.

Q    (By Mr. Beller)  Okay.  Do you get, in addition to your salary, any other benefits fees, commissions, stock options, profit sharing contributions or bonuses from Redwood?

A    No.

MR. LEVY:  Objection to form.

Give me a chance to object, please.

Q    (By Mr. Beller)  Do you take profit sharing from Redwood?

A    I thought you just asked that.

Q    So you're saying you get zero income from Redwood?

A    You're saying right now?

Q    Since -- Since October 15, 2024, have you received any income from Redwood?

MR. LEVY:  Objection to form.

A    To be honest, I really don't think so. Yeah, I . . .

Q    (By Mr. Beller)  When was the last time Redwood paid you money?

A    I would have to look.

Q    Was it before October 15, 2024?

MR. LEVY:  If you know, you can answer.

A    Was it before --

Q    (By Mr. Beller)  Yes.

A    -- or have I been paid since then?

Q    Yeah.  Have you been paid since then by Redwood?

MR. LEVY:  Objection, asked and answered.

A    I've -- Yes, I probably have at some point.  I'm not sure the last time I've been paid. You said am I currently getting distributions, and I am not.

Q    (By Mr. Beller)  How much did Redwood pay you by any means in 2024?

A    Extremely variable.

Q    I just mean total.

A    I believe I gave you a profit and loss.

I don't know exactly what my distribution was.

Q    Can you approximate?

MR. LEVY:  Objection, calls for speculation.

A    I really can't, to be honest.

Q    (By Mr. Beller)  How often do you take distributions from Redwood?

A    Extremely variable.

Q    When was the last time you took a distribution from Redwood?

A    I think you already asked that.  I said I'm not sure.  Not recently.  We haven't had any actual money.

Q    Since October 15, 2024, list all  sources of income you've received from anybody.

MR. LEVY:  Objection to form.

THE DEPONENT:  So that means -- So you objected.  Does that mean I don't have to answer?

MR. LEVY:  No.  You have to answer. It's an objection to form.

Can we go off the record for a second? Can I step outside with him for a second?

MR. BELLER: Sure. That's fine if you want to explain the objections, that's okay with me.

(Recess from 10:24 a.m. to 10:25 a.m.)

MR. BELLER: Can you please read back the last question?

(Last question read.)

A   I don't recall.

MR. LEVY: I'm going to object to form anyway on the question, but -- Yeah. If you could define "income" better by maybe asking for some examples.

Q   (By Mr. Beller) So here I'm using "income" the way the IRS would use "income." It's a defined term. You have to put it on your tax return.

Have you received any income from anybody in 2025 for month-ending 2025?

A   I don't recall. No, I don't think so.

Q   Since October 15, 2024, have you received any income?

MR. LEVY: Objection to form.

I really don't think so

Brent Herron Deposition at p. 10, line 1- p. 14, line 7 (February 3, 2025) (attached as Exhibit J).

21.   In his deposition, Debtor also testified that he has no role with Living Well Design, and that he has received no money from it:

·4· · · ·Q· · ·Since 2023, have you received any money
·5· ·from Living Well Design?
·6· · · ·A· · ·No.
·7· · · ·Q· · ·When was Living Well Design formed?
·8· · · ·A· · ·Sometime last year.
·9· · · ·Q· · ·What is your role with Living Well
10· ·Design?
11· · · ·A· · ·Absolutely nothing.
12· · · ·Q· · ·Is that Michelle's business?
13· · · ·A· · ·I believe so.
14· · · ·Q· · ·But you own half?
15· · · ·A· · ·Correct.
16· · · ·Q· · ·But you haven't --· Have you ever
17· ·received any money from Living Well Design?
18· · · ·A· · ·Nope.

Brent Herron Deposition at p. 24, line 4-18 (February 3, 2025) (attached as **Exhibit J**).

22.   That is false according to Debtor's wife, Ms. Herron, who testified at her deposition that Debtor withdrew $25,000 and $4,000 from the Living Well Design bank account in 2025 alone, after the state court's Charging Order was entered. Ms. Herron also testified that Debtor

controls access to Living Well Design's bank account. See Michelle Herron Deposition at p. 16,

line 3 – p. 18, line 24, and p. 114, line 4 – p. 116, line 8 (April 23, 2025) (attached as **Exhibit K**).

     I declare under penalty of perjury of the laws of the United States that the foregoing is true

and correct.

Dated this 8th day of August 2025.

                               Richard D. Beller

STATE OF COLORADO    )
                                ) ss.
COUNTY OF LARIMER    )

Subscribed and sworn to before on this 18th day of August 2025, by Richard D. Beller.

                                 Notary Public
                                 My Commission Expires: 10-10-2026

**ZOE OLSEN**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 20224038240**
**MY COMMISSION EXPIRES OCT 10, 2026**

| | |
|---|---|
| Adams County, Colorado, District Court<br>Adams County Justice Center<br>1100 Judicial Center Dr.<br>Brighton, CO 80601<br>(303) 659-1161 | DATE FILED<br>November 9, 2024 1:06 PM<br>CASE NUMBER: 2024CV31629 |
| **Plaintiff:** MidCountry Bank<br><br>v.<br><br>**Defendants:** Freeport Elk River LLC, Brent Herron, and Michelle Herron. | **COURT USE ONLY** |
| | Case Number: 2024CV____<br><br><br>Courtroom |
| **ORDER FOR CONFIRMATION OF<br>REGISTRATION OF FOREIGN JUDGMENT** | |

This matter having come before the Court on Plaintiff's filing of a Foreign Judgment entered by the District Court for the Tenth Judicial District, County of Sherburne, State of Minnesota on the 15th day of October 2024, which is a court of original and general jurisdiction for the State of Minnesota, and the Court being fully advised in the premises, it is

HEREBY ORDERED AND CONFIRMED that a registration of foreign judgment has been entered in favor of Plaintiff MidCountry Bank and against Defendants Freeport Elk River LLC, a Minnesota limited liability company, Brent Herron, and Michelle Herron in the principal amount of $2,931,208.94 with judgment interest continuing to accrue at the rate of 8% per year from the 15th day of October 2024 until paid.

DATED this ____ day of _____ 2024.    DATED November 9, 2024

_____

DISTRICT COURT JUDGE

**EXHIBIT H**

| | |
|---|---|
| Adams County, Colorado, District Court<br>Adams County Justice Center<br>1100 Judicial Center Dr.<br>Brighton, CO 80601<br>(303) 659-1161 | DATE FILED<br>December 29, 2024 5:34 PM<br>CASE NUMBER: 2024CV31629 |
| **Plaintiff:** MidCountry Bank<br><br>v.<br><br>**Defendants:** Freeport Elk River LLC, Brent Herron, and Michelle Herron. | **COURT USE ONLY** |
| | Case Number: 2024CV31629<br><br><br><br>Courtroom C |

### CHARGING ORDER AGAINST REDWOOD MEDICAL LLC PURSUANT TO C.R.S. § 7-80-703

Plaintiff MidCountry Bank (the "Bank") has moved for a charging order on Defendant Brent Herron's ("Mr. Herron's") membership interest in Redwood Medical LLC, a Colorado limited liability company, 1001 S. Perry St., Suite 104B, Castle Rock, CO 80104, ("Redwood Medical"), pursuant to C.R.S. § 7-80-703:

1)   By Notice of Filing of Foreign Judgment dated October 31, 2024, this Court entered a judgment in favor of the Bank against Freeport Elk River LLC, Brent Herron, and Michelle Herron in the amount of $2,931,208.94, plus interest at the rate of 8% per annum (the "Judgment"). The Judgment is now collectible, as the stay of C.R.S. § 13-53-104(3) has expired.

2)   C.R.S. § 7-80-703 provides:

On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the membership interest of the member with payment of the unsatisfied amount of the judgment with interest thereon and may then or later appoint a receiver of the member's share of the profits and of any other money due or to become due to the member in respect of the limited liability company and make all other orders, directions, accounts, and inquiries that the debtor member might have made, or that the circumstances of the case may require. To the extent so charged, except as provided in this section, the judgment creditor has only the rights of an assignee or transferee of the membership interest. The membership interest charged may be redeemed at any time before foreclosure. If the sale is directed by the court, the membership interest may be purchased without causing a dissolution with separate property by any one or more of the members.

**EXHIBIT I**

With the consent of all members whose membership interests are not being charged or sold, the membership interest may be purchased without causing a dissolution with property of the limited liability company. This article shall not deprive any member of the benefit of any exemption laws applicable to the member's membership interest.

3)      Pursuant to C.R.S. § 7-80-703, the Court hereby orders that Mr. Herron's membership interest in Redwood Medical LLC, a Colorado limited liability company, be charged with payment of the unsatisfied amount of the $2,931,208.94 Judgment with interest thereon.

4)      Redwood Medical LLC is hereby:

(a)      Required to pay to Plaintiff Mr. Herron's full distributive share, whether or not Mr. Herron normally draws his` full share due.

(b)      Prohibited from making any loans to any person until the Judgment is fully satisfied.

(c)      Prohibited from acquiring any capital assets.

(d)      Prohibited from selling or encumbering any property belonging to the limited partnership or limited liability company.

(e)      Required to deliver all financial records from the past three years, including balance sheets, current accounting in electronic and paper form, tax returns, operating agreements, and books of account to Plaintiff's counsel.

IT IS SO ORDERED this XXXXX day of November 2024. DATED December 29, 2024

_____
DISTRICT COURT JUDGE

**EXHIBIT I**

| Adams County, Colorado, District Court<br>Adams County Justice Center<br>1100 Judicial Center Dr.<br>Brighton, CO 80601<br>(303) 659-1161<br>**Plaintiff:** MidCountry Bank<br><br>v.<br><br>**Defendants:** Freeport Elk River LLC, Brent Herron, and Michelle Herron. | DATE FILED<br>December 29, 2024 5:33 PM<br>CASE NUMBER: 2024CV31629<br><br>**COURT USE ONLY** |
|---|---|
|  | Case Number: 2024CV31629<br><br><br><br>Courtroom C |

### CHARGING ORDER AGAINST LIVING WELL DESIGN USA LLC PURSUANT TO C.R.S. § 7-80-703

Plaintiff MidCountry Bank (the "Bank") has moved for a charging order on Defendant Michelle Herron's ("Ms. Herron's") membership interest in Living Well Design USA LLC, 2153 S. Dayton St., Denver, CO 80231, a Colorado limited liability company ("Living Well Design"), pursuant to C.R.S. § 7-80-703:

1)      By Notice of Filing of Foreign Judgment dated October 31, 2024, this Court entered a judgment in favor of the Bank against Freeport Elk River LLC, Brent Herron, and Michelle Herron in the amount of $2,931,208.94, plus interest at the rate of 8% per annum (the "Judgment"). The Judgment is now collectible, as the stay of C.R.S. § 13-53-104(3) has expired.

2)      C.R.S. § 7-80-703 provides:

On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the membership interest of the member with payment of the unsatisfied amount of the judgment with interest thereon and may then or later appoint a receiver of the member's share of the profits and of any other money due or to become due to the member in respect of the limited liability company and make all other orders, directions, accounts, and inquiries that the debtor member might have made, or that the circumstances of the case may require. To the extent so charged, except as provided in this section, the judgment creditor has only the rights of an assignee or transferee of the membership interest. The membership interest charged may be redeemed at any time before foreclosure. If the sale is directed by the court, the membership interest may be purchased without causing a dissolution with separate property by any one or more of the members.

**EXHIBIT I**

With the consent of all members whose membership interests are not being charged or sold, the membership interest may be purchased without causing a dissolution with property of the limited liability company. This article shall not deprive any member of the benefit of any exemption laws applicable to the member's membership interest.

3)      Pursuant to C.R.S. § 7-80-703, the Court hereby orders that Ms. Herron's membership interest in Living Well Design USA LLC be charged with payment of the unsatisfied amount of the $2,931,208.94 Judgment with interest thereon.

4)      Living Well Design USA LLC is hereby:

(a)      Required to pay to Plaintiff Ms. Herron's full distributive share, whether or not Ms. Herron normally draws her full share due.
(b)      Prohibited from making any loans to any person until the Judgment is fully satisfied.
(c)      Prohibited from acquiring any capital assets.
(d)      Prohibited from selling or encumbering any property belonging to the limited partnership or limited liability company.
(e)      Required to deliver all financial records from the past three years, including balance sheets, current accounting in electronic and paper form, tax returns, operating agreements, and books of account to Plaintiff's counsel.

IT IS SO ORDERED this X̶X̶X̶X̶X̶ day of November 2024   DATED December 29, 2024

_____
DISTRICT COURT JUDGE

**EXHIBIT I**

| Adams County, Colorado, District Court<br>Adams County Justice Center<br>1100 Judicial Center Dr.<br>Brighton, CO 80601<br>(303) 659-1161<br><br>**Plaintiff:** MidCountry Bank<br><br>v.<br><br>**Defendants:** Freeport Elk River LLC, Brent Herron, and Michelle Herron. | DATE FILED<br>December 29, 2024 5:32 PM<br>CASE NUMBER: 2024CV31629<br><br><br>**COURT USE ONLY** |
|---|---|
|  | Case Number: 2024CV31629<br><br><br><br>Courtroom C |

### CHARGING ORDER AGAINST SIMPLY STYLED USA LLC PURSUANT TO C.R.S. § 7-80-703

Plaintiff MidCountry Bank (the "Bank") has moved for a charging order on Defendants Brent Herron's ("Mr. Herron") and Michelle Herron's ("Ms. Herron's") membership interest in Simply Styled USA LLC, a Colorado limited liability company, 2153 S. Dayton St., Denver, CO 80231 ("Simply Styled"), pursuant to C.R.S. § 7-80-703:

1)     By Notice of Filing of Foreign Judgment dated October 31, 2024, this Court entered a judgment in favor of the Bank against Freeport Elk River LLC, Brent Herron, and Michelle Herron in the amount of $2,931,208.94, plus interest at the rate of 8% per annum (the "Judgment"). The Judgment is now collectible, as the stay of C.R.S. § 13-53-104(3) has expired.

2)     C.R.S. § 7-80-703 provides:

On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the membership interest of the member with payment of the unsatisfied amount of the judgment with interest thereon and may then or later appoint a receiver of the member's share of the profits and of any other money due or to become due to the member in respect of the limited liability company and make all other orders, directions, accounts, and inquiries that the debtor member might have made, or that the circumstances of the case may require. To the extent so charged, except as provided in this section, the judgment creditor has only the rights of an assignee or transferee of the membership interest. The membership interest charged may be redeemed at any time before foreclosure. If the sale is directed by the court, the membership interest may be purchased without causing a dissolution with separate property by any one or more of the members.

**EXHIBIT I**

With the consent of all members whose membership interests are not being charged or sold, the membership interest may be purchased without causing a dissolution with property of the limited liability company. This article shall not deprive any member of the benefit of any exemption laws applicable to the member's membership interest.

3)      Pursuant to C.R.S. § 7-80-703, the Court hereby orders that Mr. and Ms. Herron's membership interests in Simply Styled USA LLC are charged with payment of the unsatisfied amount of the $2,931,208.94 Judgment with interest thereon.

4)      Simply Styled USA LLC is hereby:

(a)     Required to pay to Plaintiff Mr. and Ms. Herron's full distributive share, whether or not Mr. and Ms. Herron normally draws their full share due.

(b)     Prohibited from making any loans to any person until the Judgment is fully satisfied.

(c)     Prohibited from acquiring any capital assets.

(d)     Prohibited from selling or encumbering any property belonging to the limited partnership or limited liability company.

(e)     Required to deliver all financial records from the past three years, including balance sheets, current accounting in electronic and paper form, tax returns, operating agreements, and books of account to Plaintiff's counsel.

IT IS SO ORDERED this XXXXXX day of November 2024.   DATED December 29, 2024

_____
DISTRICT COURT JUDGE

**EXHIBIT I**

### *MidCountry Bank*

### *v.*

### *Freeport Elk River LLC*

---

Brent S. Herron

February 03, 2025

---



MEADORS COURT
REPORTING

4025 Automation Way, Suite D-2
Fort Collins, CO 80525
970-482-1506

**EXHIBIT J**

DISTRICT COURT, ADAMS COUNTY, COLORADO

Case No. 2024-CV-31629

---

DEPOSITION OF BRENT S. HERRON

February 3, 2025

---

MIDCOUNTRY BANK,

Plaintiff,

vs.

FREEPORT ELK RIVER LLC, BRENT HERRON,

and MICHELLE HERRON,

Defendants.

---

APPEARANCES:

RINGENBERG & BELLER, P.C.
By Richard D. Beller, Esq.
125 South Howes Street, 3rd Floor
Fort Collins, Colorado 80521
Appearing on behalf of Plaintiff

ATLAS LAW FIRM P.C
By Edward Levy, Esq.
501 South Cherry Street, Suite 1100
Denver, Colorado 80246
Appearing on behalf of Defendants

Pursuant to Notice and the Colorado Rules of Civil Procedure, the deposition of BRENT S. HERRON, called by Plaintiff, was taken on Monday, February 3, 2025, commencing at 10:14 a.m., at 125 South Howes Street, 3rd Floor, Fort Collins, Colorado, before Tracy L. Harris, Certified Realtime Reporter, Registered Merit Reporter, within and for the State of Colorado.

I N D E X

DEPOSITION OF BRENT S. HERRON

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Beller | 4 |
| Mr. Levy | -- |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Letter dated 12/13/2024 from Kris Becker to Brent Herron, Michelle Herron, Re: Personal Statement of Financial Position (PFS) | 60 |
| Exhibit 2 | Redwood Medical LLC Profit and Loss January - October, 2024 | 73 |
| Exhibit 3 | Redwood Medical LLC Balance Sheet As of October 31, 2024 | 80 |
| Exhibit 4 | Living Well Design Profit and Loss January - October, 2024 | 95 |

I N D E X (Continued)

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 5 | Living Well Design Balance Sheet As of October 31, 2024 | 97 |
| Exhibit 6 | Simply Styled USA LLC Profit and Loss, January - October, 2024 | 100 |
| Exhibit 7 | Simply Styled USA LLC Balance Sheet As of October 31, 2024 | 104 |
| Exhibit 8 | American Bank Personal Financial Statement Bates Nos. NORTHWOODS | 112 |
| Exhibit 9 | Petition for Dissolution of Marriage with Children Pursuant to 14-10-106, C.R.S. | 121 |
| Exhibit 10 | Charging Order Against Redwood Medical LLC Pursuant to C.R.S. 7-80-703 | 121 |

| INFORMATION REQUESTED | |
|---|---|
| Bookkeeper's name | 86 |
| Financials for Redwood | 124 |
| Answer to writ of garnishment for Redwood | 133 |
| Financial information regarding charging orders for Simply Styled | 124 |

P R O C E E D I N G S

BRENT S. HERRON,

being first duly sworn in the above cause, was examined and testified as follows:

EXAMINATION

BY MR. BELLER:

**Q Okay. Have you had your deposition taken before?**

A No.

**Q Okay. Well, first off -- I'll give you a couple warnings that are just common to any deposition. First off, even though we're in an informal proceeding today, we're in a conference room and your testimony here today is under oath and has the same force and effect as if it were given in a court of law.**

**Do you understand that?**

A Yes.

**Q Okay. And the next few rules have to do with the fact that our court reporter is trying to transcribe what we say, so it's really important that we not talk over one another. I'll wait until you finish your answer and then, likewise, please wait until I finish my question before you answer because she can't transcribe**

EXHIBIT J

**Page 9**

| 1 | Q | Do you have any renters at all? |
| 2 | A | I -- No. |
| 3 | Q | Is anyone paying you rent for |
| 4 | commercial or residential real property? |
| 5 | A | No. |
| 6 | Q | And what's your current occupation? |
| 7 | | MR. LEVY: Objection, relevance to |
| 8 | assets and income. |
| 9 | A | I mean, you already know I'm a |
| 10 | physician. |
| 11 | Q | (By Mr. Beller) Okay. What kind of |
| 12 | physician are you? |
| 13 | A | Family medicine is my specialty. |
| 14 | Q | And Redwood is your employer? |
| 15 | | MR. LEVY: Objection, form. |
| 16 | Q | (By Mr. Beller) Is that right? |
| 17 | A | What was the question? |
| 18 | Q | Redwood is your employer. Is your |
| 19 | employer Redwood? |
| 20 | A | No. |
| 21 | Q | Who's your employer? |
| 22 | A | I don't have an employer. Well, I |
| 23 | guess define "employer." |
| 24 | Q | Are you employed? |
| 25 | A | No. |

**Page 10**

| 1 | Q | Do you own Redwood? |
| 2 | A | From the basis of what I know to be an |
| 3 | employee, I'm not an employee of anybody. |
| 4 | Q | Okay. Do you own 100 percent of |
| 5 | Redwood? |
| 6 | A | Yes. |
| 7 | Q | What is the full name of Redwood? |
| 8 | A | Redwood Medical, LLC. |
| 9 | Q | Are you paid a regular wage at Redwood? |
| 10 | A | No. |
| 11 | Q | Do you take distributions? |
| 12 | A | No. |
| 13 | Q | Does Redwood pay you anything by any |
| 14 | means? |
| 15 | A | No. |
| 16 | | MR. LEVY: Objection to form, vague. |
| 17 | Q | (By Mr. Beller) Do you take profits |
| 18 | from Redwood? |
| 19 | A | No. |
| 20 | Q | And are you paid a salary or wage? |
| 21 | A | I think you just asked that. |
| 22 | | MR. LEVY: Objection, asked and |
| 23 | answered. |
| 24 | Q | (By Mr. Beller) Okay. Do you get, in |
| 25 | addition to your salary, any other benefits or |

**Page 11**

| 1 | fees, commissions, stock options, profit sharing |
| 2 | contributions or bonuses from Redwood? |
| 3 | A | No. |
| 4 | | MR. LEVY: Objection to form. |
| 5 | | Give me a chance to object, please. |
| 6 | Q | (By Mr. Beller) Do you take profit |
| 7 | sharing from Redwood? |
| 8 | A | I thought you just asked that. |
| 9 | Q | So you're saying you get zero income |
| 10 | from Redwood? |
| 11 | A | You're saying right now? |
| 12 | Q | Since -- Since October 15, 2024, have |
| 13 | you received any income from Redwood? |
| 14 | | MR. LEVY: Objection to form. |
| 15 | A | To be honest, I really don't think so. |
| 16 | Yeah, I . . . |
| 17 | Q | (By Mr. Beller) When was the last time |
| 18 | Redwood paid you money? |
| 19 | A | I would have to look. |
| 20 | Q | Was it before October 15, 2024? |
| 21 | | MR. LEVY: If you know, you can answer. |
| 22 | A | Was it before -- |
| 23 | Q | (By Mr. Beller) Yes. |
| 24 | A | -- or have I been paid since then? |
| 25 | Q | Yeah. Have you been paid since then by |

**Page 12**

| 1 | Redwood? |
| 2 | | MR. LEVY: Objection, asked and |
| 3 | answered. |
| 4 | A | I've -- Yes, I probably have at some |
| 5 | point. I'm not sure the last time I've been paid. |
| 6 | You said am I currently getting distributions, and |
| 7 | I am not. |
| 8 | Q | (By Mr. Beller) How much did Redwood |
| 9 | pay you by any means in 2024? |
| 10 | A | Extremely variable. |
| 11 | Q | I just mean total. |
| 12 | A | I believe I gave you a profit and loss. |
| 13 | I don't know exactly what my distribution was. |
| 14 | Q | Can you approximate? |
| 15 | | MR. LEVY: Objection, calls for |
| 16 | speculation. |
| 17 | A | I really can't, to be honest. |
| 18 | Q | (By Mr. Beller) How often do you take |
| 19 | distributions from Redwood? |
| 20 | A | Extremely variable. |
| 21 | Q | When was the last time you took a |
| 22 | distribution from Redwood? |
| 23 | A | I think you already asked that. I said |
| 24 | I'm not sure. Not recently. We haven't had any |
| 25 | actual money. |

**EXHIBIT J**

**Page 13**

1    Q      Since October 15, 2024, list all
2    sources of income you've received from anybody.
3             MR. LEVY:  Objection to form.
4             THE DEPONENT:  So that means -- So you
5    objected.  Does that mean I don't have to answer?
6             MR. LEVY:  No.  You have to answer.
7    It's an objection to form.
8             Can we go off the record for a second?
9    Can I step outside with him for a second?
10            MR. BELLER:  Sure.  That's fine if you
11   want to explain the objections, that's okay with
12   me.
13            (Recess from 10:24 a.m. to 10:25 a.m.)
14            MR. BELLER:  Can you please read back
15   the last question?
16            (Last question read.)
17   A     I don't recall.
18            MR. LEVY:  I'm going to object to form
19   anyway on the question, but -- Yeah.  If you
20   could define "income" better by maybe asking for
21   some examples.
22   Q      (By Mr. Beller)  So here I'm using
23   "income" the way the IRS would use "income."  It's
24   a defined term.  You have to put it on your tax
25   return.

**Page 14**

1             Have you received any income from
2    anybody in 2025 for month-ending 2025?
3    A     I don't recall.  No, I don't think so.
4    Q      Since October 15, 2024, have you
5    received any income?
6             MR. LEVY:  Objection to form.
7    A     I really don't think so.
8    Q      (By Mr. Beller)  What bank accounts do
9    you have?
10   A     Well, I had the Wells Fargo one, but
11   there's no -- or there's zero dollars in there, as
12   you know.
13   Q      Okay.  What other bank accounts do you
14   have?
15   A     Business bank accounts.
16   Q      What business bank accounts do you
17   have?
18   A     There is a U.S. Bank account for the --
19   for Redwood Medical.
20   Q      Where is that account?
21   A     Where?
22   Q      Yeah.
23   A     I just said U.S. Bank.
24   Q      Yeah, but where?  What's the address
25   generally, the location?

**Page 15**

1    A     I mean, there's a lot of U.S. Banks.
2    Q      What's the one you use?  What's --
3    What's your local branch?
4    A     I really don't have a local branch.
5    Like, there's not one that I go to.  I don't even
6    know if --
7    Q      Is it near the business?
8    A     Well, I just said there's not one --  I
9    can't answer that.  There's not one that I use.
10   Q      Okay.
11   A     I mean . . .
12   Q      Besides Wells Fargo and then U.S. Bank
13   for Redwood, what other bank accounts do you use?
14   A     There's a Novo Bank account.
15   Q      Where is Novo Bank?
16   A     It's an online only bank.
17   Q      Where is it based?
18   A     I don't know.
19   Q      And is that a personal bank account?
20   A     No.
21   Q      Business?
22   A     (Deponent nodded head.)
23   Q      For Redwood?
24   Q      You nodded.
25   A     I'm sorry.  Yes.

**Page 16**

1    Q      Is that for Redwood?
2    A     Yes.
3    Q      Do you have any other personal bank
4    accounts?
5    A     No.
6    Q      So you have a Wells Fargo account that
7    has zero dollars, but that's it for you
8    personally?
9    A     There used to be an Ally Bank account
10   that I used, but there's zero dollars in there
11   because I haven't used it in years.
12   Q      Okay.  For Redwood, you said U.S. Bank
13   and Novo bank.  Does Redwood have any other bank
14   accounts?
15   A     No.
16   Q      Do you have any brokerage or investment
17   accounts?
18   A     Through the business?
19   Q      First just you individually.
20   A     Other than a 401(k), no.
21   Q      Where's your 401(k)?
22   A     I actually don't recall.  They switched
23   right before I left.  That's probably something I
24   should look into.
25   Q      What was the old provider?

**EXHIBIT J**

**Page 21**

1  Q  I already asked about a trust,
2  insurance policies -- Okay. So other than the
3  401(k) you mentioned, are you a beneficiary under
4  the terms of any pension plans or profit sharing
5  agreements?
6  A  No.
7  Q  Okay. Besides Redwood, since 2023,
8  what sources of income have you had?
9  MR. LEVY: Objection, asked and
10  answered.
11  MR. BELLER: Not since 2023.
12  A  Nothing's different from my answer for
13  2023.
14  Q  (By Mr. Beller) So your only source of
15  income since 2023 has been from Redwood?
16  A  Correct. Well, I said that I worked at
17  Kaiser, actually, so I think that was answered.
18  Q  So it's just Kaiser and Redwood, and
19  that's it?
20  A  Correct.
21  Q  Okay. What is Freeport Elk River, LLC?
22  A  That was the LLC that owned the
23  commercial real estate.
24  Q  Where was that commercial real estate?
25  A  Minnesota.

**Page 22**

1  Q  Did Freeport Elk River, LLC own
2  anything else?
3  A  No.
4  Q  Who owned Freeport Elk River, LLC?
5  MR. LEVY: Objection to form, Rule 69
6  assets and income.
7  A  Michelle and I.
8  Q  (By Mr. Beller) Were you 50-50 owners?
9  MR. LEVY: Objection, spousal
10  privilege.
11  A  I don't think so. I -- I think there
12  was a different split.
13  Q  (By Mr. Beller) Okay. What was your
14  split?
15  A  I'm not sure.
16  Q  Did anyone else own an interest in that
17  LLC?
18  A  No.
19  Q  Did you own the majority?
20  A  I don't think so.
21  Q  You don't think so. She -- Did she
22  own the majority?
23  A  Someone had majority, but -- I mean,
24  my understanding is that we were married. I'm not
25  a divorce attorney here, but I'm pretty sure

**Page 23**

1  everything's owned 50-50. You guys are the
2  lawyers, though, so . . .
3  Q  Okay. Does Freeport Elk River, LLC
4  have any assets?
5  A  Currently, no.
6  Q  Does it own any real property?
7  A  No.
8  Q  Any personal property?
9  A  No.
10  Q  Does it have any bank accounts?
11  A  I can't answer that, actually. I don't
12  know if MidCountry shut it down.
13  Q  Did Freeport have a bank account at
14  MidCountry?
15  A  Yes.
16  Q  Did it have any bank accounts anywhere
17  else?
18  A  No.
19  Q  What is Living Well Design?
20  A  That is a business.
21  Q  Do you own any interest in that
22  business?
23  A  Yes.
24  Q  How much do you own?
25  A  I believe 50 percent.

**Page 24**

1  Q  What does that business do?
2  A  It is a home staging company for people
3  trying to sell their house.
4  Q  Since 2023, have you received any money
5  from Living Well Design?
6  A  No.
7  Q  When was Living Well Design formed?
8  A  Sometime last year.
9  Q  What is your role with Living Well
10  Design?
11  A  Absolutely nothing.
12  Q  Is that Michelle's business?
13  A  I believe so.
14  Q  But you own half?
15  A  Correct.
16  Q  But you haven't -- Have you ever
17  received any money from Living Well Design?
18  A  Nope.
19  Q  What is Simply Styled USA, LLC?
20  A  It's a business.
21  Q  Do you own part of that business?
22  A  Yes.
23  Q  How much do you own?
24  A  50 percent.
25  Q  What kind of business is Simply Styled

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page114 of 134
Case:25-14392-KHT   Doc#:41-4   Filed:08/19/25   Entered:08/19/25 12:41:03   Page13 of 32

*Meador's Court Reporting*

**Page 25**

1  engaged in?

2      A     A home remodeling business.

3      Q     What is your role in that business?

4      A     Trying to make it not lose as much

5  money as it is currently.

6      Q     Do you have a title?

7      A     No.

8      Q     Since 2023, have you received money

9  from Simply Styled?

10     A     I wish.

11     Q     When was Simply Styled formed?

12     A     Sometime last year.

13     Q     And you indicated that the business is

14  losing money?

15     A     Correct.

16     Q     So with the last one, you said that --

17  With Living Well Design, you said that you had

18  absolutely nothing to do with the business and

19  that, basically, it was your wife's business.

20           It sounds like with Simply Styled, you

21  have more of a role with that entity; is that

22  right?

23     A     Yes.

24     Q     What do you do?

25     A     I'm trying to turn it back around.  I

**Page 26**

1  mean, it was a thriving business when it was

2  purchased.

3      Q     When did you purchase it?

4      A     January 1st, I believe, of 2024.  Maybe

5  a few days before 2024.

6      Q     Does anyone else --  You said you own

7  about 50 percent.  Does anyone else besides you

8  and your wife own an interest in Simply Styled?

9      A     No.

10     Q     What is your wife's role with that

11  business?

12     A     Nothing.

13     Q     So this is 100 percent your business as

14  far as the operation?

15     A     Well, we just said --  Well, I mean,

16  she says she's going to try to help market for it

17  but does not, you know, so . . .

18     Q     So as far as the business activity

19  that's taking place, that's your responsibility.

20           Is that fair?

21     A     That would be fair.

22     Q     Do you have a title with Simply Styled?

23     A     No.

24     Q     Does Simply Styled have any employees?

25     A     No.

**Page 27**

1      Q     Does Living Well Design have any

2  employees?

3      A     As we just mentioned, I don't know how

4  that business is being run.

5      Q     I have the same question for Freeport.

6  Does Freeport have any employees?

7      A     No.

8      Q     Do you own any other businesses?

9      A     No.

10     Q     What is BBSC Endurance?

11     A     That is a business that I owned

12  previously.

13     Q     What kind of a business was that?

14     A     It was a running triathlon event

15  production company.

16     Q     Is BBSC Endurance still in business?

17     A     I believe so.

18     Q     Did you sell it?

19     A     Yes.

20     Q     How much did you sell it for?

21     A     I don't recall the exact number.

22     Q     When did you sell it?

23     A     I would be speculating.  It was around

24  when my kids were born, and they're three and

25  four.

**Page 28**

1      Q     Okay.  So is it fair to say that you

2  sold BBSC, LLC roughly three to four years ago or

3  before?

4      A     Yeah.

5      Q     Okay.  How much did you sell it for?

6      A     I said I don't recall exactly.

7      Q     Do you have any current interest in

8  BBSC Endurance?

9      A     No.

10     Q     How much of BBSC Endurance did you own?

11     A     100 percent.

12     Q     Since you sold it, have you been

13  involved in any way with BBSC Endurance?

14     A     No.

15     Q     Have you owned any other companies?

16     A     No.

17     Q     And then currently, as you sit here

18  today, do you own any companies other than the

19  ones mentioned?

20     A     No.

21     Q     Okay.  When I looked at real estate

22  records, I saw various LLCs that had owned

23  interests in real estate, specifically a few of

24  them that were in the Boulder area.  Do you still

25  own interests in any of those companies?

**EXHIBIT J**

**Page 49**

| | | |
|---|---|---|
| 1 | Q | Since October 15, 2024, have you made |
| 2 | any gifts of -- with a value of over $1,000? | |
| 3 | A | Define "gift." |
| 4 | Q | Given something of value to somebody |
| 5 | that's worth more than $1,000. | |
| 6 | A | I don't recall. I don't think so. |
| 7 | Q | Do you have any accident, health or |
| 8 | life insurance? | |
| 9 | A | I have health insurance. |
| 10 | Q | Let's talk about -- Do you have any |
| 11 | life insurance? | |
| 12 | A | The loans that we got made us get life |
| 13 | insurance, so, yeah. | |
| 14 | Q | What kind of life insurance is that? |
| 15 | A | I believe it's called a term life |
| 16 | insurance. | |
| 17 | Q | How much is the amount? |
| 18 | A | I don't know. |
| 19 | Q | Do you know if it was a million? |
| 20 | A | I think it was around the amount to |
| 21 | cover -- I don't know. | |
| 22 | Q | Do you know if this life insurance is |
| 23 | still active? | |
| 24 | A | I think so. |
| 25 | Q | Do you know if it has a cash surrender |

**Page 50**

| | | |
|---|---|---|
| 1 | value? | |
| 2 | A | I don't think so. |
| 3 | Q | Does anyone else have life insurance on |
| 4 | you? | |
| 5 | A | Not that I'm aware of. |
| 6 | Q | Have you borrowed against any insurance |
| 7 | policies? | |
| 8 | A | No. |
| 9 | Q | What vehicles do you own? |
| 10 | A | I own a BMW. |
| 11 | Q | What kind of BMW? |
| 12 | A | i8. |
| 13 | Q | What's that? |
| 14 | A | i8. |
| 15 | Q | Okay. What year? |
| 16 | A | 2019. |
| 17 | Q | And is that in your name? |
| 18 | A | Yes. |
| 19 | Q | Is that leased, owned free and clear or |
| 20 | are you paying somebody for it? | |
| 21 | A | I am paying somebody for it. |
| 22 | Q | Are you current on those payments? |
| 23 | A | I think so. |
| 24 | Q | So you paid a January -- Do you have |
| 25 | to pay monthly payments on that? | |

**Page 51**

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | And you paid a January 2025 payment? |
| 3 | A | I'm not sure. |
| 4 | Q | You just said yes. |
| 5 | A | Well, you said do I have a monthly |
| 6 | payment. Then you said do I think I'm current on | |
| 7 | it, and I said yes. | |
| 8 | Q | Where did that money come from? |
| 9 | A | I don't know. |
| 10 | Q | What bank do you use to pay that |
| 11 | monthly payment? | |
| 12 | A | I was paying by using Wells Fargo, but |
| 13 | there's no money in there. | |
| 14 | Q | Do you use any other bank account to |
| 15 | pay that monthly payment? | |
| 16 | A | No. |
| 17 | Q | What other cars do you own or what |
| 18 | other vehicles? | |
| 19 | A | A Chevrolet Corvette. |
| 20 | Q | What year? |
| 21 | A | 2020. |
| 22 | Q | Let's go back to the BMW. What is the |
| 23 | approximate balance on the loan on the BMW? | |
| 24 | A | I don't know. |
| 25 | Q | How much are the payments? |

**Page 52**

| | | |
|---|---|---|
| 1 | A | Expensive. I don't know. $2,000-ish. |
| 2 | Q | $2000 a month? |
| 3 | A | Yeah, -ish. |
| 4 | Q | Are you making payments on the Chevy |
| 5 | Corvette? | |
| 6 | A | Yes, I believe so. |
| 7 | Q | How much are those payments? |
| 8 | A | That, I have no idea. |
| 9 | Q | Are you current on those payments? |
| 10 | A | I don't know. |
| 11 | Q | Do you know if you made a payment for |
| 12 | January 2025? | |
| 13 | A | I don't know. |
| 14 | Q | Do you know how much that loan balance |
| 15 | is? | |
| 16 | A | I don't know. |
| 17 | Q | So you have no idea what those monthly |
| 18 | payments are? | |
| 19 | A | I have no idea. |
| 20 | Q | Do you know if you made a payment for |
| 21 | December 2024? | |
| 22 | A | I don't know. |
| 23 | Q | Do you have any other vehicles? |
| 24 | A | Nope. Not that are owned by me, no. |
| 25 | Q | Do you have any other vehicles owned by |

**Page 53**

1  any other businesses?

2       A    Yes.

3       Q    What vehicles are those?

4       A    The -- I have a 2020 Tesla that's

5  owned by the Simply Styled.

6       Q    What are the monthly payments on that

7  Tesla?

8       A    I don't know that either.

9       Q    Are those monthly payments current?

10      A    I believe so, but I'm not sure.

11      Q    Who pays those monthly payments?

12      A    Simply Styled.

13      Q    Who on behalf of Simply Styled actually

14  makes those payments?

15           MR. LEVY:  Objection to form.

16      A    It was set up on auto pay.

17      Q    (By Mr. Beller)  From what account?

18      A    Simply Styled.

19      Q    What bank account does Simply Styled

20  have?

21      A    Novo.

22      Q    Okay.  Does Simply Styled have a

23  bookkeeper or someone who handles payments and,

24  you know, bills generally?

25      A    No.  Well, we have a bookkeeper.

**Page 54**

1       Q    Who's the bookkeeper?

2       A    I don't know her name.  I'd have to

3  look it up.

4       Q    Does anyone else work at Simply Styled?

5       A    We have a lot of contractors.

6       Q    Is the bookkeeper a contractor?

7       A    I'm not sure what the definition of a

8  contractor is, but she's not an employee.

9       Q    What's the bookkeeper's first name?

10      A    I really don't know.  I'm sorry.

11      Q    You don't recall at all?

12      A    I really don't.  I told you that I was

13  bad at names.

14      Q    Does Simply Styled own any other

15  vehicles?

16      A    No.  No.

17      Q    Okay.  Do you --  Do any of your other

18  entities own any vehicles?

19      A    Michelle might have a vehicle.  I don't

20  know.

21      Q    What vehicle does Michelle have?

22      A    I don't know.

23      Q    You don't know what she drives?

24      A    No.

25      Q    Does Living Well Design own any

**Page 55**

1  vehicles?

2       A    I -- I have no idea.  I mean, I think

3  you've got a balance sheet and income statements

4  and all those kinds of things, so . . .

5       Q    Yeah, we're going to go through that.

6  Okay.  Do you own any other vehicles in your own

7  name besides the two that you mentioned, the BMW

8  and the Corvette?

9       A    No.

10      Q    Okay.  Do you own any --  Well, let me

11  ask you, do you have any snow machines?

12      A    I do have a snowmobile.

13      Q    What kind of snowmobile?

14      A    Polaris.

15      Q    What kind?

16      A    I'm not sure.

17      Q    What year?

18      A    I don't know.

19      Q    Old?  New?

20      A    Old.

21      Q    Do you just have one?

22      A    Currently, yes.  There was another one,

23  but it's broken.  This one's broken right now,

24  too.

25      Q    And you --  What did you do with the

**Page 56**

1  other one?

2       A    It's sitting in the lawn.

3       Q    At the Dayton Street property?

4       A    Nope.  It's up at the lake house, I

5  believe.

6       Q    Okay.  Granby?

7       A    Granby, yep.

8       Q    Are both the snow machines at the

9  Granby property?

10      A    I believe so.

11      Q    How do you get to the Granby property?

12      A    I drive.

13      Q    Do you use either the BMW or the

14  Corvette to get there?

15      A    No.  I usually go with my friend

16  Phil --

17      Q    Okay.

18      A    -- in the summer.

19      Q    Do you have a Ford Bronco?

20      A    I do not.  There is --  There was one,

21  and I think Michelle still has that.  I'm not

22  sure, though.  That's why I said I wasn't sure

23  earlier when you asked.

24      Q    Do you know if that's owned by an

25  entity or by Michelle?

**EXHIBIT J**

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page117 of 134
Case:25-14392-KHT   Doc#:41-4   Filed:08/19/25   Entered:08/19/25 12:41:03   Page16 of 32

*Meador's Court Reporting*

**Page 57**

1    A    I know she's operating it as a business
2  and -- Actually, I don't know that.  I believe
3  she is.
4    Q    So is it one of the businesses you
5  mentioned, Simply Styled or Living Well Design?
6    A    Definitely not Simply Styled.  Living
7  Well Design, if anything, yeah.
8    Q    Okay.
9    A    I think that was on the balance sheet.
10    Q    Do you know -- Do you own any aspect
11  of this Ford Bronco?
12    A    I mean, I think the loan's under my
13  name and is part of our divorce proceedings, which
14  I would not like it to be the case.
15    Q    Are you making payments on that Ford
16  Bronco?
17    A    I'm not.
18    Q    Have you made a monthly payment for
19  January or December 2024?
20    A    You just asked me if I was making
21  payments and I said I'm not.
22    Q    Okay.  So we went through the
23  snowmobiles, the Ford Bronco.  Are there any other
24  vehicles that you have an interest in, either
25  directly or indirectly?

**Page 58**

1    A    No.
2    Q    Motorcycles?
3    A    I used to work in trauma, and I would
4  never get on a motorcycle.
5    Q    Boats?
6    A    No.  I crashed a boat once, though.
7  That's also very dangerous.
8    Q    Bicycles?
9    A    Yes, I have a bicycle.
10    Q    Is it worth more than $1,000?
11    A    No.
12    Q    What kind of bicycle?
13    A    Specialized.
14    Q    What kind?
15    A    I don't know.
16    Q    Is it a triathlon bike?
17    A    No.
18    Q    Do you own a triathlon bike?
19    A    No.  I don't do triathlons anymore.
20    Q    Is this just a road bike?
21    A    It's just a road bike.
22    Q    No mountain bikes?
23    A    It got stolen when I was in college and
24  I've been jaded ever since and won't buy another
25  one.

**Page 59**

1    Q    Oh, okay.  Either directly or
2  indirectly, do you have any accounts with any
3  stockbrokers or commodity brokers?
4    A    No.
5    Q    Since December 2024, it sounds like
6  you're making some payments but not others.
7  You're paying on the BMW, right?
8    A    I never said I was paying on the BMW.
9  I said I was not sure.
10    Q    I could have sworn you said you were
11  making payments.  What payments have you been
12  making since December 2024 to any creditor?
13    A    I'm really not sure.  Like, I've -- If
14  you knew what my daily life was like, you would
15  believe that it's very hard to keep up on anything
16  right now.
17    Q    When you do make payments to a
18  creditor, where -- where do they come from?
19        MR. LEVY:  Objection, form, asked and
20  answered.
21    A    Yeah.  So I believe I have answered
22  that to the best of my knowledge.  I mean, my
23  business credit card is managed by my -- my
24  practice managers, so I have nothing to do with
25  it.

**Page 60**

1    Q    (By Mr. Beller)  Okay.  You provided us
2  with some financial information which I'm going to
3  go through with you.
4        (Exhibit 1 marked.)
5    Q    (By Mr. Beller)  Did you look at
6  Exhibit 1 before it was provided?
7    A    Yeah.  Apparently, this Audi is no
8  longer around.
9    Q    What happened to the Audi?
10    A    She said she got rid of it.  I have no
11  idea if that's true or not.
12    Q    So it was her car, not yours?
13    A    It was not my car.  That's correct.
14    Q    When you see Michelle, is she driving
15  the Bronco?
16    A    I haven't seen her recently.  The last
17  time that I saw her, yes, she was driving the
18  Bronco.
19    Q    First, you mentioned a bookkeeper.  Is
20  this Kris Becker, CPA, is she the bookkeeper
21  you're referencing?
22    A    So that is a man, and he is my CPA that
23  files my taxes.  He is not my bookkeeper.
24    Q    Okay.  Who came up with these values?
25  Was that you or was that Kris Becker?

**EXHIBIT J**

*Page 133*

1　A　I don't know that. My understanding is
2　that both were, but I don't know.
3　Q　Okay. Were they both from First
4　Internet Bank of Indiana?
5　A　Yes.
6　　　MR. BELLER: Okay. Other than getting
7　that information we talked about, that's --
8　　　MR. LEVY: Yeah. And just for the
9　record, I've got those three things here, and so I
10　just want to make sure we're clear.
11　　　You want the bookkeeper's name, Nicole
12　whoever it is.
13　　　MR. BELLER: Uh-huh.
14　　　MR. LEVY: The financials for Redwood.
15　I'll let you know when we expect to get them in
16　response to the charging order. And then there's
17　the answer to the writ of garnishment for Redwood
18　which we're not contesting service of, and we will
19　provide that to you. I'll e-mail that to you
20　today.
21　　　MR. BELLER: Sure. And then also the
22　financial information for the other charging
23　orders.
24　　　MR. LEVY: Oh, yeah. The two -- The
25　charging orders on Living Well -- or Simply

*Page 134*

1　Styled?
2　　　MR. BELLER: Sure.
3　　　MR. LEVY: Yeah. Four things.
4　　　MR. BELLER: Okay. We're all done.
5　　　THE COURT REPORTER: Before we go off
6　the record, Mr. Beller, are you ordering the
7　transcript?
8　　　MR. BELLER: Yes, please.
9　　　THE COURT REPORTER: And, Mr. Levy, do
10　you need a copy of the transcript?
11　　　MR. LEVY: Yes, please.
12　　　THE COURT REPORTER: With exhibits?
13　　　MR. LEVY: No. I'm okay on exhibits.
14　Thanks.
15　　　THE COURT REPORTER: Thanks, everyone.
16　　　(The deposition concluded at
17　　　1:13 p.m., February 3, 2025.)
18
19
20
21
22
23
24
25

*Page 135*

1　　　I, BRENT S. HERRON, do hereby certify
2　that I have read the foregoing transcript and
3　that the same and accompanying amendment sheets,
4　if any, constitute a true and complete record
5　of my testimony.
6
7　　　_____
8　　　Signature of Deponent
9
10　　　( ) No amendments
11　　　( ) Amendments attached
12
13　　　Subscribed and sworn to before me th
14　___ day of _____, 2025.
15
16　　　My commission expires _____
17　　　Seal:
18
19
20
21
22
23　TLH
24
25

*Page 136*

1　STATE OF COLORADO)
2　　　　　)ss.　REPORTER'S CERTIFICATE
3　COUNTY OF DENVER )
4　　　I, Tracy L. Harris, do hereby certify that I
5　am a Certified Realtime Reporter, Registered Merit
6　Reporter, within the State of Colorado; that
7　previous to the commencement of the examination,
8　the deponent was duly sworn to testify to the
9　truth.
10　　　I further certify that this deposition
11　was taken in shorthand by me at the time and place
12　herein set forth, that it was thereafter reduced
13　to typewritten form, and that the foregoing
14　constitutes a true and correct transcript.
15　　　I further certify that I am not related to,
16　employed by, nor of counsel for any of the parties
17　or attorneys herein, nor otherwise interested in
18　the result of the within action.
19　　　In witness whereof, I have affixed my
20　signature this 17th day of February, 2025.
21
22
23　　　Tracy L. Harris, CRR, RMR, RPR
24
25

**EXHIBIT J**

**Page 137**

```
 1   MEADORS COURT REPORTING
     4025 Automation Way, Suite D2
 2   Fort Collins, Colorado  80525

 3   February 17, 2025

 4   ATLAS LAW FIRM P.C
     Edward Levy, Esq.
 5   501 South Cherry Street, Suite 1100
     Denver, Colorado  80246

 6
     Re:  Deposition of BRENT S. HERRON
 7        MidCountry Bank vs. Freeport Elk River
          Case No. 2024-CV-31629

 8
     The aforementioned deposition is ready for
 9   reading and signing.  Please attend to this
     matter by following BOTH of the items indicated
10   below:

11   _____ Call 970-482-1506 and arrange with us
            to read and sign the deposition in our
12          office

13   _XXX_ Have the deponent read your copy and sign
           the signature page and amendment sheets, if
14         applicable; the signature page is attached

15   _____ Read the enclosed copy of the deposition
            and sign the signature page and amendment
16          sheets, if applicable; the signature page
            is attached

17
     _XXX_ WITHIN 35 DAYS OF THE DATE OF THIS LETTER
18
     _____ By _____ due to a trial date of _____
19
     Please be sure the original signature page and
20   amendment sheets, if any, are SIGNED BEFORE A
     NOTARY PUBLIC and returned to Meadors Reporting
21   for filing with the original deposition.  A copy
     of these changes should also be forwarded to
22   counsel  of record.  Thank you.
23   MEADORS COURT REPORTING
24   cc:  All Counsel
25
```

**Page 138**

```
 1   MEADORS COURT REPORTING
     4025 Automation Way, Suite D2
 2   Fort Collins, Colorado  80525

 3

 4

                      BRENT S. HERRON
 5                    February 3, 2025
        MidCountry Bank vs. Freeport Elk River, et al.
 6         Case No. 2024-CV-31629

 7
     The original deposition was filed with

 8
     Richard D. Beller, Esq., on

 9
     approximately the 17th day of February, 2025.

10
     _____ Signature waived

11
     _____ Signature not requested

12
     _____ Unsigned; signed signature page and
13          amendment sheets, if any, to be filed at
            trial

14
     _XXX_ Unsigned; original amendment sheets and/or
15         signature pages should be forwarded to
           Meadors Court Reporting to be filed in the
16         envelope attached to the sealed original.

17
18   Thank you.
19   MEADORS COURT REPORTING
20
     cc:  All Counsel
21
22
23
24
25
```

**Page 139**

```
              Deposition of BRENT S. HERRON

                    February 3, 2025

     MidCountry Bank vs. Freeport Elk River, et al.

                Case No. 2024-CV-31629

The deponent wishes to make the following changes

        in the testimony as originally given:

Page  Line         Should Read          Reason

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,

20___.

(Seal)      Notary's signature _____

            My Commission expires _____
```

**EXHIBIT J**

# *MidCountry Bank*

## *v.*

# *Freeport Elk River LLC*

---

Michelle Herron

April 23, 2025

---



MEADORS COURT
REPORTING

4025 Automation Way, Suite D-2
Fort Collins, CO 80525
970-482-1506

**EXHIBIT K**

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page121 of 134
Case:25-14392-KHT   Doc#:41-4   Filed:08/19/25   Entered:08/19/25 12:41:03   Page20 of 32

*Meador's Court Reporting*

---

Page 1

ADAMS COUNTY, COLORADO, DISTRICT COURT

Case No. 2024CV31629

_____

DEPOSITION OF: MICHELLE HERRON - 4/23/2025

_____

PLAINTIFF: MIDCOUNTRY BANK,

v.

DEFENDANTS: FREEPORT ELK RIVER LLC, BRENT

HERRON, and MICHELLE HERRON.

_____

        PURSUANT TO NOTICE, the deposition of MICHELLE

HERRON was taken on behalf of the Plaintiff at 125 South

Howes Street, 3rd Floor, Fort Collins, Colorado 80521,

on April 23, 2025, at 10:08 a.m. before Karen Waters,

Registered Professional Reporter.

---

Page 2

```
 1              A P P E A R A N C E S
 2   For the Plaintiff:
 3       MR. RICHARD D. BELLER, ESQ.
         RINGENBERG & BELLER, P.C.
 4       125 South Howes Street
         3rd Floor
 5       Fort Collins, Colorado  80521
         Phone:  970-482-1056
 6       Email:  Rbd@rb-legal.com
 7
     For the Defendants:
 8
         MR. ANDREW BRITT
 9       BRITT LAW LLC
         11990 Grant Street
10       Suite 550
         Northglenn, Colorado  80233
11       Phone:  720-336-0262
         Email:  Abritt@brittlaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1              I N D E X
 2
     EXAMINATION OF MICHELLE HERRON:            PAGE
 3   April 23, 2025
 4   BY MR. BELLER                          4, 133
 5   BY MR. BRITT                              119
 6
                                           INITIAL
 7   DEPOSITION EXHIBITS:                  REFERENCE
 8   Exhibit 11      Draft tax return           56
 9   Exhibit 12      Writ of continuing        112
                     garnishment
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1       WHEREUPON, the following proceedings were taken
 2   pursuant to the Colorado Rules of Civil Procedure.
 3           *    *    *    *    *    *
 4                MICHELLE HERRON,
 5   having been first duly sworn to state the whole truth,
 6   testified as follows:
 7           (Deponent's reply to oath:  Yes, I do.)
 8                EXAMINATION
 9   BY MR. BELLER:
10       Q.  Have you ever had your deposition taken
11   before?
12       A.  No.
13       Q.  Let's start off just with a couple warnings
14   that are common to pretty much every deposition.  And
15   you may have heard this already from your attorney, but
16   if I repeat something, that's okay.
17       A.  It's good.
18       Q.  The most important thing is, you are under
19   oath just as if you were in a court of law.  So it's
20   absolutely critical that you tell the truth because your
21   testimony has the same force and effect and the perjury
22   as it would in the court of law.
23       A.  Okay.
24       Q.  And the second thing that's really important
25   is, we have a court reporter who is trying to transcribe
```

**EXHIBIT K**

Case:25-14392-KHT   Doc#:44   Filed:08/19/25   Entered:08/20/25 10:34:47   Page122 of 134
Case:25-14392-KHT   Doc#:41-4   Filed:08/19/25   Entered:08/19/25 12:41:03   Page21 of 32

*Meador's Court Reporting*

**Page 13**

1  the approximate balance of your Chase Bank?

2      A.   Very low.  Like maybe $7 in there.

3      Q.   U.S. Bank?

4      A.   U.S. Bank, there's probably $700 in there

5  right now.

6      Q.   And I see there's a savings account right now.

7  Is that a savings or in checking?

8      A.   I believe that's in checking.  And I believe

9  there's $0 in savings.

10     Q.   You also mentioned Airbnb.  What is that

11  Airbnb revenue?

12     A.   Yes.  So the Airbnb is the Granby property.

13  And that, I know I get only 12 percent of the proceeds

14  that are generated from rentals.  That fluctuates based

15  on season, so there's not really a -- if I could give

16  you an average, maybe it's $200 every month is what I'm

17  bringing in from the revenue on the Airbnb is my guess

18  and estimate.

19     Q.   Is it better in the winter or better in the

20  summer?

21     A.   Summertime and wintertime.  Spring and fall,

22  it's very dead.

23     Q.   What kind of property is that?

24     A.   It's a cabin in the mountains, two-bed,

25  two-bath.

**Page 14**

1      Q.   You said you get 12 percent of the Airbnb

2  revenue?

3      A.   Roughly 12 to 13 percent, yeah.

4      Q.   And that's about $200 a month on average?

5      A.   Yes.

6      Q.   What's a good month?

7      A.   Maybe I will bring in $360.  So maybe, like,

8  doubling, closer to 400 on a good month.

9      Q.   Okay.  How much does it rent for?

10     A.   Anywhere from $200 a night to, like, $450 a

11  night on, like, holidays and busy weekends.

12     Q.   And are you involved at all in renting that

13  property?

14     A.   I currently do have -- I'm tied to the Airbnb

15  account and I will answer tenants every once in a while,

16  but mainly Brent is managing that.  But my name is, yes,

17  definitely still on there, and I get all the renter

18  emails.

19     Q.   What is the address of that Granby property?

20     A.   23 GCR 6121 Granby, Colorado.

21     Q.   What sources of regular income do you have?

22     A.   Sources of regular income?  Currently, I'm not

23  bringing in income.  Yeah, I don't pay myself through

24  Living Well Design right now.  I was taking owner draws

25  through 2024; but since then, those have stopped.  And

**Page 15**

1  then, yeah, it's the rent that I'm bringing in.  And

2  that's about it.

3      Q.   So the rent you are bringing in of $1,500 a

4  month for the basement?

5      A.   Yes.

6      Q.   And you said you have been taking

7  approximately, I think it was, 4,600?

8      A.   The way I came up with that is I kind of just

9  added up all the owner draws years, averaged it out,

10  divided it by 12, and that's the number I came up with.

11     Q.   How do you handle owner draws at Living Well?

12     A.   In the past it was to, you know, cover my

13  expenses.  I had pretty high expenses in May of last

14  year, so I took out a lot more.  But how do I handle

15  them?  I guess if you could be more specific with the

16  question.  Yeah, I was just taking out to cover the

17  expenses.

18     Q.   So basically, as you have a personal expense,

19  you took money out of Living Well to cover it?

20     A.   Correct, yes.

21     Q.   Okay.  So I guess what I was kind of asking --

22  well, what I was trying to ask about was, do you take

23  out a regular draw, like a monthly --

24     A.   It wasn't regular.  It wasn't consistent in a

25  sense.

**Page 16**

1      Q.   Okay.

2      A.   Yeah.

3      Q.   **In your interrogatory responses, I understood**

4  **that you took money in 2005 that you put back.**

5      A.   Correct.

6      Q.   **And how much money did you take out in 2025?**

7      A.   Yes.  And to give you context about that,

8  Brent had taken out $25,000 out of the Living Well

9  Design bank account, I think, on January 6th.  I

10  specifically remember $25,000 left the account.  I did

11  not authorize that.  I didn't know why he was taking the

12  money out.  And I got scared that he was going to

13  continue to take the money out, so I withdrew the rest

14  of the money so that he wouldn't continue to take money

15  out of the business.  So I held that money in my account

16  to protect it from him.  And then when I realized I

17  broke the charge order by doing that, I did deposit

18  everything back.  I wrote a personal check to the

19  business and deposited it back that way.  And I also

20  think at the same time, my accountant had put me on

21  payroll.  He didn't know I didn't want to be on payroll,

22  and I had gotten a couple paychecks that way.  And I

23  also deposited all that that was put in my account from

24  payroll.  I think it was only two weeks that that

25  happened, and all that money went back into the business

**Page 17**

1  as well.
2  Q.  Let me break that down a little bit.
3  A.  Sure.
4  Q.  So you said Brent took $25,000 out on
5  January 6th if I got that right?
6  A.  Yes.
7  Q.  And then you took the rest out because you
8  were worried that the funds were disappearing?
9  A.  Yes.
10  Q.  Did you put them into the U.S. Bank account?
11  A.  Yes.
12  Q.  And how much money was that?
13  A.  If I'm remembering correctly, it was around
14  $6,000, or it might have been $9,000.  I'm trying to
15  remember.  Between 6- and $9,000 is what I took out and
16  put back into the company.
17  Q.  And then there was an additional amount that
18  was payroll as I understood it.
19  A.  Correct.  I was on payroll for two to
20  three weeks in, like, February to March.  And maybe it
21  was, like, $400 a week that ran payroll.  So I added
22  that all up and included that in the check that went
23  back into the business.
24  Q.  And that check that went back to the business,
25  where was that from?

**Page 18**

1  A.  My U.S. Bank personal check.
2  Q.  And that was in February?
3  A.  I believe so.  I would have to check when that
4  check was deposited; but, yes, I believe that was
5  February.  It may have been early March.
6  Q.  And I also understood from a pleading that I
7  saw in the divorce case that Mr. Herron took besides the
8  $25,000 another amount out of Living Well.
9  A.  It was close to, like, $4,000 or $5,000.  So
10  total I think he has withdrawn $4,000 that I'm not sure
11  where that went.
12  Q.  Did Mr. Herron ever explain why he did that?
13  A.  He explained that he took the money out of my
14  business account to help pay for joint legal expenses.
15  Q.  Do you have joint legal expenses?
16  A.  We do have -- we have retained a lawyer in
17  Minnesota.  His name is Drew Bardwell.  We do have both
18  an interest in that situation.
19  Q.  Is that lawyer on retainer?
20  A.  Yes.
21  Q.  Do you know how big the retainer is?
22  A.  It was $25,000 for the initial retainer, and I
23  believe we owe another $10,000.  And I'm not sure if
24  that's been paid by Brent or not.
25  Q.  And do you know the nature of the litigation

**Page 19**

1  in Minnesota?
2  A.  Yes.  So that case, how do I explain it?  That
3  case Andrew Bardwell is kind of questioning -- her name
4  is Ashley Kemplin-Gamm.  But this is the lawyer that
5  represented us and represented Matthew Onofrio on the
6  business deal where we purchased Freeport Elk River, the
7  property from MidCountry Bank.
8  Q.  Okay.  Is there some kind of a malpractice
9  action pending?
10  A.  Yes.
11  Q.  Do you know if that action is actually
12  pending, or is just in the works?
13  A.  It's definitely in the works.  And it's
14  definitely -- we are getting evidence, I think, to
15  present at some point.  She was just deposed on
16  April 17th, I think.  So we have her deposition, and I
17  think the lawyers are kind of going over that right now.
18  Q.  Okay.  So you have an attorney-client
19  privilege with that attorney.  I'm not trying to invade
20  that, but I'm just trying to understand kind of basics.
21  A.  Sure.
22  Q.  At least the way I think of it generally, to
23  take a deposition, you have to have a pending court
24  case.  You don't take a deposition generally without
25  having a pending court case.  Is a there a pending court

**Page 20**

1  case that you took that deposition in; do you know?
2  A.  I am not sure how or where that case is.  I
3  don't know.
4  Q.  Okay.  I know generally that there's
5  underlying litigation that resulted in a judgment
6  against Freeport and Mr. Herron.
7  A.  Yes.
8  Q.  And that was in Minnesota.  And that judgment
9  is what we are talking about today; that's why we are
10  talking today.
11  A.  Yes.
12  Q.  But I'm just wondering if that deposition was
13  part of that case or if it was part of another case.  Do
14  you know?
15  A.  It's part of a different case.
16  Q.  Do you know who the parties are to that case?
17  A.  Other than Ashley being named in that case,
18  I'm not sure who else is named in the case.  I would
19  have to look at everything.
20  Q.  But in any event, you are represented by
21  Mr. Bardwell?
22  A.  Andrew Bardwell, yes.
23  Q.  And are you parties to the case, you and
24  Mr. Herron?
25  A.  I believe so, yes, both Brent and I.

**EXHIBIT K**

**Page 113**

1    November.

2         What I'm wondering is, have you seen this writ

3    of garnishment?  It's something that would have been

4    served on you by our process server.

5         A.   I believe I have received this.

6         Q.   Did you respond to that?

7         A.   No, I did not.

8         Q.   So the garnishment was issued and served -- I

9    believe it was served on you roughly in that time frame,

10   November of 2024.  So it sounds like you basically

11   ignored it; is that fair?

12        A.   At the time Brent and I -- did I ignore it?  I

13   guess individually, yes, because Brent said he would

14   handle it.  It's obviously clear that I should have

15   handled it myself.  So, yes, I had bad advice from

16   Brent.

17        Q.   So it sounds like after the date of this writ

18   of continuing garnishment was served on you that you

19   continued to take funds from Living Well Design; is that

20   fair?

21        A.   There was an incident where I did take money

22   out after it was served, yes.

23        Q.   But even in December 2024, you took funds,

24   correct?

25        A.   I would have to go back and look to see if I

**Page 114**

1    took funds.  So I would have to look to confirm that I

2    did take funds in December.  I'm not sure if I did or

3    not.

4         Q.   What records do you generate when you take a

5    draw or a distribution from Living Well Design

6    specifically?

7         A.   I can tell when I took a draw just through the

8    Novo Bank account transition activity.

9         Q.   So it's a Novo Bank account, your bank account

10   with Living Well Design, correct?

11        A.   Yes.

12        Q.   So you have access to those records?

13        A.   Not all the time.  Brent is the primary

14   accountholder on Novo Bank.  So every time I go to

15   access Novo Bank, I have to request an access code.  He

16   then has to provide me an access code for me to be able

17   to view the bank account.  So I have been able to get in

18   there with access codes that he provides me, but it's

19   not on a consistent basis.  So I haven't been able to

20   have consistent access to that bank account.  When I am

21   able to get into that bank account, yes, I can see the

22   activity pretty easily.

23        Q.   Okay.  So what I understand just through my

24   own banking is you type in a username, then a password,

25   and then you've got the secondary authenticity

**Page 115**

1    authentication that texts a little code to your cell

2    phone.

3         A.   It goes to his phone.

4         Q.   So if he doesn't text you that code, you can't

5    get into the account?

6         A.   Exactly, yes.  And that's been a huge point of

7    contention since January.  And my divorce lawyer has

8    been working to get me full access so that that ends,

9    but I don't know why we haven't gotten there yet.

10        Q.   Because this Novo Bank account is in Living

11   Well's name?  Or is it in Brent's Herron's name?

12        A.   It's Living Well Design's bank account, but

13   Brent Herron is the primary account user.  I had

14   secondary access as a user, but he has deleted my access

15   multiple times out of, like, revenge, pretty much, like,

16   I'm taking you off the account, blah-blah-blah.

17             So once he does that, it doesn't allow you to

18   add that same user back in.  So that's kind of been a

19   big disconnect because I'm sitting there trying to talk

20   to someone from Novo, and it's been very hard to get

21   ahold of Novo to see, like, why can't I get added back

22   as a user.  And they were just like, well, unless we get

23   permission from the primary person.

24             So there's a lot of disconnect happening

25   with -- again, he is very controlling of every

**Page 116**

1    finance -- you know, any money, he wants full control

2    of, and he doesn't want me to have access to it.  So

3    it's been very difficult to get access to anything.

4         So with that said, like, my brain is so

5    jumbled, like, I don't know if I took a withdrawal in

6    December.  I don't know if I had access to take

7    withdrawals in December.  When I did have access, I was

8    taking withdrawals.

9         Q.   Okay.  So as a general matter, though, if you

10   are taking money from -- and this is just how you

11   generally do things -- if you are taking money from Novo

12   Bank, the bank transfers the funds to your U.S. Bank

13   account?

14        A.   Correct.

15        Q.   And so then you would have a record generated

16   from both U.S. Bank and Novo Bank?

17        A.   Yes.

18        Q.   Both, in theory, send monthly statements.

19        A.   So you are right.  I could go into U.S. Bank

20   account and see all the draws that I've taken.  Right

21   now I don't know if I took one in January or not because

22   they were so inconsistent.

23        Q.   And QuickBooks, I would assume, also would

24   have a record of that if you are taking withdrawals?

25        A.   I don't know if QuickBooks would have a record

**EXHIBIT K**

*Meadors Court Reporting*

```
 1              REPORTER'S CERTIFICATE

 2   STATE OF COLORADO        )

                              )  Ss.

 3   COUNTY OF LARIMER        )

 4          I, KAREN WATERS, Registered Professional

 5   Reporter, do hereby certify that previous to the

 6   commencement of the examination, the said MICHELLE

 7   HERRON was duly sworn or affirmed by me to testify to

 8   the truth in relation to the matters in controversy

 9   between the parties hereto; that the said deposition was

10   taken in machine shorthand by me at the time and place

11   aforesaid and was thereafter reduced to typewritten

12   form; that the foregoing is a true transcript of the

13   questions asked, testimony given, and proceedings had.

14       I further certify that I am not employed by,

15   related to, nor of counsel for any of the parties

16   herein, nor otherwise interested in the outcome of this

17   litigation.

18          IN WITNESS WHEREOF, I have affixed my

19   signature this 9th day of May, 2025.

20   _____  Reading and Signing was requested.

21   _XXX_   Reading and Signing was waived.

22   _____  Reading and Signing is not required.

23

24          Karen Waters

            Registered Professional Reporter

25
```

```
 1   MEADORS COURT REPORTING

 2   4025 Automation Way, Suite D2

     Fort Collins, CO 80525

 3

 4

 5

                   MICHELLE HERRON

 6               April 23, 2025

         MidCountry Bank v. Freeport Elk River LLC

 7              Case No. 2024CV31629

 8

 9   The original deposition was filed with

10   Richard D. Beller, Esq., on approximately the

11   9th day of May, 2025.

12   _XXX_  Signature waived.

13   _____  Signature not requested.

14   _____  Unsigned; signed signature page and

             amendment sheets, if any, to be filed at

15           trial.

16   _____  Unsigned; original amendment sheets and/or

             signature pages should be forwarded to Meadors

17           Court Reporting to be filed in the envelope

             attached to the sealed original.

18

19

20   Thank you.

21   MEADORS COURT REPORTING

22   cc:  All Counsel

23

24

25
```

| | |
|---|---|
| DISTRICT COURT, ADAMS COUNTY, STATE OF COLORADO<br>1100 Judicial Center Dr.<br>Brighton, Colorado 80601 | |
| Plaintiff<br><br>MIDCOUNTRY BANK<br><br>v.<br><br>Defendants:<br>Freeport Elk River, LLC<br>Brent Herron , an individual<br>Michelle Herron, an individual | ▲ COURT USE ONLY ▲ |
| Attorney:<br>Edward Levy, #36090<br>Edward Levy, P.C.<br>One Cherry Center, Suite 1100<br>501 South Cherry Street<br>Denver, Colorado 80246<br>Phone: (303)-481-6352<br>E-mail: elevy@edwardlevylaw.com | Case No: 2024CV031629<br><br><br><br><br><br>Division: C |
| **BRENT HERRON'S ANSWERS TO JUDGMENT DEBTOR INTERROGATORIES TO DEFENDANT BRENT HERRON** | |

Mr. Brent Herron ("Mr. Herron" or "Judgment Debtor"), through counsel Edward Levy of Edward Levy, P.C., hereby submits his Answers to Judgment Debtor Interrogatories to Defendant Brent Herron ("Interrogatories") served by MidCountry Bank ("MidCountry" or the "Judgment Creditor").

## I.      General and Continuing Objections

1. Mr. Herron objects to MidCounty's Interrogatories to the extent that they seek legal conclusions rather than factual information.

2. Mr. Herron objects to Judgment Creditor's Interrogatories to the extent they seek information protected by any privilege, including the attorney/client privilege, the spousal privilege, and the work product doctrine.

**EXHIBIT L**

Doc ID: 6cf3bae2d828acae94e445df840de467e9e5786c

3. Judgment Debtors object to Judgment Creditors' Interrogatories to the extent they seek the identification or production of confidential information, trade secrets, or proprietary documents.

4. Mr. Herron objects to Judgment Creditor's Interrogatories to the extent they are overly broad or unduly burdensome.

5. Mr. Herron objects to these Interrogatories to the extent Judgment Creditor already knows the information requested, and/or have possession of Judgment Debtor's documents and records that contain the information requested.

6. Mr. Herron, in making these responses, does not in any way waive or intend to waive: (a) objections relating to competency, relevancy, materiality, privilege, or admissibility; or (b) the right to revise, correct, supplement, or clarify any response.

7. Mr. Herron objects to these interrogatories in that they are excessive and burdensome in number, well in excess of the interrogatories that might reasonably be allowed in discovery and intended to oppress and burden him.

Subject to these General and Continuing Objections, Judgment Debtor responds to Judgment Creditor's Interrogatories as follows:

## II.    ANSWERS TO INTERROGATORIES

INTERROGATORY NO. 1

Brent Sanders Herron

INTERROGATORY NO. 2

2153 South Dayton Street, Denver, Colorado 80231

INTERROGATORY NO. 3

Yes. Michelle Herron

INTERROGATORY NO. 4

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined term and seeks irrelevant names of minors.

Judgment Debtor has two minor children.

INTERROGATORY NO. 5

4605

INTERROGATORY NO. 6

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms.

**EXHIBIT L**

Doc ID: 6cf3bae2d828acae94e445df840de467e9e5786c

Mr. Herron does not have any of the categorized listed living with him.

INTERROGATORY NO. 7

Not applicable

INTERROGATORY NO. 8

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms.

Doctor

INTERROGATORY NO. 9

Self-employed

INTERROGATORY NO. 10

Variable

INTERROGATORY NO. 11

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms.

INTERROGATORY NO. 12

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms.

Not applicable

INTERROGATORY NO. 13

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms.

Not applicable

INTERROGATORY NO. 14

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms.

Self-employed

INTERROGATORY NO. 15

Self employed

INTERROGATORY NO. 16

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

**EXHIBIT L**

Doc ID: 6cf3bae2d828acae94e445df840de467e9e5786c

No

INTERROGATORY NO. 17

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

No

INTERROGATORY NO. 18

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

No

INTERROGATORY NO. 19

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

Named beneficiary of life insurance policy.

INTERROGATORY NO. 20

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

No

INTERROGATORY NO. 21

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information already available to the judgment creditor.

INTERROGATORY NO. 22

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is a document production demand.

INTERROGATORY NO. 23

Mr. Herron reiterates and restates the general and continuing objections above, objects to this interrogatory which has an undefined terms and to the extent that it seeks information which is protected by spousal privilege and/or already available to the judgment creditor.

INTERROGATORY NO. 24

Mr. Herron reiterates and restates the general and continuing objections above.

Mr. Herron may have unliquidated claims against various persons and entities.

**EXHIBIT L**

Doc ID: 6cf3bae2d828acae94e445df840de467e9e5786c

INTERROGATORY NO. 25

No.

INTERROGATORY NO. 26

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory which has an undefined terms and to the extent that it seeks irrelevant information and information already in the possession of the judgment creditor.

INTERROGATORY NO. 27

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

INTERROGATORY NO. 28

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague, seeks information which is protected by spousal privilege, or seeks information already known to the judgment creditor.

INTERROGATORY NO. 29

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague, seeks information which is protected by spousal privilege, or seeks information already known to the judgment creditor.

INTERROGATORY NO. 30

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague.

No

INTERROGATORY NO. 31

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague, seeks information which is protected by spousal privilege, or seeks information already known to the judgment creditor.

Yes. Mr. Herron has an interest in his home and other real estate.

INTERROGATORY NO. 32

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it seeks information which is protected by spousal privilege.

No.

INTERROGATORY NO. 33

Not applicable

Page 5 of 7

**EXHIBIT L**

INTERROGATORY NO. 34

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague or seeks information which is protected by spousal privilege.

No

INTERROGATORY NO. 35

No.

INTERROGATORY NO. 36

No.

INTERROGATORY NO. 37

No.

INTERROGATORY NO. 38

No.

INTERROGATORY NO. 39

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague or seeks information which is protected by spousal privilege.

INTERROGATORY NO. 40

No.

INTERROGATORY NO. 41

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague or seeks information which is protected by spousal privilege.

INTERROGATORY NO. 42

N/A

INTERROGATORY NO. 43

N/A

INTERROGATORY NO. 44

N/A

INTERROGATORY NO. 45

**EXHIBIT L**

Doc ID: 6cf3bae2d828acae94e445df840de467e9e5786c

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is a document production demand.

INTERROGATORY NO. 46

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is a document production demand.

INTERROGATORY NO. 47

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is duplicative and a document production demand.

INTERROGATORY NO. 48

N/A

INTERROGATORY NO. 49

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague, is a document production request or seeks information already available to the judgment creditor.

INTERROGATORY NO. 50

Mr. Herron reiterates and restates the general and continuing objections above and objects to this interrogatory to the extent that it is vague, is a document production request or seeks information already available to the judgment creditor.

## III.   VERIFICATION

The undersigned swears under oath that the forgoing answers to interrogatories are accurate and complete to the best of his knowledge as of 8th day of January, 2025.

_____     01 / 09 / 2025
Brent S. Herron

**EXHIBIT L**

Doc ID: 6cf3bae2d828acae94e445df840de467e9e5786c

**Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | 20250108 Herron Response Rogs.pdf |
| **File name** | 20250108%20Herron%20Response%20Rogs.pdf |
| **Document ID** | 6cf3bae2d828acae94e445df840de467e9e5786c |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

This document was requested from app.clio.com

## Document History

| | | |
|---|---|---|
| ↗ **SENT** | **01 / 08 / 2025** 16:22:13 UTC | Sent for signature to Brent Herron (brentherronco@gmail.com) from elevy@edwardlevylaw.com IP: 76.131.29.231 |
| 👁 **VIEWED** | **01 / 09 / 2025** 07:59:36 UTC | Viewed by Brent Herron (brentherronco@gmail.com) IP: 73.78.224.121 |
| ✒ **SIGNED** | **01 / 09 / 2025** 08:04:10 UTC | Signed by Brent Herron (brentherronco@gmail.com) IP: 73.78.224.121 |
| ✓ **COMPLETED** | **01 / 09 / 2025** 08:04:10 UTC | The document has been completed. |

Powered by **Dropbox** Sign

**EXHIBIT L**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Brent Sanders Herron | ) | Case No. 25-14392-KHT |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

---

### ORDER GRANTING MOTION FOR APPOINTMENT OF TRUSTEE

---

Pursuant to 11 U.S.C. § 1104 and Bankruptcy Rule 2007.1, MidCountry Bank ("Bank") has moved the Court for the appointment of a Chapter 11 Bankruptcy Trustee pursuant to 11 U.S.C. § 1104 and Bankruptcy Rule 2007.1 for cause, due to Debtor's fraud and dishonesty, and because such appointment is in the best interests of creditors.

IT IS HEREBY ORDERED:

1.  The Motion is granted and a chapter 11 trustee shall be appointed in this case in accordance with 11 U.S.C. § 1104(a);

2.  The United States Trustee is hereby authorized and directed to immediately appoint a chapter 11 trustee herein.

Dated: _____                    _____
                                          Bankruptcy Court Judge

1